# EXHIBIT "W"

1

SUPERIOR COURT OF CALIFORNIA

**FILED**

2

COUNTY OF MONTEREY

JUN 0 1 2007

3

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
_____DEPUTY

4    In re

)    Case No.: HC 4990

)                           S. GARSIDE

5        Fred L. Baker

)    ORDER

)

6                    On Habeas Corpus.

)

7        The background of the petition is as follows.

8        Petitioner is currently incarcerated at the Correctional Training Facility (CTF) in Soledad.

9        On September 24, 2004, the Board of Prison Terms (now Board of Parole Hearings)

10    hearing panel found Petitioner suitable for parole.

11        On November 30, 2004, the Decision Review Unit recommended that the September 24,

12    2004 hearing be disapproved and that a rehearing be conducted on the next available calendar.

13    The then-chief counsel of the Board, Terry Farmer, endorsed the Decision Review Unit's

14    recommendation.  On December 14, 2004, the en banc Board voted to disapprove the proposed

15    decision of September 24, 2004 to grant parole and to schedule a rehearing of the Petitioner's

16    subsequent parole consideration hearing on the next available calendar.

17        On January 27, 2005, Petitioner filed a petition for writ of habeas corpus, claiming that

18    the Board violated his due process rights when the Board ordered that his September 24, 2004

19    parole suitability hearing be reheard because the hearing could not be entirely transcribed.

20        On March 25, 2005, the court requested an informal response from the Attorney

21    General's Office (Respondent).  The court ordered that Petitioner may file a reply.

22        On July 28, 2005, Respondent filed an informal response.

23        On August 10, 2005, Petitioner filed a reply.

24        On August 23, 2005, the court issued an Order to Show Cause.

25

1    On October 4, 2005, a panel consisting of the same members who granted Petitioner

2  parole on September 24, 2004 conducted the rehearing.  Petitioner waived his appearance at the

3  rehearing, but his counsel was present.  Petitioner was denied parole for one year.

4    On October 7, 2005, Respondent filed a letter with the court, advising the court that

5  Petitioner's subsequent parole suitability hearing was held on October 4, 2005 and that the panel

6  denied Petitioner parole for one year.

7    On October 24, 2005, the court denied Respondent's request that the court modify its

8  Order to Show Cause.  The court ordered Respondent to file a return on or before November 25,

9  2005.  The court further ordered that Petitioner may file a denial on or before December 16,

10  2005.

11    On November 28, 2005, Respondent filed a return.  On December 23, 2005, Petitioner

12  filed a denial.

13    Subsequently, Petitioner filed a motion to amend the denial and a request for judicial

14  notice and Respondent filed an opposition and objection.

15    On March 8, 2006, Petitioner filed a response to Respondent's opposition to request for

16  judicial notice and a response to Respondent's objection.

17    On June 5, 2006, the court found that the petition contained pleading defects which must

18  be corrected.  The court granted Petitioner leave to amend or supplement his petition by

19  addressing facts and theories relevant to the Board's decision which were not expressly or

20  implicitly raised in the petition.

21    On July 10, 2006, Petitioner filed an amended/supplemental petition.

22    On August 5, 2006, Respondent filed a request for clarification and, if appropriate, the

23  issuance of an order to show cause.

24    On November 20, 2006, the court issued an order to show cause.

25

1    Petitioner's subsequent parole consideration hearing was scheduled for December 19,

2  2006, but it was postponed at Petitioner's request because of the instant petition.

3    Respondent was granted an extension of time to file a supplemental return by January 8,

4  2007. Subsequently, the court, on its own motion, granted Respondent an extension of time to

5  file a supplemental return within 30 days from January 5, 2007.

6    On February 1, 2007, the court denied Petitioner's "Motion to Grant Relief Requested in

7  Petition for Writ of Habeas Corpus."

8    On February 7, 2007, Respondent filed a return to the amended/supplemental petition.

9    Thereafter, Petitioner was granted an extension of time to file a supplemental denial on or

10  before March 30, 2007. On March 29, 2007, Petitioner filed a supplemental denial.

11    The court has reviewed all documents filed in this case.

12    The court finds that the Board did not lose jurisdiction to preside over Petitioner's

13  rehearing under the time limits of sections 2041, 2042, 2044 and 2451 of title 15 of the

14  California Code of Regulations and Penal Code section 3041(b). The Decision Review Unit

15  found that the September 24, 2004 hearing was not in accordance with the law because a

16  significant portion of the transcript was unable to be transcribed. In order to comply with the

17  law, the Decision Review Unit recommended that the September 24, 2004 decision be

18  disapproved and a rehearing be scheduled. (See Cal. Code Regs., tit. 15, §2042 [including that

19  *an error of law* is a basis for disapproving a decision].) On November 30, 2004, Daniel Moeller

20  signed the recommendation on behalf of the Decision Review Unit, and the then-chief counsel of

21  the Board, Terry Farmer, endorsed the Decision Review Unit's recommendation on the same

22  day. On December 14, 2004, the en banc Board considered the findings of the Decision Review

23  Unit and ordered that the panel decision be disapproved and a rehearing be scheduled. Thus, the

24  panel's September 24, 2004 decision did not become final on January 22, 2005. (Pen. Code,

25  §3041(b).) The sixty-day limit of section 2044 of the regulations does not apply to this case

3

1  because a hearing panel member did not request that the en banc Board consider this case.  (Cal.

2  Code Regs., tit. 15, §2044(a).)  The decision to hold a rehearing was the result of the normal

3  decision review process.  (Return, Exhibits 3-4.)  Section 2042 of the regulations does not

4  provide a time limit during which the Board must act.  Section 2451 of the regulations also does

5  not provide a time limit and is not relevant because it addresses rescission hearings.

6       The court notes that Petitioner is not responsible for his September 24, 2004 parole

7  suitability hearing being transcribed in part only.

8       Nevertheless, the court finds that Petitioner's 2004 parole suitability hearing record is

9  insufficient.  The hearing transcript is incomplete and *written documents* relating to the hearing

10 are insufficient.  It would be inappropriate to order the panel to recreate their decision

11 recommending parole based on the incomplete transcript, insufficient written documents and

12 their independent recollection.  The transcript of the 2004 hearing did not contain the statements

13 by the victim and the panel's findings and reasoning for granting Petitioner parole.  In addition,

14 Petitioner and/or his attorney, as well as the deputy district attorney, likely gave a closing

15 statement that was not included in the transcript.  The Board could not effectively fulfill the

16 statutory requirement that the hearing transcripts be made available to the public and be subject

17 to different levels of review with such an incomplete transcript.  Aside from the incomplete

18 transcript, the only existing written documents relating to Petitioner's 2004 parole suitability

19 hearing are BPT1001 (Life Prisoner Hearing Decision Face Sheet), The Board's Miscellaneous

20 Decision dated December 20, 2004, BPT 1000 (Life Prisoner Consideration Worksheet) and

21 BPT1005 (Life Prisoner: Parole Consideration Proposed Decision).  Respondent has shown that

22 it would be impossible to recreate the September 24, 2004 panel decision granting parole based

23 on the incomplete transcript and other *existing* documents (See Declarations of Debra Levorse

24 and Sandra Maciel).  Regardless of whatever consultation the Board may have had with the

25 commissioners, having the panel members recreate the decision granting parole based on the

4

1  incomplete transcript, other existing documents and their independent recollection would not

2  cure the fact that the entire transcript was not recorded as required by law.

3       The court notes that in another inmate (Inmate Freddy Fikes)'s case the panel's decision

4  was recreated based on the decision work sheet that was fortuitously retained and reflected the

5  panel's reasoning.  However, the instant case is distinguishable from Freddy Fikes' case. Fikes'

6  parole suitability hearing was held *in 1992*, the documents relating to Fikes' parole suitability

7  hearing do not reveal what part of Fikes' hearing was unable to be transcribed, and the errata

8  sheet was an available alternative because the *decision worksheet containing the decision and*

9  *reasoning for the decision was retained.*  In Petitioner's case, his parole suitability hearing took

10  place in 2004, no decision worksheet containing the decision and reasoning for the decision was

11  retained, and the significant portion of the hearing was unable to be transcribed.

12       Petitioner's due process rights were not violated when the Board ordered that his parole

13  suitability hearing be reheard.  The law requires that the entire hearing be recorded and

14  transcribed.  The victim, the district attorney, and the defendant must have an opportunity to

15  voice their opinions.  See Pen. Code, §§3043(b), 3042(a), 3041.5(a)(2).  The transcript must be

16  available to the public (Pen. Code, §3042(b)), and it must include the findings and reasons

17  supporting the decision (Pen. Code, §3042(c)).  The Board (Pen. Code, §3041(b)) and the

18  Governor (Pen. Code, 3041.1) must be able to competently review the panel's decision.  The

19  hearing transcript omitted any further questions by the deputy district attorney, the panel, or

20  Petitioner's counsel.  As also discussed above, the transcript did not contain the statements by

21  the victim and the panel's findings and reasoning for granting Petitioner parole.  During its

22  mandatory review, Daniel Moeller of the Decision Review Unit recommended that because the

23  transcript was incomplete, the Board should disapprove the September 24, 2004 decision

24  granting parole and schedule a rehearing.  Terry Farmer, the then-chief counsel of the Board,

25  endorsed the Decision Review Unit's recommendation.  A new hearing is appropriate if there

1  was an error of law or fact, or based on new information.  Cal. Code Regs., tit. 15, §2042.  If the

2  chief counsel recommends that a new hearing should be held, a new hearing will not be ordered

3  unless a majority of the Board sitting en banc votes to do so.  Pen. Code, §3041(b).  The Board

4  sitting en banc considered the *findings and recommendation* of the Decision Review Unit, and

5  voted to disapprove the September 24, 2004 proposed decision and schedule a rehearing.

6  Moreover, the panel's parole grant was a preliminary decision subject to review by the Board

7  and the Governor, and Petitioner did not have a due process liberty interest in a preliminary

8  decision.  The panel notified Petitioner on multiple documents that its decision was a proposed

9  decision, it was not final, and it would be reviewed.

10      The tentative decision granting parole was reviewed and *a rehearing was held*.  Upon

11  further review, the same panel concluded that public safety concerns required finding Petitioner

12  unsuitable for parole.

13      In light of the foregoing, the petition is denied.

14      IT IS SO ORDERED.

15  Dated: 6-1-07

16

17  _____

    Hon. Jonathan R. Price
18  Judge of the Superior Court

19

20

21

22

23

24

25

## CERTIFICATE OF MAILING

### C.C.P. SEC. 1013a

I do hereby certify that I am not a party to the within stated cause and that on

__JUN 0 1 2007__    I deposited true and correct copies of the following document:

ORDER in sealed envelopes with postage thereon fully prepaid, in the mail at Salinas,

California, directed to each of the following named persons at their respective addresses

as hereinafter set forth:

Michael Herro, Attorney at Law
111 West Alisal St
Salinas, CA 93901

Denise A. Yates, DAG
Office of the Attorney General
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102-7004

Dated: __JUN 0 1 2007__

LISA M. GALDOS,
Clerk of the Court

By: _____
Deputy

S. GARSIDE

# EXHIBIT "X"

SUBSEQUENT PAROLE CONSIDERATION HEARING

COURT-ORDERED REHEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

```
In the matter of the Life )
Term Parole Consideration )
Hearing of:                )        CDC Number C-22918
                           )
FRED BAKER                 )
                           )
_____ )
```

**COPY**

**INMATE**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 4, 2005

PANEL PRESENT:

Ms. Susan Fisher, Presiding Commissioner
Mr. Rolando Mejia, Deputy Commissioner

OTHERS PRESENT:

Ms. Linda Dunn, Deputy District Attorney
Mr. Val Dixon, victim
Ms. (indiscernible) Dixon, victim family member
Ms. Sara (phonetic) Balli, victim support member
Ms. Marion Tardiff, attorney for Inmate

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

Patricia Chapin, Peters Shorthand Reporting

ii

## INDEX

|                                    | PAGE |
|------------------------------------|------|
| Proceedings                        | 1    |
| Case Factors                       | 7    |
| Pre-Commitment Factors             | 8    |
| Parole Plans                       | 9    |
| Post-Commitment Factors            | 10   |
| Closing Statements                 | 15   |
| Recess                             | 30   |
| Decision                           | 31   |
| Adjournment                        | 33   |
| Transcriber Certification          | 34   |

--oOo--

1

1                    P R O C E E D I N G S

2          PRESIDING COMMISSIONER FISHER:  This is a

3    court-ordered hearing for Fred Baker, CDC No. C-22918.

4    This is 10/04/05, and we're located at the

5    Correctional Training Facility at Soledad.  The inmate

6    was received on 11/6/80 from Riverside County.  The

7    life term began on 7/31/87, and the minimum eligible

8    parole date is 7/31/94.  The controlling offense for

9    which the inmate has been committed is kidnap for

10   robbery, Case No. CR-17643, Count Six, and that's

11   Penal Code Section 209.  There was an additional

12   finding in that count of the use of a firearm.  That's

13   Penal Code Section 12022.5.  Also there was Count One,

14   Penal Code Section 211 robbery.  Also with the use of

15   a firearm.  And Count Eight, that is Penal Code

16   Section 217 (indiscernible) with intent to commit

17   murder also with a finding of great bodily injury, and

18   that's Penal Code Section 12022.7.  The inmate

19   received a term of seven years to life.  Once again,

20   the minimum eligible parole date is 7/31/94.  As I

21   stated earlier, this is a court-ordered hearing.

22          ATTORNEY TARDIFF:  Rehearing.

23          PRESIDING COMMISSIONER FISHER:  Rehearing.

24   Thank you.  The court order is dated August 23, 2005,

25   signed by the Honorable Lila O. Anderson.  I'm just

26   going to read the last paragraph because that's the

27   instruction to the panel.  And it states, "Accordingly

2

```
1   respondent was ordered to show cause why petitioner
2   should not be" -- oh wait a minute.  I'm sorry.  I
3   have to start a little higher here.  It's actually on
4   line two of the prior paragraph.  "In the present
5   case, it would appear the most equitable solution
6   would be to reschedule the hearing before the same
7   group (indiscernible) with instructions to adopt the
8   existing transcript from the former hearing and
9   recreate their decision to recommend parole based on
10  that transcript and their independent recollection.
11  The court (indiscernible) was ordered to show cause
12  why petitioner should not be granted relief on his
13  petition.  Specifically, the respondent is ordered to
14  show cause (indiscernible) the rescheduled hearing
15  should not be heard by the same board members with
16  instructions to issue a decision on it recommending
17  parole.  The alternate public defender's office is
18  appointed to represent petitioner."  All right.  I'm
19  not going to go on with the rest of it.  This is your
20  copy, Ms. Tardiff.  All right.  Now, regarding
21  Mr. Baker's appearance -- he's waiving his appearance
22  today; is that correct?
23          ATTORNEY TARDIFF:  Yes, that is.
24          PRESIDING COMMISSIONER FISHER:  Okay.  And he
25  hasn't -- did he sign a waiver or did he just verbally
26  --
27          ATTORNEY TARDIFF:  He verbally.  I can get a
```

3

1    signed one later.

2        PRESIDING COMMISSIONER FISHER:  All right.  He

3    indicated to his attorney that he did not wish to

4    appear.  I'm going to go ahead and have everyone state

5    their name for the record, starting with myself.  I'm

6    going to go to the right.  Susan Fisher, F-I-S-H-E-R,

7    Commissioner.

8        DEPUTY COMMISSIONER MEJIA:  Rolando Mejia,

9    M-E-J-I-A, Deputy Commissioner.

10        DEPUTY DISTRICT ATTORNEY DUNN:  Linda Dunn

11    (phonetic), Riverside County District Attorney's

12    Office.

13        MR. DIXON:  Val Dixon (phonetic), victim.

14        DEPUTY COMMISSIONER MEJIA:  Spell your last

15    name, please.

16        PRESIDING COMMISSIONER FISHER:  Spell your last

17    name for us.

18        MR. DIXON:  Oh, Dixon, D-I-X-O-N.

19        PRESIDING COMMISSIONER FISHER:  Thank you.  And

20    ladies, go ahead.  You're on the tape.  Spell your

21    last name, please.

22        INDISCERNIBLE ATTENDANT :  D-I-X-O-N.

23        PRESIDING COMMISSIONER FISHER:  Thank you.

24    It's for the transcriber.  Go ahead.

25        MS. BALLI:  Sara Balli (phonetic), B-A-L-L-I,

26    victim (indiscernible).

27        PRESIDING COMMISSIONER FISHER:  Thank you.

1       ATTORNEY TARDIFF:  Marion Tardiff, T-A-R-D-I-

2    double F, attorney for inmate Fred Baker, B-A-K-E-R,

3    CDC C Charlie 22918 who's waiving his appearance since

4    this is a rehearing.

5       PRESIDING COMMISSIONER FISHER:  Okay.  Now,

6    regarding the Americans With Disabilities Act.  Are

7    you aware of any issues that we need to accommodate?

8       ATTORNEY TARDIFF:  I am not.

9       PRESIDING COMMISSIONER FISHER:  Okay.  I do

10   want to note for the record that on 4/7/05, Mr. Baker

11   signed the BPT 1073 form and stated that he has no

12   disabilities.  All right.  Counselor, I think that

13   what I will do, if you have no objections, is to

14   incorporate by reference the summary of the crime from

15   the prior transcript.

16      ATTORNEY TARDIFF:  But I have objections I want

17   to raise before we --

18      PRESIDING COMMISSIONER FISHER:  Oh, I'm sorry.

19   And I neglected to ask for those.  I'm leaping ahead

20   here.  Go ahead.  First of all, is there anything that

21   needs to be submitted?

22      ATTORNEY TARDIFF:  No.

23      PRESIDING COMMISSIONER FISHER:  All right.  Go

24   ahead with your objections.

25      ATTORNEY TARDIFF:  I'm objecting to this

26   hearing taking place since there is a current rated

27   process which basically alleges that the Board no

5

1    longer has jurisdiction over this matter to based on

2    3041(b) which states that, quote, "a decision of the

3    Parole Board finding an inmate suitable for parole

4    shall become final within 120 days of the date of the

5    hearing." And that would have been September 24, '04.

6    "During that period, the Board may review the panel's

7    decision. The panel's decision shall become final

8    unless the Board finds that the panel made an error of

9    law. When the panel's decision was based on an error

10   of fact or that new information should be presented to

11   the Board, any of which would correct or, considered

12   by the Board, has a substantial likelihood of

13   resulting in a substantially different decision upon a

14   rehearing. In making this decision, the Board shall

15   consult with the commissioners who conducted the

16   parole consideration hearing." Therefore since the

17   120 days has obviously gone -- since come and gone,

18   since it's over a year, the Board has lost

19   jurisdiction of this matter. Also I do not believe

20   that the Board consulted with the commissioners who

21   conducted this parole hearing on September 24, '04 as

22   according to this statute. Also, that this decision,

23   while it is a rehearing -- the Board is ordered to

24   find Mr. Baker suitable again. Mr. Baker again is

25   alleging that regardless of that, and he appreciates

26   that fact, the fact of the matter is the Board no

27   longer has even any power over the suitability of

1    unsuitability of Mr. Baker.  And further, the order of

2    rehearing finding for the finding of suitability

3    simply is in Danenburg (phonetic), the court said that

4    that's a decision -- it states here, I'll read it for

5    you.  "Respondents overturn and ordered rehearing the

6    granting panel's finding of suitability simply by

7    failing to record the decision portion of the hearing,

8    thus the high court rejected that."  So basically this

9    hearing should not even take place.  The only reason

10    it's taking place is the Board of Prison Terms stated

11    that they would not postpone it until the writ is gone

12    through the process and then finalized.  But if the

13    rehearing, I suppose if I weren't even here, that my

14    client could potentially receive a 115, therefore

15    jeopardizing -- if in fact, he needs to have a

16    rehearing -- jeopardize his suitability.  Simply the

17    Board has -- didn't do they're job in timely hearing

18    this matter, and he's not waiving his right to the --

19    right to prohibit the board for hearing this case, but

20    he's simply doing it because he's -- more or less it's

21    being forced upon him, therefore abolishing him of his

22    due process as well.

23            PRESIDING COMMISSIONER FISHER:  Thank you.  Is

24    that everything?

25            ATTORNEY TARDIFF:  That's it.

26            PRESIDING COMMISSIONER FISHER:  All right.  I'm

27    going to overrule your objection, and we're going to

1    in compliance with the court order, go forward with

2    the hearing.  Is there anything confidential to be

3    used today?

4          DEPUTY COMMISSIONER MEJIA:  None will be used

5    today.

6          PRESIDING COMMISSIONER FISHER:  All right.

7    Thank you.  All right.  Once again, I am specifically

8    incorporating the summary of the crime from the prior

9    transcript that starts on page 10, line 13.  It goes

10   to page 15, line 5.  It's my understanding that in

11   reading the court order, that we are to incorporate

12   essentially the entire transcript of the hearing that

13   we have available. So --

14         ATTORNEY TARDIFF:  And so, are you going to be

15   incorporating the rest of the hearing as well?

16         PRESIDING COMMISSIONER FISHER:  Let's -- I

17   believe that that's -- that's the verbiage used in the

18   court order, and so I'm -- my assumption is that we

19   will have -- we will do that.  I'll let the lawyers

20   decide what part -- what they need to do when it comes

21   to that.  We're going to go ahead and go forward.  Is

22   there anything regarding the summary of events that

23   you need to comment upon, Counsel before we --

24         ATTORNEY TARDIFF:  No, I believe it's in the

25   body of the existing transcript.

26         PRESIDING COMMISSIONER FISHER:  All right.  I'm

27   going to go on to Mr. Baker's history.  I'm just going

8

1   to be the Board report dated September 2002 under pre-

2   conviction --

3       ATTORNEY TARDIFF:  Okay.  I need -- is there

4   any reason why you're not incorporating that as well?

5   It's to adopt the existing transcript from the former

6   hearing and recreate their decision.  I think you're

7   just supposed to recreate your decision.

8       PRESIDING COMMISSIONER FISHER:  I think that

9   that's true.  I just think for the sake of -- I just

10  want to touch on some of these things as we go along

11  just for the sake of refreshing everyone's memory as

12  we move forward.  His pre-conviction factors are:  In

13  October 2002, in the Board report under juvenile

14  record, it says that he was arrested for burglary at

15  the age of 17 and sent to juvenile camp, and escaped

16  from camp and was committed to the Youth Authority.

17  Under adult convictions, it says he has no known prior

18  convictions as an adult.  His personal history, social

19  history, is as follows:  He -- it says here that he

20  was raised by his mother and his grandparents until he

21  was 15.  At 15, he went to live with his father.  At

22  the time of this report, which was in May of '03, he

23  had two brothers, both of whom he was still in

24  communication with.  He has been -- it's my

25  understanding, let me look back up here just to

26  clarify -- he completed the 11th grade prior to his

27  incarceration, and quit school in the 10th grade.  I'm

1   sorry, in the 12th grade.  Good grief, I'm going

2   backwards instead of forwards.  He quit school in the

3   12th grade.  He's been married twice.  First marriage,

4   he was -- was when he was 18.  And the second marriage

5   was in 2002.  At the time of this psych evaluation I'm

6   looking at, which was in '03 once again, he was still

7   married.  (Indiscernible) is something that we do want

8   to take a look at again.  It says -- in this

9   particular report, it says that he does not have a

10  significant substance abuse history; however, was

11  under the influence of marijuana and PCP at the time

12  of this commitment offense.  He stated that he used

13  marijuana only two times in his life, the second being

14  just prior to the commitment offense, and denied using

15  any substances after being incarcerated.  All right.

16  And I think that that, along with the prior

17  transcript, probably covers his social history.  Is

18  there anything, Counsel, that I've left out, or that

19  you need to address regarding that?

20          ATTORNEY TARDIFF:  No.

21          PRESIDING COMMISSIONER FISHER:  All right.

22  I'll take a look at parole plans.  Once again, I'm

23  looking at the most recent Board report.  It's dated

24  5/25/04, and it says, under future plans, that they

25  remain the same as the prior report.  It says that he

26  plans to parole to his wife, that's in Rancho

27  Cucamonga.  It says that his wife will help him

10

1    financially.  He has a second plan, which is for them

2    to reside in a piece of property owned by his aunt in

3    the Marino Valley, and a third plan, which is to --

4    for he and his wife to live with another aunt in

5    Fontana.  He says his last residence he offered this

6    time, if necessary, is for him and his wife to reside

7    with his uncle in Rio Linda.  Now, according to the

8    prior Board report --

9          ATTORNEY TARDIFF:  Which prior report is that?

10         PRESIDING COMMISSIONER FISHER:  October of

11   2002.  It refers us back regarding employment.  It

12   says he's received an employment offer from Mrs. Ethel

13   Martin (phonetic), who's an aunt, who's arranged

14   employment as a bookkeeper in the county for him.

15   Also he plans to upgrade his computer technology,

16   vocational skills by attending college in the evening

17   once funds are available.  Is there anything related

18   to parole plans that have changed?

19         ATTORNEY TARDIFF:  No.

20         PRESIDING COMMISSIONER FISHER:  All right.

21   Then at this --

22         ATTORNEY TARDIFF:  They're still valid.

23         PRESIDING COMMISSIONER FISHER:  All right.

24   Then at this time, I'm going to turn the hearing over

25   to Commissioner Mejia to go through the

26   post-conviction factors.

27         DEPUTY COMMISSIONER MEJIA:  (Indiscernible)

11

1   (indiscernible) His classification score is 19,

2   Medium-A (indiscernible) possible level.  His academic

3   history as a GED in 1989, and (indiscernible) went to

4   college in 2004/2005.  He has vocational information

5   technologies, and this is on his vocation course.

6   Self-help participation is up-to-date for AA

7   participation, June 30, 2005.  And there's numerous

8   self-help groups such as Open to Violence Project,

9   Impact, Breaking Barriers (indiscernible), Lifers

10  (indiscernible) with Dr. Fishback (phonetic).  There's

11  a laudatory chrono dated June 1st, 2005 for his good

12  work while assigned to the central clothing ward as an

13  assistant tailor written by the supervisor,

14  (indiscernible) supervisor.  NA (indiscernible) and AA

15  and (indiscernible). January 24, 2005, Pushing Basics

16  class.  He completed a twelve-week course with that.

17  Chaplain Medsey (phonetic).  And then I go to his

18  disciplinary history.  He has only two 115s, the last

19  being in 1989.  No 128(a)s.  No gang affiliation

20  noted.  And we're going to go to the psychiatric

21  report, dated April 29, 2005, by Dr. Steward, S as in

22  Sam -T as in Tom -E as in Edward -W-A-R-D as in David,

23  Clinical Psychologist at CTF.  Diagnostic impressions,

24  Axis One:  No contributory clinical disorder.  Axis

25  Two:  No contributory personality disorder.  Axis

26  Three:  No contributory physical disorder.  Axis Four:

27  Incarceration.  Axis Five: GAF of 90.  Total

12

```
 1   evaluation, there's no evidence for a known or thought
 2   disorder, and he denied any suicidal or homicidal
 3   ideation.  Inmate Baker's judgment is very good, and
 4   he has demonstrated excellent into himself and his
 5   commitment offense.  (Indiscernible) information from
 6   prior psychological reports (indiscernible) inmate
 7   Bakers discussion today for this interview.  He
 8   clearly stated, "I feel really bad about the crime of
 9   Mr. Dixon.  I ask myself did he have a child or a
10   wife, if he was married, and how would this affect his
11   family."  Inmate Baker stated further what was so
12   overwhelming that when my uncle was shot and paralyzed
13   from the neck down, sometimes I wake up in the night.
14   I understand how I have affected everyone.  That what
15   you do to others comes back to you.  The shot that
16   paralyzed his uncle gave him clear insight into how
17   Mr. Dixon's family felt.  Inmate Baker offered the
18   following information and affirmed that he
19   understanding of his actions.  Quote, "The Parole
20   Board asked me why I should be found suitable for
21   release.  I said no, because there's no way I can give
22   back what I took from Mr. Dixon.  I cannot tell you
23   that whether I am suitable for release.  That is up to
24   God.  There is no way I can give them back which I
25   have taken from Mr. Dixon."  Unquote.  Assessment of
26   dangerousness:  Inmate Baker has made exceptional
27   gains during his incarceration having taken full
```

1    advantage of self-help opportunities and educational

2    programs.  What is even more relevant in importance,

3    inmate Baker's intrinsic right to be (indiscernible)

4    mature, responsible, conscientious.  As anyone who is

5    familiar with the prison system can attest it is

6    (indiscernible) given the nature of the

7    (indiscernible) of this person; however, inmate Baker

8    does not have a violent history other than the

9    commitment offense as he has maintained excellent

10   self-control and good behavior toward his

11   incarceration.  If released into the community --

12   given all the factors mentioned, his estimated

13   potential for violence within a controlled setting is

14   significantly below average relative to the inmate

15   population.  (Indiscernible) two 115s also.  If

16   released to the community, inmate Baker's potential

17   for violence is estimated to be the same as that for

18   an average citizen.  In fact, one may make the case

19   given his ability to remain free of violence for his

20   incarceration which is an inherently no violence

21   setting than the community.  He may have a below

22   average probability of being involved in the violence

23   as compared to the average citizen.  The only apparent

24   risk factor for which Mr. Baker which could be a

25   precursor to violence would be a return to illicit

26   substance use; however, inmate Baker does not have a

27   significant substance abuse history, and has attended

14

1    AA and NA since 1991, a period of 15 years.  He has

2    also (indiscernible) a very mature attitude towards

3    understanding substance abuse as it occurred in his

4    family.  (Indiscernible) a very insightful

5    (indiscernible).  Counsel, do you want to make some

6    additions or comments?

7           ATTORNEY TARDIFF:  Not at this time.

8           DEPUTY COMMISSIONER MEJIA:  I'll return back to

9    the chair.

10           ATTORNEY TARDIFF:  I would just like to clarify

11    something.  Is the transcript that's being

12    incorporated into this hearing, does that consist of

13    an 84 page transcript from September 24, 2004?

14           PRESIDING COMMISSIONER FISHER:  If my

15    understanding of the court order is correct, that's

16    what they're instructing us to do.  What I have

17    specifically incorporated for the purposes of this

18    hearing is the summary of the offense, and I'll leave

19    it to our legal department.

20           ATTORNEY TARDIFF:  All right.  Well, I just --

21           PRESIDING COMMISSIONER FISHER:  What the court

22    is ordering.  It does - that's what it looks like to

23    me.

24           ATTORNEY TARDIFF:  84 pages of a transcript

25    from September of '04?

26           PRESIDING COMMISSIONER FISHER:  Yes.

27           DEPUTY DISTRICT ATTORNEY DUNN:  All right.  I

1    would like to know at what point the victim may give a

2    statement.  He's come a long way today.

3          PRESIDING COMMISSIONER FISHER:  He'll be the

4    last one.

5          DEPUTY DISTRICT ATTORNEY DUNN:  He's come a

6    long way today, and it's difficult for me to say

7    without repeating what's in the transcript.  So please

8    bear with me.

9          PRESIDING COMMISSIONER FISHER:  Okay.  And

10   he'll get the last word.

11         DEPUTY DISTRICT ATTORNEY DUNN:  I understand.

12   I understand that everybody has a copy of the

13   transcript, and I would like to have us make a

14   statement by pointing out what happened last year.

15   First of all, I'd like to refer everybody to page 49

16   of the transcript.  This inmate did not take

17   responsibility for his crime.  When he was questioned

18   by the Deputy Commissioner on page 49 beginning at

19   line 6, when the Deputy Commissioner asked him, how

20   did the victim get shot twice, the inmate, beginning

21   on page 49 line 8 said, by claiming he had the gun

22   pointing out, and I believe this.  I don't know, but I

23   believe he pulled the trigger thinking I pulled the

24   trigger, and that's how that happened because both

25   barrels were, like, right there.  Inmate, on line 12

26   of page 49.  That is not taking responsibility because

27   it's a direct contradiction to what is pointed out

1    clearly by the appellate court in their opinion, which

2    is based, of course, on the transcript of the trial,

3    beginning on page 4 at the bottom, and ending at the

4    top of page 5, where the appellate court pointed out

5    that the laboratory tests of gunshot residue indicated

6    that defendant Baker was the one who shot Dixon and

7    ballistic tests indicated that the bullet had been

8    fired from one of the guns taken at the hardware

9    burglary that evening.  In other words, as recently as

10   last September, the inmate was not taking

11   responsibility for one of the victims, that being

12   Mr. Dixon, by claiming that his co-defendant, who he

13   refers to as his crimee, was responsible for the

14   second shot.  That's a fundamental part of his crime,

15   if not the most important portion of his crime, and

16   still as recently as September 24th of '04, he was

17   untruthful about how this crime happened.  The

18   psychiatrist, in his report from April 29th, says that

19   Mr. Baker demonstrates excellent insight and has

20   remorse.  There cannot be excellent insight when one

21   is denying the fundamental occurrences of the crime.

22   Insight means full acceptance and responsibility for

23   everything that happened.  It does not mean that one

24   continues to misrepresent what really happened that

25   night as Mr. Baker has continued to do as recently as

26   last year.  He does that in other ways as well.  On

27   page 54 of the transcript, as Deputy District Attorney

1    Danville (phonetic), beginning on line 11, pointed out

2    the information that was referred to by the appellate

3    court regarding to the gunshot residue and regarding

4    that the bullets were fired from one of the guns, she

5    points that out, and at that point, all persons

6    present at the hearing, which I believe are all

7    parties here with the exception of myself, were given

8    a copy of the appellate report to read.  It is clear

9    that Mr. Dixon has not acknowledged that he fired the

10   shot --

11          PRESIDING COMMISSIONER FISHER:  Mr. Baker.

12          DEPUTY DISTRICT ATTORNEY DUNN:  Mr. Baker has

13   not acknowledged that he fired the shot, not once, but

14   twice.  Again, on page 60 of the transcript, there is

15   another issue he has not told the truth about.

16   Beginning on line 20 when questioned by Deputy

17   District Attorney Danville, inmate Baker is asked

18   through the Commissioner for what purpose did his

19   cousin go acquire the gun and the inmate responded,

20   beginning on line 22, that the cousin and the father

21   were going hunting and that they had gone hunting and

22   fishing.  That is not true.  According to what the

23   appellate court said on page 4 and 5 of their report,

24   the gun that was traced to a bullet in Mr. Dixon was

25   stolen from a hardware store.  So the inmate was only

26   lying about who fired the second shot, but he's lying

27   about where the guns came from.  That's fundamental to

18

1    this case, and it does not again demonstrate any

2    insight, let alone excellent insight, for him to

3    continue to lie about where the guns came from.  Again

4    on page 62 of the transcript, at line 22, beginning on

5    line 19 and continuing to line 23, Deputy District

6    Attorney Danville is asking inmate about where he got

7    the clothing and the make-up.  And then Mr. Baker,

8    beginning on page 62, line 24, says, "That was after

9    all that was done, after all that was done, and then I

10   believe my cousin's baby started crying, and she said

11   there was no milk, and we didn't have a way to get to

12   the store or nothing like that, and so that's when

13   this stuff about going out there and getting a car on

14   the road."  The inmate continued to claim that these

15   people went out to steal a car for the purpose of

16   buying milk for a baby.  That's not true.  That's a

17   misrepresentation of the facts, and so again, there's

18   no insight, and there's no acceptance of

19   responsibility.  When the plan was that these people

20   would all go out and commit a carjacking and a

21   robbery.  Nobody had to buy milk, so as recently as

22   September 24th of 2004, the inmate has continued to

23   misrepresent the truth.  Again, there's another

24   example.  Beginning on page 64 of this transcript,

25   Deputy District Attorney Danville, at line 8, asks the

26   inmate when they left the house, had he seen the other

27   guns yet, and the inmate responded, "Right when we

1  started leaving the house, that's when I seen them.

2  That's when I seen them." We know from all the facts

3  that that cannot be true. That the guns, in fact,

4  were in the hands of those people as they walked the

5  three to four miles to the point where they stole the

6  first car. He knew there were guns because those guns

7  were stolen in a hardware burglary the night before or

8  the same day. So the inmate had the guns. He didn't

9  just see them for the first time when they walked out

10 of the house. Now, again on page 69, Deputy District

11 Attorney Danville asked the inmate, "Does the inmate

12 recall Bernice (phonetic), referring to the

13 co-defendant, coming back out to the car where the

14 three men were waiting to tell them the condition of

15 the store, that she only saw a female, go ahead, go on

16 in." The inmate, beginning on page 69, line 11, says,

17 "That absolutely didn't happen. That didn't happen.

18 I don't remember nothing like that because the way

19 that went down when my cousin went in to get the milk,

20 while she was in the store, that's when the decision

21 was made to rob the store. So she didn't know nothing

22 about that." Well, the circumstances indicate that

23 that is not true, that the plan was made that day to

24 go out and commit a robbery. So that for the inmate

25 to say at recently at September 24th that they made a

26 decision out in the parking lot to rob flies in the

27 face of the circumstances, and again, there's no

1    demonstration of responsibility or insight when the

2    inmate is continuing to claim that they never decided

3    to rob until they were sitting out in the parking lot.

4    Now, on page 74 of the transcript, again beginning in

5    the middle of the page, Deputy District Attorney

6    Danville says, "Once they released the two women, who

7    fired the shot over their heads?"  Inmate Baker

8    replies, beginning online 17, "I believe that had to

9    be Steven.  It had to be.  It had to be Steven because

10   I was driving."  Now, when Mr. Baker says that --

11   indicates that he does not know who fired the shots.

12   However, he according to his own statement was sitting

13   next to the person who was firing the shots, so he

14   knew full well who it was that was firing the shots.

15   He saw him do it.  Now, there is another indication

16   that Mr. Baker again not taking responsibility, and

17   this goes back to the issue that I started with.  Look

18   at page 75 of the transcript from September 24th, '04,

19   beginning on line 19 in response to a question by the

20   Deputy District Attorney.  Inmate Baker says, "Like I

21   said earlier, I believe it was two guns.  Like I said,

22   I pulled the trigger once.  And I'm saying if they're

23   saying he got shot twice, the other gun had to be

24   there.  It had to be there.  There were three guns in

25   the car.  He got shot twice.  I pulled the trigger

26   once.  It had to be another gun."  That statement by

27   inmate Baker made as recently at September of last

21

1  year, again, indicates that he's not taking

2  responsibility for the second shot.  He knows who

3  fired those shots.  The ballistics tests indicated he

4  fired both shots.  He had the gunshot residue on his

5  hands.  How can a man have excellent insight when he's

6  still not taking responsibility?  Well, he doesn't,

7  and he's not.  The gun did not just go off.  On page

8  76 of the transcript when asked by Deputy District

9  Attorney Danville why his finger was on the trigger,

10  inmate Baker gives a long, rambling, and disjointed

11  statement that never answers the question.  He's

12  basically saying if this happened, it's true, but

13  yeah, my finger was on the trigger, I felt, because

14  that was a logical place for it to be at that time in

15  that state of mind.  That is not an acceptance of

16  responsibility.  What he's not saying and this victim

17  would like him to say is that he did fire the gun.  He

18  did mean to fire the gun.  He not only fired it once,

19  but he fired it twice.  And our position is that until

20  he takes complete responsibility for what he actually

21  did that night, he should not be granted parole.  He's

22  not suitable.  Suitability should be reserved for

23  those rare individuals who have actually said, yes, I

24  did it. I did everything I'm charged with.  He's still

25  dancing around the truth.  He is not telling the full

26  and complete truth, and until that happens, he should

27  not be found suitable because the public is still

1    going to be at risk when Mr. Baker is released.  And

2    secondly, his parole plans -- it's very interesting

3    that he is plan A in Rancho Cucamonga, plan B in

4    Marino Valley, and plan C in Fontana.  All of these

5    plans, by the way, are several years old.  It sounds

6    like Mr. Baker has some people in his life who are

7    saying sure, we'll help you.  But the reality is, once

8    he's out there, they're dealing with the reality of

9    him living with them, it appears that those are not

10   very tangible, solid plans, and that is going to lead

11   Mr. Baker into making the same kind of horrible

12   decisions that he made that day.  And for that reason,

13   we understand what the Board may do, but we feel that

14   his suitability is severely in question.  Thank you.

15        ATTORNEY TARDIFF:  In terms of the DA's first

16   issue regarding Mr. Baker not taking responsibility in

17   which she took out from the prior transcripts -- this

18   is precisely why the law states that the re-hearing

19   should take place within 120 days of the prior

20   decision, because it's well over a year since that

21   decision, since any of us have gone through all of

22   this, and that's why the order was that the date be

23   reaffirmed.  Things were taken out of context by the

24   District Attorney from that hearing.  We only heard

25   several questions with the answer, and it's not a true

26   reflection, and that's precisely why the Board has no

27   jurisdiction today to even hear this.  Because the

1   time factor has really made it -- whatever the DA is

2   saying, almost impossible to address.   In either

3   event, in terms of not taking responsibility, we have

4   psych evals -- not the most current ones, but we'll

5   include the most current ones, but prior ones as well

6   -- and this is from trained individuals who have

7   spoken at length with Mr. Baker regarding the

8   commitment offense since -- in the '97 and '98, the

9   '03 and the '05, they all four psych evals are

10  positive and supportive of Mr. Baker's release.   And I

11  think that they certainly know more than any of us

12  here in terms of -- I don't think four of them would

13  have been completely off base.   In terms of the 1997

14  psych eval, it states that his violence potential is

15  below average relative to the inmate population, and

16  at that time they weren't assessing with the free

17  community.   That was based on his lack of violent

18  115s, his lack of violent criminal history, as well as

19  his current pro-social attitude.   He does not seem to

20  have a substance abuse problem, and it concludes, I

21  agree with the conclusions of both Cat X evaluation in

22  '95 as well as the previous BPT psychological

23  evaluation in '94, which both felt that this inmate

24  had made great strides in understanding his commitment

25  offense as well as its causes.   The next report was

26  dated in '98, prognosis for community living is quite

27  positive.   He showed excellent insight into his

1    commitment offense.  His judgment appears now to be

2    sound.  High GAF score of 85.  His prognosis is quite

3    positive for being able to maintain his current mental

4    state upon parole.  Under the review of the life

5    crime, all of this remorse appears to be genuine and

6    appropriate.  In consideration of several factors,

7    including his minimal criminal history as well as his

8    lack of any violent criminal history, his minimal

9    history of 115s, as well as his greater maturity and

10   given his pro-social attitude, his violence potential

11   -- and I'm paraphrasing here, if released to the

12   community is to be no more than the average citizen.

13   And then it points out that the risk factor would be

14   the abuse of illegal drugs; however, it concludes, it

15   did not seem likely he would ever abuse again.  And it

16   states under the last page on that '98 report, this

17   man should be commended for taking full advantage of

18   his self-help opportunities during his incarceration.

19   The '03 psych eval is also again supportive, and is

20   contra to the District Attorney's remarks saying my

21   client does not take responsibility.  Under the review

22   of the life crime, inmate Baker discussed the crime in

23   detail, his reflection and thoughts about why such a

24   thing might have happened.  He stated in particular

25   after taking Dr. Fishback's life groups -- lifer's

26   group, and that's what kind of got him to this point.

27   He is feeling both -- at the time of the crime, and

1   this is where we're getting into the insight -- he was

2   feeling both angry and depressed as a result of what

3   had been happening and this and that, and it goes on

4   to state, "Inmate Baker accepted responsibility for

5   the crime and did not attempt to minimize his part.

6   He demonstrated what appeared to be genuine remorse

7   when discussing the victims, and it was clear after

8   his detailed discussion, that he has spent much time

9   reflecting on the crimes and generating alternatives

10  to his choices at the time." Since being incarcerated

11  for a period of about 23 years, inmate Baker has had

12  two 115 violations, the last one in '89, neither of

13  them were violent, and then again the minor criminal

14  history concluding under the assessment of

15  dangerousness, he's made considerable gains since his

16  incarceration. He has taken advantage of many

17  self-help opportunities, and his violence potential is

18  no higher than the average citizen. He does not have

19  a significant substance abuse history, and he should

20  be commended for taking advantage of self-help

21  opportunities. And then we have the '05 report, which

22  much has been read into the record, concludes that he

23  poses no degree of risk, the same as the average

24  citizen, he has excellent self-control, good behavior,

25  exceptional gains, and just pretty much reiterates the

26  psych eval since '97. So he's had four psych evals in

27  a row, and I didn't go back further than that, but

1    apparently the Cat T, and X as well, were favorable

2    that substantiate that he does have insight into the

3    commitment offense, he accepts responsibility, and his

4    programming has been exceptional.  His prehistory is

5    supportive of release in the sense that he had only

6    one prior conviction, no adult convictions or arrests.

7    I would submit that he has a very stable social

8    history and that includes currently he has strong

9    family support.  I'm not sure of where the District

10   Attorney gets this information that his family is

11   going to abandon him when he gets out on parole.  The

12   evidence presented at the -- at this hearing, which is

13   the rehearing, is that he has solid parole plans, he

14   has strong family support, and all those documents

15   were presented at that time and are here and are

16   incorporated as if they were being discussed.  And I

17   don't believe we went into that, but we're going to

18   incorporate it from the prior record.  And at that

19   time his parole plans were very suitable.  The Board

20   reports are supportive of release.  The '04 Board

21   report states considering the commitment offense,

22   prior record in prison adjustment -- excuse me.  This

23   writer's impressions are that inmate Baker would

24   probably pose a low risk to the public if released

25   from prison.  He received his GED.  He's taking

26   college courses.  He appears to be mature, following

27   the right path, making right decisions for his life,

27

1    realizing that what was in his past was wrong and not

2    acceptable.  He has found understanding in his study

3    of religion.  He practices his religious beliefs.

4    Baker stated during the interview that he feels that

5    incarceration and self-help programs have combined to

6    make him better understand who he is as a person, what

7    his path was all about, and how important it is to be

8    positive on the right path.  Now he continues to

9    improve his life and help others.  So we not only have

10   four prior psychologists stating that he poses -- does

11   not pose an unreasonable risk, we have the counselor

12   stating that as well.  His self-help, I'm not going to

13   go into.  That's on the record in the transcript from

14   the September '04 hearing.  He's got a job offer -- he

15   has job offers, he has housing, he has strong family

16   support.  And again, I still am objecting to this

17   hearing because I don't believe this panel has

18   jurisdiction, and I think that there obviously -- what

19   has come out particularly in the District Attorney's

20   closing remarks, there's a reason why there's a 120-

21   day rule.  Because this type of thing, taking things

22   out of context and such as was in the District

23   Attorney's closing is the problem when you hold a

24   hearing this late or this far after the granted

25   decision of September 24, '04.  And obviously is a

26   violation of due process, and I'll submit it.

27              PRESIDING COMMISSIONER FISHER:  Mr. Dixon, are

1    you both going to be speaking, or just you?

2        MR. DIXON:  Just me.

3        PRESIDING COMMISSIONER FISHER:  All right.

4    Would you please, when you speak, just say your name

5    and spell your last name again.

6        MR. DIXON:  Val Dixon.  V-A-L D-I-X-O-N.

7                    [End of tape.]

8        DEPUTY COMMISSIONER MEJIA:  Okay.

9    (Indiscernible) and we have the victim making a

10   statement.

11       PRESIDING COMMISSIONER FISHER:  Go ahead.

12       MR. DIXON:  Val Dixon, D-I-X-O-N.  First off, I

13   would like to apologize for me blowing up last time.

14   I do -- I'm not that (indiscernible).  I was caught

15   off guard, so I just want to tell you that I'm sorry

16   about that.

17       PRESIDING COMMISSIONER FISHER:  Okay.

18       MR. DIXON:  I'd like to now get a little more

19   in depth than I was last time.  I've been in this

20   situation now for 25 years, and I'll be this way for a

21   lot longer.  (Indiscernible) it's hard (indiscernible)

22   trying to survive and not hold things in and go on

23   from there.  It's not easy for me to talk about this,

24   but I'd rather be a survivor than a victim I guess so

25   that's what -- let's see. (indiscernible).  The last

26   25 years wasn't so hot for me.  I was (indiscernible),

27   I was working as a warehouse manager, I was coming

1   home from my job when my car broke down and all of

2   this went down.  Everybody knows that (indiscernible)

3   after they stopped and asked me if I needed any help,

4   and I said no, that I had somebody to come and get me.

5   They (indiscernible) came back and shoot me, not once,

6   but twice.  Now even I can say, okay, maybe it was my

7   fault the first time for (indiscernible), but you

8   can't accidentally shoot somebody twice with

9   (indiscernible) it's impossible.  Let's see, I can go

10  on and on about that, but the long and the short of it

11  is that he left me -- or they left me there to die.

12  Why?  I mean, if it was an accident, he wouldn't have

13  left.  (Indiscernible) I'll ask, and you already know,

14  and I'm hear to show it, I can't just get up and walk

15  out that door right now.  I can't take my daughter for

16  a walk.  Things like that (indiscernible) involved

17  are, I'm not vindictive.  I'm not.  But, when he won't

18  even admit to the things that he did that are facts,

19  not hearsay (indiscernible) but certain parts of this

20  thing that I don't recall wrongly.  I know exactly

21  what happened. So the long and short of it -- a

22  couple of things have changed.  Like, I was in the

23  hospital (indiscernible) over a year between the

24  attack (indiscernible) and it has been like three

25  years of hospital time.  That's not including all

26  (indiscernible).  I mean I've been in pain

27  (indiscernible).  My nerves are shot.  (Indiscernible)

1  be able to talk.  The point is, (indiscernible) and no

2  big deal, right?  That doesn't mean I don't keep

3  going.  Like, (indiscernible) ask anybody for help,

4  but there are times that I will break down and lose

5  it.  (Indiscernible) years and years of holding things

6  in, and like I said, I do apologize for that, but it's

7  not easy.  I'm not a vengeful person.  I'm really not

8  able.  And until he's ready to accept responsibility

9  and say yeah, I did it, how's any of this

10  (indiscernible) words are easy.  (Indiscernible) the

11  actions that follow-up on words like that -- it's a

12  lot harder.  I'll (indiscernible) suffering down, and

13  I think it pretty much covers what I'm trying to say

14  and what I think you should take into consideration,

15  and that is if he's not ready to take responsibility,

16  how's he going to go out there?

17                    R E C E S S

18                    --oOo--

19

20

21

22

23

24

25

26

27

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2    D E C I S I O N

3    DEPUTY COMMISSIONER MEJIA:  Thank you.  We're

4    back on the record for your decision in the matter of

5    Mr. Baker, inmate Baker.

6    PRESIDING COMMISSIONER FISHER:  After, once

7    again considering all of the information received from

8    the public, Commissioner Mejia and I are relying on

9    the following circumstances in concluding that we

10   erred in the last hearing.  There is information that

11   either was not presented to us in the same manner that

12   it was at this hearing or that we somehow

13   (indiscernible) because we.  This is going to be a

14   denial, a one-year denial, and it's going to be based

15   entirely on the commitment offense and insight.  And

16   I'll tell you why.  We went back through every part of

17   the transcript based on what was said and talked about

18   today, which was the second shot that was fired.  And

19   we went back through the (indiscernible) and the

20   ballistics evidence, and I don't know that we had that

21   in front of us last time.  If we did, certainly, we

22   overlooked what it meant, because the ballistics

23   evidence clearly states that Mr. Baker was the person

24   who shot Mr. Dixon.  It doesn't say that Mr. Baker and

25   another gun shot Mr. Dixon.  It says that Mr. Baker

26   (indiscernible) that he had to have fired twice.  And

27   FRED BAKER  C-22918  DECISION PAGE 1  10/4/05

32

1   then every transcript that I have here, he has said

2   that he only fired the gun once. And in his early

3   days, he said that the gun went off, but it still was

4   one time going off. That was in '99. In 2003, he

5   said that Steven shot him too. Mr. Cordero (phonetic)

6   asked him how did Mr. Dixon get shot. He was shot

7   twice. And inmate Baker said I believe it was once

8   because I pulled the trigger just once

9   (indiscernible). And in the most recent hearing in

10  response to Mr. Mejia saying how did the victim get

11  shot twice, Mr. Baker said my crimee, he had the gun

12  pointed out, and I believe this. I don't know, but I

13  believe he pulled the trigger thinking I pulled the

14  trigger, and that's how it happened (indiscernible).

15  That's clearly not what the ballistics said. And for

16  that reason, as well as the gravity of the crime, this

17  is going to be a one-year denial. Mr. Baker has done

18  very well, and it is obvious by the fact that this

19  same panel granted his parole last time. He has been

20  an exemplary inmate and he's done very well. He

21  demonstrated, I think, sincere remorse when he was at

22  his last hearing. But because of the outcome of this

23  kidnap for robbery and the gravity of it based on what

24  the outcome was, it's just too important for him to

25  have good insight (indiscernible) into his culpability

26  (indiscernible) we need to talk about having an

27  FRED BAKER  C-22918  DECISION PAGE 2  10/4/05

1    understanding of (indiscernible).  And that concludes

2    the discussion.  Any comments, Commissioner?

3         DEPUTY COMMISSIONER MEJIA:  No further

4    comments.

5                        --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR        NOV. 1 6. 2005

24    THIS DECISION WILL BE FINAL ON: _____

25    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    FRED BAKER  C-22918  DECISION PAGE 3  10/4/05

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, PATRICIA CHAPIN, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 33, and which recording was duly recorded at THE CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF FRED BAKER, CDC NO. C-22918, ON OCTOBER 4, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated OCTOBR 20, 2005, at Sacramento, California.


PATRICIA CHAPIN
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT "Y"

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

COURT OF APPEAL, FOURTH DISTRICT

DIVISION TWO

STATE OF CALIFORNIA

COURT OF APPEAL - FOURTH DIST.

F I L E D

MAR 30 1982

RICHARD J. SMITH, ACTING, Clerk

Deputy Clerk

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, ) | |
| ) | |
| Plaintiff and Respondent, ) | 4 Crim. 12415 |
| ) | |
| v. ) | (Super.Ct.No. CR 17643) |
| ) | |
| FRED L. BAKER and ) | |
| VERNICE ROSE HABBITT, ) | |
| ) | O P I N I O N |
| Defendant and Appellant. ) | |
| ———————————————————) | |

APPEAL from a judgment of the Superior Court of Riverside County. Gerald F. Schulte, Judge. Affirmed.

David Morse Hammond, under appointment by the Court of Appeal, for Defendant and Appellant Fred L. Baker.

Jacalyn T. Drexler, under appointment by the Court of Appeal, for Defendant and Appellant Vernice Rose Habbitt.

George Deukmejian, Attorney General, and Robert M. Foster, Deputy Attorney General, for Plaintiff and Respondent.

Following a jury trial, defendants Fred L. Baker and Vernice Rose Habbitt were each found guilty of three counts of robbery (Pen. Code, § 211), two counts of kidnapping for the purpose of robbery (Pen. Code, § 209, subd. (b)), one count of grand theft (Pen. Code, § 487, subd. 3), one count of car theft (Veh. Code, § 10851), and one count of assault with intent to

murder (Pen. Code, § 217).  Allegations in each count that a
principal was armed within the meaning of Penal Code section
12022, subdivision (a), were found to be true.  Allegations
that Baker had personally used a firearm in the commission of the
offense within the meaning of Penal Code section 12022.5 and that
he had inflicted great bodily injury on one of the victims within
the meaning of Penal Code section 12022.7 were also found to be
true.  Defendants were each sentenced to state prison and have
prosecuted separate appeals from the judgment of conviction.[1]

   This court appointed separate counsel for each defendant.
Counsel for defendant Habbitt has filed an appellate brief rais-
ing several contentions.  Counsel for defendant Baker has filed a
Wende brief (People v. Wende (1979) 25 Cal.3d 436), stating that
he has reviewed the entire record and has been unable to find any
arguable issues on appeal.

### FACTS

   The pertinent facts will be stated in accordance with the
settled rule on appeal that the evidence be viewed in the light
most favorable to respondent.

---

[1]    Defendant Habbitt was sentenced to life with possibility
of parole on one count of kidnapping for the purpose of robbery,
plus one year enhancement pursuant to section 12022, subdivision
(a).  A like sentence was imposed on the other kidnapping for
robbery count, the sentence to run concurrently with the other
kidnapping conviction.  Sentences were imposed on the other
counts to run concurrently with the sentence on the kidnapping
count, or were imposed and permanently stayed.  Defendant Baker
was sentenced to state prison for seven years on the assault with
intent to murder count.  He was also sentenced to life with
possibility of parole on the kidnapping for robbery count with an
additional 1 2/3 years for the robbery conviction and weapons use
findings, the sentences to run consecutively to the sentence on
the assault with intent to murder conviction.

Sometime during the night of May 18-19, 1980, a hardware store in Perris, California, was burglarized. Among other items taken were numerous guns and ammunition.

That evening sometime after midnight, Joseph Berger was driving home from work in his red Vega on Wood Road near Perris. He saw a black female hitchhiking and stopped to give her a ride. She was defendant Habbitt. When Berger stopped, defendant Baker and two others (Early Farris and Steven Scoby) emerged from the darkness carrying rifles which had been taken from the hardware store. Berger was ordered out of his car; his wallet was taken; and defendant and their companions got into the Vega and drove off. As they did, one said "Don't let the white boy get away." Berger heard a shot fired over his head and he fled into the shrubs nearby.

About 2 a.m. that same evening defendant Habbitt entered a 7 - 11 market in Woodcrest. She picked up some items, went to the front counter and then left saying she forgot her money and would be back. There were no other customers in the store. Robin Ingram and her mother Harriet Rommel were tending the store. Moments after defendant Habbitt left, defendant Baker (wearing a red dress) along with Farris and Scoby entered the store. Each wore facial covering and carried a rifle. They forced Ingram and Rommel to open the cash register and hand over the contents amounting to approximately $235. Ingram and her mother were then ordered outside. One of the participants

demanded the keys to Rommel's blue Pinto which was parked outside. When Ingram went into the store to get the keys she was followed by two of the gunmen who took Rommel's purse and cash from Ingram.

After Ingram delivered the keys to the Pinto to one of the individuals, she was ordered into the Pinto and Rommel was ordered to get into the Vega. The two were then driven several miles from the store. Defendant Habbitt drove the Vega and defendant Baker drove the Pinto. Eventually the two cars stopped in an orange grove and Ingram and Rommel were released. They fled into the orange grove and as they did so, a shot was fired over their heads.

After leaving the orange grove, defendants and their companions ditched the Pinto in some weeds alongside a lot and they all got into the Vega with defendant Habbitt driving.

About 3 or 3:30 a.m., Val Dixon was driving down a street just outside of Perris when one of his tires went flat. He stopped to call his automobile club. A red Vega driven by defendant Habbitt pulled up and asked if Dixon needed help. He said he was doing fine and the Vega drove off but shortly it returned and someone in it said "Hey sucker." When Dixon turned he saw a rifle pointed at him. Dixon tried to knock the barrel away but failed and was shot twice. His spinal cord was struck and he has been paralyzed from the waist down. Laboratory tests of gunshot residue indicated that defendant Baker was the one who shot Dixon and ballistics tests indicated that the bullet had been fired

-4-

from one of the guns taken at the hardware burglary earlier that evening.

A police radio broadcast the description of the Vega. A Perris police officer spotted a vehicle matching the description of the broadcast and called for a backup. The car was finally stopped and defendant Habbitt was the driver. Defendant Baker managed to crawl under the car unnoticed but was later discovered and arrested. The car contained rifles taken from the hardware store and used during the crime spree, ammunition, the loot from the 7-11 store and Berger's wallet.

<u>HABBITT'S APPEAL</u>

Defendant Habbitt contends (1) she was denied effective assistance of counsel and (2) the court erred in denying her motion for a mistrial grounded on a denial of a right to confront and cross-examine witnesses. For the reasons to be stated, we find no merit to the contentions.

I

Defendant Habbitt bases her charge of incompetency of trial counsel on his failure to present a diminished capacity defense and for his failure to make a timely written motion for severance.

The standard governing adequacy of counsel is whether defendant received the assistance of a reasonably competent attorney acting as a diligent, conscientious advocate. (<u>People</u> v. <u>Pope</u> (1979) 23 Cal.3d 412, 423-424.) The burden of proving a

claim of inadequate trial counsel is on the defendant. He or she must show that trial counsel failed to act as a reasonably competent attorney acting as a conscientious and diligent advocate and that counsel's failure resulted in the withdrawal of a potential meritorious defense. (Id., at p. 425.) Where the record on appeal fails to shed any light on the charges of any alleged act or omission of counsel, a claim of ineffective assistance of counsel should be made by a petition for writ of habeas corpus. (Id., at p. 426.)

The record fails to substantiate defendant's claim of incompetency of counsel for failure to investigate the availability of a diminished capacity defense and to present the same at trial.

Defendant contends that the record contains evidence that she and her companions might have been on drugs during the evening in question. She refers to testimony of the victims Berger, Ingram and Rommel that defendant and her companions were jabbering and mumbling at one another, gave conflicting and confusing orders and on the testimony of Ingram that she thought at least two of the group might have been on drugs. Defendant Habbitt also maintains that the testimony of Farris concerning his recollection of the events of the night suggests that he must have been under the influence of drugs.

The record, however, sheds no light on why trial counsel did not present a diminished capacity defense. The record

includes neither an explanation as to why counsel did not raise the defense nor an indication that he was asked for an explanation. Nor is this a case where this court can conceive of no satisfactory explanation for counsel's failure to present the defense. Insofar as the present record is concerned, counsel may have investigated the viability of the defense and found that it could not be substantiated. Or, he may have decided for tactical reasons that reliance on the questionable defense of diminished capacity would have harmed defendant's case.

Defendant concedes that the record is silent as to why a diminished capacity defense was not presented and states that that was the reason she filed the petition for writ of habeas corpus with this court on the ground of incompetency of trial counsel, reciting the same reasons for her claim as are asserted on appeal. Because an evidentiary hearing would be required to resolve the factual issues raised by the petition, this court denied it without prejudice to her right to file the same petition in the superior court. (4 Crim. 12760, Aug. 7, 1981.)

For the foregoing reasons, the contention that defendant was denied effective assistance of counsel for failure to raise the diminished capacity defense must be rejected on this appeal.

Defendant also contends that her trial counsel's failure to make a timely written motion for severance constituted a denial of effective assistance of counsel. The record shows that when the case was called to trial, defendant Habbitt and her counsel

told the court that she wished to waive a jury. The people declined to waive because codefendant Baker had not waived a jury. Counsel for defendant Habbitt thereupon orally moved to have her trial severed. The motion was denied.

Inasmuch as the motion to sever was denied on the merits and not because it had not been made in writing, defendant suffered no prejudice by the failure to make a formal written motion. Morover, defendant Habbitt concedes that when, as here, the record fails to show why the motion to sever was not made earlier, any claim of incompetency of counsel for failure to make a timely motion to sever must be raised by habeas corpus. (People v. Hall (1980) 28 Cal.3d 143, 158.) Defendant Habbitt has raised that contention in her petition for writ of habeas corpus which was denied without prejudice of the right to file the same petition in the superior court. The contention of inadequacy of counsel with respect to the motion of severance must therefore be rejected.

II

Defendant contends the court committed prejudicial error in denying her motion for a mistrial on the ground that the prosecution was guilty of misconduct in calling Scoby as a witness with the knowledge that he would exercise his Fifth Amendment right not to testify.

Scoby, who was a juvenile, was called as a witness for the prosecution and testified to the following: His relationship with

-8-

the other participants; that they all lived in Perris; that he lived in an apartment near Wood Road in Perris with his parents, his sister defendant Habbitt and another sister; that at about 4 a.m. on the night in question he was arrested at the apartment of yet another sister; that he arrived there in a red Vega and that the first time he saw the red Vega was on Wood Road. Thereafter he refused to answer any further questions and the court found him in contempt. Defendant moved for a mistrial on the ground the prosecutor knew that Scoby would refuse to testify but called him for the purpose of having him invoke his Fifth Amendment privilege in front of the jury to create an adverse inference against defendant. The court denied the motion.

A prosecutor may be guilty of misconduct for calling a witness for the sole purpose of having the witness invoke his Fifth Amendment privilege in front of the jury in order to create an inference reflecting adversely on the party against whom the witness has been called. (People v. Johnson (1974) 39 Cal.App.3d 749, 760; People v. Chandler (1971) 17 Cal.App.3d 798, 803-804.) However, here there was no abuse of discretion in the denial of the mistrial motion for prosecutorial misconduct. The prosecutor represented to the court that he had talked to Scoby the night before and that while Scoby indicated some reluctance to testify, he gave no indication he would refuse or claim the Fifth Amendment privilege; in fact, according to the prosecutor, Scoby said he would appear and testify truthfully. The fact that Scoby gave

considerable testimony before refusing to testify tends to substantiate the prosecutor's representation that he did not call the witness for the sole purpose of having him invoke the Fifth Amendment in front of the jury.

Furthermore defendant did not request the court to give an instruction under Evidence Code section 913[2/] not to draw any inference from the witness' exercise of the Fifth Amendment privilege. In the present case such an instruction would have cured any harm resulting from the witness' refusal to testify. Defendant is therefore precluded from complaining on appeal of the order denying mistrial. (See People v. Green (1980) 27 Cal. 3d 1, 34-35.)

The judgment of conviction as to defendant Habbitt is affirmed.

### APPEAL OF DEFENDANT BAKER

As we indicated earlier, defendant Baker's appointed counsel filed a Wende brief stating that he is unable to find any

---

[2/]    Evidence Code section 913 provides:
    "(a)  If in the instant proceeding or on a prior occasion a privilege is or was exercised not to testify with respect to any matter, or to refuse to disclose or to prevent another from disclosing any matter, neither the presiding officer nor counsel may comment thereon, no presumption shall arise because of the exercise of the privilege, and the trier of fact may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding.
    "(b)  The court, at the request of a party who may be adversely affected because an unfavorable inference may be drawn by the jury because a privilege has been exercised, shall instruct the jury that no presumption arises because of the exercise of the privilege and that the jury may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding."

arguable issues on appeal.  He states he has written to the defendant asking for his comments concerning any issues he would like to have raised on appeal and has also sent him a copy of the brief advising him that he may request this court to have present counsel relieved.  This court has received no communication from defendant concerning any issues he would like to raise nor has he requested that present counsel be relieved.

We are faced with an anomalous situation where one defendant has filed a Wende brief and the other defendant has filed a brief raising several issues on appeal.  We have earlier concluded that the contentions raised by codefendant Habbitt are either not cognizable on this appeal or otherwise lack merit.  We have reviewed the entire record in this case and find no arguable issues on appeal on behalf of defendant Baker.  We nevertheless give defendant Baker the benefit of doubt and treat the issues raised by defendant Habbitt as having also been raised on behalf of defendant Baker.  Our conclusions on the merits of these contentions as to defendant Baker are the same as those we reached as to defendant Habbitt.

The judgment of conviction as to defendant Baker is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

_____
Tamura
                J.*

We concur:

_____
Morris
           Acting P. J.

_____
McDaniel
                J.

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

-11-