**EXHIBIT "Z"**



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT



Court of Appeal - Sixth App. Dist.

# FILED

SEP 1 2 2007

MICHAEL J. YERLY, Clerk

By_____
DEPUTY

In re FRED L. BAKER,

    on Habeas Corpus.

H031782
(Monterey County
Super. Ct. No. HC4990)

BY THE COURT:

    The petition for writ of habeas corpus is denied.

(Bamattre-Manoukian, Acting P.J., Mihara, J., and McAdams, J.,

participated in this decision.)

Dated ___SEP 1 2 2007___     ___BAMATTRE-MANOUKIAN, J.___ Acting P.J.

# BOARD TRANSCRIPT

Board Transcript (BT)

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
)
FRED BAKER (BABER) )
_____ )

CDC Number C-22918

COPY

INMATE

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

SEPTEMBER 24, 2004

PANEL PRESENT:

SUSAN FISHER, Presiding Commissioner
ROLANDO MEJIA, Deputy Commissioner

OTHERS PRESENT:

FRED BAKER, Inmate
MARY ANN TARDIFF, Attorney for Inmate
SARA DANVILLE, Deputy District Attorney
VAL DIXON, Victim
STEPHANIE GARTHWAITE, Observer

NOT APPROVED

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

Patricia Ricci          Capitol Electronic Reporting

ii

INDEX

                                                          Page

Proceedings...................................... 1

Case Factors.....................................10

Pre-Commitment Factors...........................19

Post-Commitment Factors..........................35

Parole Plans.....................................27

Closing Statements...............................--

Recess...........................................--

Decision.........................................--

Adjournment......................................--

Transcriber Certification........................85

--oOo--

1

1       **P R O C E E D I N G S**

2           **DEPUTY COMMISSIONER MEJIA:**  We're now on

3       record.

4           **PRESIDING COMMISSIONER FISHER:**  All right,

5       thank you.  This is going to be a Subsequent Parole

6       Consideration Hearing for Fred Baker, CDC number

7       C-22918.  Today's date is 9/24/04 and we're located

8       at the California [sic] Training Facility at

9       Soledad.  Inmate was received on 11/6/80 from

10      Riverside County.  The life term began on 7/31/87

11      and a minimum eligible parole date of 7/31/94.  The

12      controlling offense for which the inmate was

13      committed is kidnap for robbery, case number

14      CR17643, count six, Penal Code Section 209, with an

15      additional finding of use of a firearm, Penal Code

16      Section 12022.5, count eight, which is assault with

17      intent to commit murder, and count one, which is

18      Penal Code Section 211, robbery.  There is a

19      finding of use of a firearm in that count also.

20      Counts two, three, four, five, and seven were all

21      stayed.  Inmate received a term of seven years to

22      life with a two-year enhancement.  And the minimum

23      eligible parole date, once again, is 7/31/94.  Mr.

24      Baker, we're going to tape record the hearing so

25      for the purpose of voice identification we're going

26      to state our first and last name and spell our last

27      name.  When we get to you would you give us your

2

1   CDC number, please.

2       **INMATE BAKER:**  Yes, Ma'am.

3       **PRESIDING COMMISSIONER FISHER:**  Okay, thank

4   you.  I'm going to start with myself and go to my

5   left, and for those of you who are on video

6   conference, once we have had everyone in the room

7   here identify themselves, I'd like for you to also

8   identify yourselves for the record, all right.

9       **MS. GARTHWAITE:**  Okay.

10      **PRESIDING COMMISSIONER FISHER:**  Thank you.

11  All right, once again I'll start with myself and go

12  to my left.  Susan Fisher, F-I-S-H-E-R,

13  Commissioner.

14      **DEPUTY COMMISSIONER MEJIA:**  Rolando Mejia,

15  M-E-J-I-A, Deputy Commissioner.

16      **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Sara

17  Danville, D-A-N-V-I-L-L-E, Deputy District

18  Attorney, Riverside County.

19      **ATTORNEY TARDIFF:**  Mary Ann Tardiff,

20  T-A-R-D-I double F, attorney for Mr. Baker.

21      **INMATE BAKER:**  Fred Baker, B-A-K-E-R,

22  C-22918.

23      **PRESIDING COMMISSIONER FISHER:**  Thank you.

24  Go ahead.

25      **MR. DIXON:**  Val Dixon, D-I-X-O-N.

26      **MS. GARTHWAITE:**  Stephanie Garthwaite,

27  G-A-R-T-H-W-A-I-T-E, just for technical support.

1      **PRESIDING COMMISSIONER FISHER:**  Okay, thank

2   you.  Okay, before we can go any further, Mr.

3   Dixon, I need to ask you to read that --

4      **INMATE BAKER:**  Baker.

5      **PRESIDING COMMISSIONER FISHER:**  I'm sorry,

6   Mr. Baker, if you'd read that Americans with

7   Disabilities Act for me, and just read it out loud

8   into the record.

9      **INMATE BAKER:**  "The Americans with

10           Disabilities Act, ADA, is a law to

11           help people with disabilities.

12           Disabilities are problems that make

13           it harder for some people to see,

14           hear, breathe, talk, walk, learn,

15           think, work, or take care of

16           themselves than it is for others.

17           Nobody can be kept out of public

18           places or activities because of a

19           disability.  If you have a disability

20           you have the right to ask for help to

21           get ready for your BPT hearing, get

22           to the hearing, talk, read forms and

23           papers, and understand the hearing

24           process.  BPT will look at what you

25           ask for to make sure that you have a

26           disability that is covered by the ADA

27           and that you have asked for the right

4

1          kind of help.  If you do not get help

2          or if you don't think you got the

3          kind of help you need, ask for a BPT

4          1074 Grievance Form.  You can also

5          get help to fill it out."

6          **PRESIDING COMMISSIONER FISHER:**  Thank you.

7     Do you understand that?

8          **INMATE BAKER:**  Yes, Ma'am, I do.

9          **PRESIDING COMMISSIONER FISHER:**  All right.

10    I do want to note for the record that on April

11    14th, 2004, Mr. Baker did sign the BPT 1073 Form

12    stating that he has no disabilities.  And I just

13    have a few specific questions that I have to ask

14    you before we can move forward.  Do you have any

15    problems walking up and down stairs or walking

16    distances of 100 yards or more?

17         **INMATE BAKER:**  No, Ma'am.

18         **PRESIDING COMMISSIONER FISHER:**  Do you need

19    glasses in order to read documents?

20         **INMATE BAKER:**  No, Ma'am.

21         **PRESIDING COMMISSIONER FISHER:**  Do you have

22    any hearing impairments?

23         **INMATE BAKER:**  No, Ma'am.

24         **PRESIDING COMMISSIONER FISHER:**  Have you

25    ever been included in the Triple CMS or EOP

26    Programs?

27         **INMATE BAKER:**  No, Ma'am.

5

1     **PRESIDING COMMISSIONER FISHER:**  Ever taken

2     any psych meds?

3         **INMATE BAKER:**  No.  No, Ma'am, excuse me.

4     **PRESIDING COMMISSIONER FISHER:**  Prior to

5     this offense and prior to coming to prison for this

6     offense, how far did you get in school?

7         **INMATE BAKER:**  Eleventh grade.

8     **PRESIDING COMMISSIONER FISHER:**  Okay.  Is

9     there any disability that you suffer from that

10    would prevent you from participating today in the

11    hearing?

12        **INMATE BAKER:**  No, there isn't, Commissioner

13    Fisher.

14    **PRESIDING COMMISSIONER FISHER:**  Okay.  This

15    hearing is being conducted pursuant to Penal Code

16    Sections 3041 and 3042 and the Rules and

17    Regulations of the Board of Prison Terms governing

18    parole consideration hearings for life inmates.

19    And as you know, the purpose of the hearing today

20    is to consider again the crimes that you were

21    committed for, your prior criminal and social

22    history, and your behavior and programming since

23    your commitment offense.  We have had the

24    opportunity to review your files and your prior

25    transcripts, and we'll give you the opportunity to

26    make any corrections that you need to today, all

27    right.

6

1       **INMATE BAKER:**  Thank you.

2       **PRESIDING COMMISSIONER FISHER:**  We're going

3   to be deciding today as to your suitability.   If we

4   do find you suitable today we'll explain to you

5   also today what the length of your confinement will

6   be.

7       **INMATE BAKER:**  Yes, Ma'am.

8       **PRESIDING COMMISSIONER FISHER:**  Prior to

9   recessing to deliberate we're going to give the

10  District Attorney and your attorney and you the

11  opportunity to make a statement about your

12  suitability.  And then once you've done that we'll

13  allow Mr. Dixon to make his statement.  After that

14  is completed we will have everyone leave the room.

15  We'll turn off the camera here and we'll

16  deliberate.  As soon as we have a decision we'll

17  bring you all back in, okay.

18      **INMATE BAKER:**  Yes, Ma'am.

19      **PRESIDING COMMISSIONER FISHER:**  The

20  California Code of Regulations states that

21  regardless of time served a life inmate shall be

22  found unsuitable for and denied parole if in the

23  judgment of the Panel the inmate would pose an

24  unreasonable risk of danger to society if released

25  from prison.  You do have certain rights relating

26  to this hearing.  You have the right to a timely

27  notice of the hearing, the right to review your

7

1  Central File, and the right to present relevant

2  documents.

3        INMATE BAKER:  Bless you.

4        PRESIDING COMMISSIONER FISHER:  Ms. Tardiff,

5  have your client's rights been met thus far?

6        ATTORNEY TARDIFF:  Yes.

7        PRESIDING COMMISSIONER FISHER:  All right.

8  You also have the right to an impartial Panel.

9  Having seen your two Panel members today, do you

10  have any objections to your Panel?

11        INMATE BAKER:  No, Ma'am, I don't.

12        PRESIDING COMMISSIONER FISHER:  Okay, Ms.

13  Tardiff?

14        ATTORNEY TARDIFF:  No objection.

15        PRESIDING COMMISSIONER FISHER:  Okay.  We're

16  going to give you a written copy today of our

17  tentative decision and that decision will be final

18  within 120 days.  And then a copy of the decision

19  and a copy of the transcript of the hearing will be

20  sent to you.  Are you familiar with the changes

21  just this year as to how you appeal Board

22  decisions?

23        INMATE BAKER:  No, Ma'am, I'm not.

24        PRESIDING COMMISSIONER FISHER:  Okay.  Let

25  me just tell you as briefly as I can.  There were

26  15 California Code of Regulations Sections that

27  were repealed.  Those were 2050 through 2056.  And

1   the current policy is in the Board's Administrative

2   Directive 0401 entitled Administrative Appeals,

3   Correspondence, and Grievances Concerning Board of

4   Prison Terms Decision.  I told you that because

5   that's available in the prison library or through

6   your correctional counselor.  Basically what it

7   boils down to is that appeals used to go directly

8   to the Board of Prison Terms on the 1040 Form.

9          **INMATE BAKER:**  Yes.

10         **PRESIDING COMMISSIONER FISHER:**  Now they go

11  directly to the courts, okay, so it's just a

12  different process.

13         **INMATE BAKER:**  Thank you.

14         **PRESIDING COMMISSIONER FISHER:**  I want to

15  remind you that you're not obligated today to

16  either admit or discuss the offense, but that this

17  Panel does accept the findings of the court to be

18  true.

19         **INMATE BAKER:**  Yes, Ma'am.

20         **PRESIDING COMMISSIONER FISHER:**  You

21  understand, all right.  Okay, I'm going to pass my

22  Hearing Checklist to the two attorneys and make

23  sure that we all have the same paperwork.

24  Commissioner Mejia, do we have any confidential to

25  be used today?

26         **DEPUTY COMMISSIONER MEJIA:**  None to be used

27  at this time.  Yes, we do have the victim's impact

9

1    letters.

2        **PRESIDING COMMISSIONER FISHER:**  Original

3    letters from the victims, all right.

4        **ATTORNEY TARDIFF:**  Yes, I have these

5    documents, thank you.

6        **PRESIDING COMMISSIONER FISHER:**  Do you have

7    anything else that needs to be submitted?

8        **ATTORNEY TARDIFF:**  No.

9        **PRESIDING COMMISSIONER FISHER:**  Okay.  Any

10   preliminary objections?

11       **ATTORNEY TARDIFF:**  No.

12       **DEPUTY DISTRICT ATTORNEY DANVILLE:**  I have

13   them as well.

14       **PRESIDING COMMISSIONER FISHER:**  All right,

15   thank you.  Is Mr. Baker going to be speaking with

16   us today?

17       **ATTORNEY TARDIFF:**  Yes.

18       **PRESIDING COMMISSIONER FISHER:**  Mr. Baker,

19   if you'll raise your right hand, I'm going to swear

20   you in.  Do you solemnly swear or affirm that the

21   testimony you give at this hearing will be the

22   truth and nothing but the truth?

23       **INMATE BAKER:**  I do.

24       **PRESIDING COMMISSIONER FISHER:**  All right,

25   thank you.  What I'm going to do, Mr. Baker, is I'm

26   going to read a summary of the crime into the

27   record and then I'm going to ask you to tell me in

10

1   your own words what happened, okay.  And we'll just

2   go from there.  I'm using the current Board Report,

3   or the 2002 Board Report.  Why is it 2002, I know

4   why, there's no summary in the current one.  I'm

5   using the 2002 Board Report under Summary of the

6   Crime.

7         **ATTORNEY TARDIFF:**  No, there's, oh, okay,

8   you're going to use the --

9         **PRESIDING COMMISSIONER FISHER:**  The longer

10   version, because I figure it's got to be closer to

11   the Probation Officer's Report, which is not

12   readable in its copied form.  It's really bad.

13         "On 5/22/80 at approximately 1:30

14         a.m., Riverside County Sheriff's

15         Office was contacted by Joseph

16         Burger, that's B-U-R-G-E-R, who

17         reported his car stolen by two

18         females later identified as Bernice

19         Habbit, that's B-E-R-N-I-C-E capital

20         H-A-B-B-I-T, and Fred Baker,

21         disguised as a female.  Both were

22         hitchhiking on -- I can only assume

23         it's Cajalio Road, it's

24         C-A-J-A-L-I-O.  Burger stopped and

25         offered them a ride.  A black male

26         then came from the opposite side of

27         the street and pointed a gun at him.

11

1   Burger was then pulled from the car

2   by the suspects.  Subsequently his

3   wallet was also taken from him.

4   Burger got scared, jumped into a

5   ditch, and ran for his life as a shot

6   was fired by one of the suspects.  As

7   he fled, the suspects took his red

8   Vega station wagon and left the area.

9   As this investigation was in process,

10  a report of a robbery at the Seven 11

11  Store at VanBurgen, B-U-R-G-E-N, and

12  Washington Streets was received.  The

13  suspect vehicle was a red Vega

14  station wagon.  At approximately two

15  a.m. Bernice Habbit went to the Seven

16  11 Store where Harriet Rommel,

17  R-O-M-M-E-L, and her daughter Robin

18  Ingram, I-N-G-R-A-M, worked.  Habbit

19  walked around the store selecting

20  items.  She placed them on the

21  counter for purchase.  When at the

22  counter to pay for her items, Habbit

23  stated that she had to go to her car

24  outside to get more money.  A short

25  time later three male suspects,

26  Baker, Ferris, F-E-R-R-I-S, who was a

27  co-defendant that was 14 years old at

12

1   the time, and Canado, C-A-N-A-D-O,

2   who was also a co-defendant, 14 years

3   old at the time, entered the store

4   carrying rifles and wearing stocking

5   masks.  Rommel, who was at the back

6   of the store at the time observed

7   Canado and Baker pointing their guns

8   at Ms. Ingram who was near the cash

9   register.  About 140 dollars was

10  taken from the register.

11  Subsequently, Rommel and Ingram were

12  taken outside by the suspects.  Ms.

13  Rommel was placed in the back of the

14  Vega station wagon and Ms. Ingram was

15  ordered to give up her mother's car

16  keys so the perpetrators could take

17  her to -- I'm sorry, to take her

18  mother's Pinto car with them.  Canado

19  and Baker put Ms. Ingram into the

20  Pinto car with them and they followed

21  the Vega station wagon.  In an orange

22  grove area the suspects stopped the

23  cars and ordered both victims out of

24  the cars.  They were told to run into

25  the grove and were given a count of

26  five to get out of sight or they

27  would be killed.  Subsequently the

13

1        perpetrators drove to an isolated

2        area and pushed the Pinto into some

3.       bushes.  Shortly thereafter the

4        victims called the Sheriff's Office.

5        While this investigation was

6        proceeding at approximately three

7        a.m., officers were notified of a

8        shooting on Perris Boulevard near

9        John F. Kennedy Street.  Val Dixon,

10       in parentheses it says (victim), had

11       been shot in the stomach and was

12       lying in the street.  He stated that

13       his car broke down and he was

14       returning from calling a tow truck

15       when he was approached by a red Vega

16       station wagon driven by a black

17       female who asked if he needed a ride.

18       When he answered negatively, the car

19       kept going and made a U-turn.  When

20       the car approached again Dixon

21       noticed a male holding a rifle

22       pointed at him.  He attempted to push

23       the gun barrel away from his body.

24       He was shot and the suspects drove

25       away.  The victim was later taken to

26       the hospital for medical treatment.

27       Doctors discovered that he'd been

14

1    shot twice.  Val Dixon is now

2    paralyzed from the waist down.  At

3    approximately 3:45 a.m. Perris Police

4    observed a red Vega station wagon in

5    the city of Perris.  A vehicle stop

6    was affected.  Ms. Habbit got out of

7    the driver's door immediately.

8    Ferris got out next and stood between

9    Ms. Habbit and the vehicle while

10    throwing away live ammunition.

11    Canado exited next and placed himself

12    between the other two suspects, and

13    Baker was found hiding under the

14    vehicle.  Backup units arrived and

15    they were all searched and

16    handcuffed.  Two high-powered rifles

17    were found in the back seat of the

18    vehicle and one was found in the

19    front passenger seat.  The suspects

20    stated that Baker had put on makeup

21    and dressed to disguise himself.

22    They also stated that both Canado and

23    Baker had their guns pointed out the

24    car window when Dixon, and when Dixon

25    grabbed the guns both suspects fired

26    and Ms. Habbit drove away.  Baker did

27    not discuss the offense with officers

1      at the time of his arrest."

2  And this notes that the source of information was

3  the Probation Officer's Report pages three through

4  seven dated 10/16/80.  Now Mr. Baker, tell me what

5  happened.

6      INMATE BAKER:  That's pretty accurate there.

7  That's very accurate there.  I guess what I would

8  like to add to that is why these things occurred,

9  at least to the best of my understanding.  And what

10  I would like for the Panel to know is that the

11  information that I give to you is not a means for

12  me to lessen the (indiscernible) offense or take

13  anything away from it or as an excuse, but it's

14  only for --

15      PRESIDING COMMISSIONER FISHER:  I'm sorry.

16  I don't mean to interrupt you.  I think you're

17  probably about to talk to me about some insight

18  about what was going on with you?

19      INMATE BAKER:  Yes.

20      PRESIDING COMMISSIONER FISHER:  And for my

21  purposes right now, I'm just looking to set down

22  the facts of the crime.  We are going to talk about

23  that, but I just want to, I want to make sure the

24  facts are on record first.  So is there anything

25  factually that you would change?

26      INMATE BAKER:  No, that's it.

27      PRESIDING COMMISSIONER FISHER:  Okay, we're

16

1  going to talk about what you were about to bring

2  up, but I wanted to make sure that that's --

3      INMATE BAKER:  That's accurate.

4      PRESIDING COMMISSIONER FISHER:  Okay, so

5  tell me what was going on with you at the time?

6      INMATE BAKER:  I was up under a lot of

7  stress prior to this crime occurring.  And what

8  I've come to realize through all the psychological

9  programs I've been involved in throughout the years

10  is that the things that was going on in my life

11  that affected this crime occurred like a week prior

12  to this crime.  And what had happened then was I

13  found out that my child had been aborted, and when

14  I heard that, it just kind of, it twisted me.  It

15  just sent me in a rage.  I didn't know how to deal

16  with that at that time.  I didn't talk to no one

17  about that then.  When I heard, I didn't even talk

18  to my girl about that, my girlfriend at the time

19  who did that.  And what happened leading up to the

20  crime was that I got away from her to go be with my

21  family for support, because I was really distraught

22  behind that because I was looking forward to

23  becoming a father at that time.  And like we had

24  smoked marijuana laced with PCP.  And what, how

25  that came about was because I smoked a joint one

26  other time in my life and that was during my

27  birthday.  And my cousin who observed me smoking

1   that joint -- See all the joint did for me was it

2   made me happy, but it made me eat a lot, but it

3   didn't make me violent or anything.  So I can only

4   roughly think in terms of why they would give me a

5   joint at that time to smoke was to bring me up out

6   of that depression.  But what no one accounted for

7   was the effects of the PCP.  And I say that too

8   because -- This is not an excuse.  This is not an

9   excuse.

10          **PRESIDING COMMISSIONER FISHER:**  Well what

11   were the effects of the PCP?

12          **INMATE BAKER:**  It kind of, it deepened my

13   feelings of remorse.  I mean, the pain I was

14   feeling for my kid, it deepened that.  It made me,

15   what I come to learn, to become narcissistic.  In

16   other words, it made me stop thinking about people.

17   It made me think about me.  And what I further

18   learned about that is this here.  Is as the

19   psychologist -- just bear with me for a minute here

20   so I can get this right -- As I was going through

21   my Category X and all these programs to understand

22   why I did these things, what the psychiatrist

23   discovered in me was this here.  When I was 10

24   years old I observed my mother getting robbed and

25   beat to the point where she couldn't have any

26   children as we exited a store and I was pushed to

27   the side.  And I remember being upset at myself

18

1   because I couldn't do anything.  But I also

2   remember being upset at society because nobody came

3   to our aid.  But what I didn't realize then was

4   that's when the Bloods and Crips had just come out

5   and people were scared to get involved.  But that

6   pain and that anger I had then stayed with me

7   because I never dealt with that pain or anger.  And

8   so what happened, as soon as I heard about that

9   with my child, I felt again that I had let somebody

10  down that I loved, that I wasn't there to protect

11  that person.  And so that sent me over the edge.

12  It really did.  And I just, I don't know the proper

13  words to convey to you the things that I was

14  feeling at that time, but it just, it made me, I

15  got numb.  It made me like feel just unreal.  I

16  just didn't matter anymore.  I just didn't exist.

17  And what the PCP did was it made the anger grow

18  more because that anger that I established way back

19  when had never been dealt with and it came to

20  surface.  And what that did, it just put it at a

21  real high level.  And then that accompanied with

22  the remorse, I mean with the pain I felt for my

23  kid, I just didn't care.  And that's what it did to

24  me, I just didn't care.

25          PRESIDING COMMISSIONER FISHER:  Okay, let me

26  ask you a couple things related to that.

27          INMATE BAKER:  Yes.

19

1        **PRESIDING COMMISSIONER FISHER:**  You were 18

2    when this happened?

3        **INMATE BAKER:**  Yes, I was.

4        **PRESIDING COMMISSIONER FISHER:**  When, and

5    you said that right before, shortly before this

6    crime occurred was when you found out about the

7    abortion?

8        **INMATE BAKER:**  Yes, Ma'am.

9        **PRESIDING COMMISSIONER FISHER:**  But that,

10    this wasn't the first crime you committed?

11        **INMATE BAKER:**  Yeah, no, there was a

12    burglary I committed.  I did a burglary.  I went

13    into the store.  This wouldn't even be in my file,

14    I was going through changes.  I went into the store

15    because I didn't have nothing to eat.  I didn't rob

16    the store, I wanted to eat.  But the only way I

17    could do that was I sat back and the store closed

18    and I ate.  And as I exited that's when the police

19    came.

20        **PRESIDING COMMISSIONER FISHER:**  All right,

21    but then, when you were sent to Juvenile Camp, you

22    escaped.

23        **INMATE BAKER:**  Yeah, I walked away.  I

24    walked away from a ranch.

25        **PRESIDING COMMISSIONER FISHER:**  Okay, so

26    what I'm saying is that before this crime happened

27    there was something going on with your attitude.

20

1    **INMATE BAKER:**  Absolutely.  I absolutely

2    agree.

3    **PRESIDING COMMISSIONER FISHER:**  Okay, I just

4    wanted to make sure that was clear on that.

5    **INMATE BAKER:**  Yes, you're right.

6    **PRESIDING COMMISSIONER FISHER:**  So why do

7    you think you took it out on people that you didn't

8    know instead of taking it out on the person that

9    aborted the baby?

10    **INMATE BAKER:**  Well I think it had to do

11    with, like I said earlier, is that I really didn't

12    care because at that time responsibility, thinking

13    responsible and all those things went out the

14    window.  And I think, you know and it wasn't, it

15    had nothing to do with them, in that sense that I

16    had met them, because I had never met them before.

17    I didn't even know them people from anyone.  So it

18    just happened that they were in that path, that

19    line of path, that path I chose to go down at that

20    time.

21    **PRESIDING COMMISSIONER FISHER:**  In the 2003

22    Psych Report it says that you, when you were

23    talking to the counselor about the review of the

24    crime, it says that your gun went off.  Is that

25    correct?

26    **INMATE BAKER:**  No.

27    **PRESIDING COMMISSIONER FISHER:**  What

21

1    happened?

2         **INMATE BAKER:**  Because I remember like when

3    Mr. Dixon went to slap the gun, right, and my

4    finger, it was on the trigger, and my finger

5    pulled.  That's what that was.

6         **PRESIDING COMMISSIONER FISHER:**  Okay, I just

7    want to be clear on that.

8         **INMATE BAKER:**  Yes, Ma'am.

9         **PRESIDING COMMISSIONER FISHER:**  All right.

10   Okay, is there anything else about the facts of the

11   crime that we haven't covered that you think would

12   be important?

13        **INMATE BAKER:**  No, that's fairly accurate.

14        **PRESIDING COMMISSIONER FISHER:**  Okay,

15   because we'll revisit the other things we talked

16   about within the hearing.  I want to go through

17   your social history.  And normally I start with

18   your, any contacts with law enforcement prior to

19   this crime, but we already talked about the fact

20   that you were arrested for burglary at 17.  We

21   talked about what that was, and you walked away and

22   then you went to the Youth Authority, right?

23        **INMATE BAKER:**  Yes, Ma'am.

24        **PRESIDING COMMISSIONER FISHER:**  Okay.  Let's

25   see, okay, so was that the reason that you didn't

26   finish high school?

27        **INMATE BAKER:**  Yes, at that time there, like

22

1    I said, me and my father, we was kind of going

2    through changes.  I was upset with my father

3    because my father was, he was drinking heavily, and

4    I didn't like that, because I seen him argue with

5    my step mom.  And we was going through it and so I

6    didn't want to be around that and so even when he

7    was trying to tell me to go to school and things, I

8    just wouldn't listen to him.  I was rebelling at

9    that point in my life.

10    **PRESIDING COMMISSIONER FISHER:**  Were you

11    living with your father?

12    **INMATE BAKER:**  Yes, I was.

13    **PRESIDING COMMISSIONER FISHER:**  Okay, so you

14    were living with your father and your step mom?

15    **INMATE BAKER:**  Yes.

16    **PRESIDING COMMISSIONER FISHER:**  Okay.  And

17    again, and I'm looking at the 2003 Psych Report

18    right now, but it says that your mom died in 1995

19    at 46.  Is that actually your biological mother?

20    **INMATE BAKER:**  Yes, that's my mom.

21    **PRESIDING COMMISSIONER FISHER:**  It just

22    wasn't clear if that was your mother.  And your

23    father died in 1995?

24    **INMATE BAKER:**  Yes, Ma'am.

25    **PRESIDING COMMISSIONER FISHER:**  And at the

26    time that this was written it says you weren't sure

27    what caused his death.  Do you know what that was?

23

1    **INMATE BAKER:**  No.

2    **PRESIDING COMMISSIONER FISHER:**  But you said

3    that he smoked a lot and --

4    **INMATE BAKER:**  Yeah, my father did a lot of

5    drinking.  It contributed to that.  I don't know

6    what the factors were that caused it, but I believe

7    it had something to do with his drinking.

8    **PRESIDING COMMISSIONER FISHER:**  And then it

9    says here that you were raised by your mother and

10   grandparents until you were 15, and then when you

11   were 15 you went to live with your father.  You

12   have two brothers?

13   **INMATE BAKER:**  Yes, Ma'am.

14   **PRESIDING COMMISSIONER FISHER:**  Okay, and

15   you're still in communication with them?

16   **INMATE BAKER:**  Yes, I am.

17   **PRESIDING COMMISSIONER FISHER:**  And what

18   about your brothers?  Did they have any problems

19   with law enforcement?

20   **INMATE BAKER:**  Well the one, my younger

21   brother did.  He joined the Crips and all kinds of

22   problems followed that.  I haven't really been in

23   contact with him.  But my -- I believe he's in the

24   system somewhere, my younger brother.  My older

25   brother is a minister and he's been a minister as

26   long as I can remember.

27   **PRESIDING COMMISSIONER FISHER:**  Okay.

24

1          **INMATE BAKER:**  So he hasn't had any problem

2     with the law.

3          **PRESIDING COMMISSIONER FISHER:**  Okay.  And

4     you've been married two times, right?

5          **INMATE BAKER:**  Yes, I have.

6          **PRESIDING COMMISSIONER FISHER:**  It says your

7     first marriage lasted about six years and it

8     started when you were 18.

9          **INMATE BAKER:**  Yes, Ma'am.

10         **PRESIDING COMMISSIONER FISHER:**  And you have

11    no children from that marriage.

12         **INMATE BAKER:**  That's true.

13         **PRESIDING COMMISSIONER FISHER:**  Okay, and

14    then you married again in 2002?

15         **INMATE BAKER:**  Yes.

16         **PRESIDING COMMISSIONER FISHER:**  And are you

17    still married?

18         **INMATE BAKER:**  Yes, I am.

19         **PRESIDING COMMISSIONER FISHER:**  Okay.  And

20    it says here that you do receive visits

21    (indiscernible).

22         **INMATE BAKER:**  Yes, Ma'am, I do.

23         **PRESIDING COMMISSIONER FISHER:**  But you have

24    no children at this point, right?

25         **INMATE BAKER:**  Yes, that's true.

26         **PRESIDING COMMISSIONER FISHER:**  All right.

27    You say you'd only smoked pot once before this

25

1    happened?

2          INMATE BAKER:  That's true.

3          PRESIDING COMMISSIONER FISHER:  What about

4    alcohol?

5          INMATE BAKER:  No, Ma'am, I never drank.

6          PRESIDING COMMISSIONER FISHER:  All right.

7    Who are these people that were involved in the

8    crime with you?  How did you know them?

9          INMATE BAKER:  I had, well, two of them was

10   my cousins.  My cousins Bernice and my other cousin

11   Steven.  And Ferris was a friend of theirs.  And

12   that's who they were.  They just happened to be

13   there.  I think Ferris, when I went over there to

14   be around people and to kind of up my spirits, and

15   they happened to all be there at that time.

16         PRESIDING COMMISSIONER FISHER:  How old was

17   Bernice?

18         INMATE BAKER:  I believe Bernice was 18.

19         PRESIDING COMMISSIONER FISHER:  The other

20   two were really young.

21         INMATE BAKER:  Yeah, like 15 or 16,

22   something like that?

23         PRESIDING COMMISSIONER FISHER:  Whose idea

24   was this?

25         INMATE BAKER:  Well initially this started

26   out with my cousin Bernice saying that she needed

27   some milk for her baby.  And we just couldn't, we

26

1   didn't have a ride or nothing there, and I wasn't
2   familiar with the area.  And then we was talking
3   about going out to the road to get a ride of some
4   type.  Initially and the idea of that, about the
5   car taking was mine and Steven, to get to the
6   store.
7        **PRESIDING COMMISSIONER FISHER:**  And three of
8   you had guns, right?
9        **INMATE BAKER:**  Yes, Ma'am.
10       **PRESIDING COMMISSIONER FISHER:**  Did you
11  normally have a gun?
12       **INMATE BAKER:**  No, Ma'am.  My cousin, with
13  them, that's sort of like my aunt Della and her
14  husband Hop, they had weapons like that because he
15  used to always go hunting, fishing, and things like
16  that.  He was in law enforcement too, so they had
17  things like that around the house.
18       **PRESIDING COMMISSIONER FISHER:**  So at what
19  point did you decide to bring the guns along with
20  you?
21       **INMATE BAKER:**  When we decided to go out
22  there and get the car.
23       **PRESIDING COMMISSIONER FISHER:**  Okay, and
24  why did you disguise yourself as a woman?
25       **INMATE BAKER:**  Because she didn't want to
26  stand out there by herself, and it was dark.  And I
27  told her I would dress in a dress and stand there

27

1    with her.

2          PRESIDING COMMISSIONER FISHER:  Because you

3    figured it would be easier to get somebody to pull

4    over?

5          INMATE BAKER:  That's one of the reasons.

6    That's one of the reasons.

7          PRESIDING COMMISSIONER FISHER:  Okay.  Do

8    you have any questions?  I'm sorry, I'm moving way

9    ahead in the hearing without actually going through

10   (indiscernible) after I finish asking questions.

11   Is there anything else about your social history

12   that we should talk about before we move on?

13   Anything important?

14         INMATE BAKER:  No we basically covered it.

15         PRESIDING COMMISSIONER FISHER:  We covered

16   it?

17         INMATE BAKER:  Yes, Ma'am.

18         PRESIDING COMMISSIONER FISHER:  All right.

19   Let me tell you what I have here regarding parole

20   plans.  It says that if you were to receive a

21   parole date that you would live with your fiancée.

22   Is that correct?

23         INMATE BAKER:  My wife.

24         PRESIDING COMMISSIONER FISHER:  That would

25   be your wife?

26         INMATE BAKER:  Yes.

27         PRESIDING COMMISSIONER FISHER:  All right.

28

1    And that you -- Now this is back in the Board

2    Report in 2002.  I think the current one says to

3    refer back to it, as I recall, yes, it does.  It

4    says that you've received an offer of employment

5    from Ethel Martin?

6         INMATE BAKER:  Yes.

7         PRESIDING COMMISSIONER FISHER:  Okay.  She's

8    your aunt?

9         INMATE BAKER:  Yes.

10        PRESIDING COMMISSIONER FISHER:  Who has

11   arranged employment as a bookkeeper in an

12   accounting firm.  Is that right?

13        INMATE BAKER:  That's true.

14        PRESIDING COMMISSIONER FISHER:  Okay.  It

15   also says you plan to upgrade your computer

16   technology vocational skills by attending college

17   in the evening.

18        INMATE BAKER:  That's true.

19        PRESIDING COMMISSIONER FISHER:  Okay, is

20   there anything else about your parole plans that we

21   should talk about?

22        INMATE BAKER:  Well, I guess I can add into

23   that is that I've had a calling.  And what I mean

24   by that, is that God is directing my life in other

25   ways to where He is directing me to become part of

26   a ministry and as a choir director because I've

27   done music all my life since I've been

29

1  incarcerated. And I didn't understand it at the

2  time I would get into the music, but over the past

3  several years I understand why God put in me such

4  an interest in music, and that's for me to, the

5  calling that He's got me on now. So that's going

6  to be part of my parole plans as well.

7      PRESIDING COMMISSIONER FISHER: And would

8  that be as a volunteer at the church or would that

9  be a paid position?

10     INMATE BAKER: A pastor. I'm going to

11  college also to become a pastor.

12     PRESIDING COMMISSIONER FISHER: Okay, so

13  you're going to actually pursue that as an

14  education program?

15     INMATE BAKER: Yes, Ma'am, absolutely.

16     PRESIDING COMMISSIONER FISHER: All right.

17  I've got some letters of support here and I'm going

18  to read these. I'm not going to read them

19  verbatim. This first one is pretty long. So I'm

20  going to try and pull out the most important parts.

21  If there's anything in any of the letters that I

22  miss that you think would be important for me to

23  read into the record, let me know, okay.

24     INMATE BAKER: Yes.

25     PRESIDING COMMISSIONER FISHER: The first

26  one is from Helen June Smith, and the heading on

27  the letterhead says Accessories and Things and this

30

1   is in Pomona, California. And she says, this is

2   your aunt, and she says she's in Pomona. She's

3   telling me about her business and her church and

4   where she lives and so on and so forth. She says

5   my position has not changed. I'm here for my

6   nephew Frederick. For many years I have given my

7   support with phone calls, care packages, visits,

8   and prayer. I have noted a great change in

9   Frederick's attitude and outlook on life. He has

10  made great strides in preparing himself for society

11  in education and soul searching. Frederick has

12  voiced his regret for the unlawful deeds he

13  committed as a young man of 18 years old many

14  times. He is ready to give back to society the

15  greatest gift he has, a law-abiding, gifted,

16  talented, well-balanced, educated black man and

17  husband with high morals, self-esteem, and true

18  love for Christ. She talks about your marriage and

19  talks about the fact that you've lost your parents

20  and grandparents and she says that she has a

21  position for you in her retail store industry with

22  great benefits. And I know he'll be a great asset.

23  My husband and I have a large four bedroom home

24  that Frederick and his wife Linda could reside in

25  until they get their foot on solid ground. If they

26  don't wish these arrangements, I've spoken to other

27  relatives that will step in and help make that

31

1    difference.  This one is from Joe Draper and is

2    this her husband?

3            **INMATE BAKER:**  Yes, Ma'am.

4            **PRESIDING COMMISSIONER FISHER:**  All right,

5    he says that he has conversed with you through

6    telephone calls and visitations.  He says that

7    you're a God-fearing young man and he says that

8    he's seen you grow in a very positive way and that

9    you have a good attitude.  He says that you show

10   great remorse and compassion for people that you

11   (indiscernible) you've taken positive steps to

12   educate yourself while you've been in the system.

13   And he says our home and support will be there for

14   Frederick and his wife Linda.  And this one is

15   from, this is from Linda.  Is this your wife?

16           **INMATE BAKER:**  Yes, that's my wife.

17           **PRESIDING COMMISSIONER FISHER:**  And I think

18   it's supposed to say Williams Baker, but it looks

19   like a B instead of a K.

20           **INMATE BAKER:**  Well my name is actually

21   Baber.

22           **PRESIDING COMMISSIONER FISHER:**  Is it?

23           **INMATE BAKER:**  Yeah, but they got a K in it

24   in the county jail and I guess the only way I can

25   rectify that is go back to court or something.

26           **PRESIDING COMMISSIONER FISHER:**  Okay.  All

27   right, well that explains that.  So

32

1    (indiscernible). She says that she's resided in

2    the same gated community complex in San Bernardino

3    County for five years. She says should the Board

4    decide not to allow Frederick to parole to San

5    Bernardino County, I have agreed to accept

6    temporary residency in a suitable facility until we

7    can establish a much more reliable and permanent

8    residence in Riverside County. She's talking about

9    staying in like a hotel (indiscernible) I assume

10   one of those long-term residential kind of things.

11        INMATE BAKER: Yes, Ma'am.

12        PRESIDING COMMISSIONER FISHER: She says

13   that she's been in contact with your aunt and

14   uncle. And that you can live with them if you need

15   to. She says I am financially able to take care of

16   my husband while he is seeking employment. I have

17   my own business as a caterer, wedding consultant,

18   and event planner. The company's name is LaJoyce

19   Creative Designs, and for the transcriber that's

20   capital L-A capital J-O-Y-C-E, and that the

21   business is located in (indiscernible). That's

22   everything I have in the file. Is there anything

23   I've missed?

24        ATTORNEY TARDIFF: There's some updates.

25        PRESIDING COMMISSIONER FISHER: Are there?

26        ATTORNEY TARDIFF: Yes, you should have it.

27        PRESIDING COMMISSIONER FISHER: Once again,

33

1    I have some updates, but not that update.  I have

2    the, I have two copies of the District Attorney's

3    letter.

4          DEPUTY COMMISSIONER MEJIA:  That's what I

5    have too.

6          ATTORNEY TARDIFF:  I got this sent to me in

7    the mail.

8          PRESIDING COMMISSIONER FISHER:  All right,

9    thank you.

10         DEPUTY COMMISSIONER MEJIA:  You're welcome.

11         PRESIDING COMMISSIONER FISHER:  All right,

12   let's see.  (Indiscernible.)  This I have.

13         DEPUTY COMMISSIONER MEJIA:  Do you have the

14   June 25th, 2004?

15         PRESIDING COMMISSIONER FISHER:  Yeah, I

16   think I've got everything (indiscernible) copies of

17   what I already read.  The first one is from

18   Stephanie Velez, V-E-L-E-Z, and she says she's

19   known you all of her life but that in 1993 she

20   became close to you.  This is your cousin?

21         INMATE BAKER:  Yes, it is.

22         PRESIDING COMMISSIONER FISHER:  Okay.  She

23   says since that time I've gotten to know my cousin

24   better.  I've discovered that he's a very warm,

25   smart, and talented individual.  She says that our

26   family is ready to help Frederick in any way

27   possible financially and spiritually.  We stand

34

1   ready to support, assist, and encourage Frederick.

2   This one is from Ethel Martin Miller.  And she

3   says, this is your aunt, right?

4           INMATE BAKER:  Yes.

5           PRESIDING COMMISSIONER FISHER:  She says

6   that she's aware of the crimes that you committed

7   and that she's been in contact with you through

8   telephone calls.  And she says I would like it

9   known that this letter is valid indefinitely until

10  Frederick is released.  She says that she loves you

11  and she'll help you in every area that you need

12  help in making a smooth transition.  She says I

13  have in every letter to the Board members stated

14  that Frederick can live with me and now that he's

15  married I extend the same invitation to him and his

16  wife.  She lives in San Bernardino County, and she

17  mentions the job offer that you have from your

18  other aunt.  And this says, is it pronounced Hail?

19          INMATE BAKER:  Hail.

20          PRESIDING COMMISSIONER FISHER:  Hail.  This

21  is your uncle?

22          INMATE BAKER:  Yes.

23          PRESIDING COMMISSIONER FISHER:  And for the

24  transcriber that's H-A-I-L.  He says I have seven

25  children and many adopted community children.  I

26  have several businesses and he says, he talks about

27  being the victim of a crime.  He was shot in an

35

1    attempted robbery when he was opening one of his

2    stores.  He says I lost 80 percent mobility of my

3    body.  I'm a quadriplegic and confined to a

4    wheelchair for the rest of my life.  He says I am

5    aware that someone was shot and paralyzed in the

6    robbery that was committed by my nephew.  I can

7    relate to the victim because of my condition.  I am

8    very sorry for what happened, as is my nephew.  And

9    he says that you've reversed the direction of your

10   life and has made, that you've made the decision to

11   be an asset to society.  And this is another letter

12   from your aunt, which just basically restates what

13   I read.  And another copy of the one from your aunt

14   Ethel.  This is another copy of the one

15   (indiscernible).  I think we have everything.  Is

16   that it?

17        **INMATE BAKER:**  Yes, that's it.

18        **PRESIDING COMMISSIONER FISHER:**  Okay, if

19   there's nothing else that we need to talk about as

20   far as your parole plans go, if you will turn your

21   attention to Commissioner Mejia, he's going to go

22   through your program with you.

23        **INMATE BAKER:**  Okay.

24        **DEPUTY COMMISSIONER MEJIA:**  Okay, Mr. Baker,

25   I'll be covering your institutional adjustment in

26   this portion of this hearing since your last Board

27   appearance.  I have reviewed your Central File,

36

1    Board Reports, and Psychiatric Report.  If I miss

2    anything I'll give you and your attorney the

3    opportunity to make comments at the end of my

4    presentation.  Your last Board appearance was on

5    August 5th, 2003, where you received a one-year

6    denial.  The recommendations were for you to remain

7    disciplinary free and participate in self-help.

8    Classification score is 19, Medium A custody level.

9    You're now currently working in the clothing room?

10         INMATE BAKER:  Yes, I am.

11         DEPUTY COMMISSIONER MEJIA:  Satisfactory to

12    above-average work reports.  You're an assistant

13    tailor now?

14         INMATE BAKER:  Yes, I am.

15         DEPUTY COMMISSIONER MEJIA:  And you have a

16    GED in 1981?

17         INMATE BAKER:  Yes.

18         DEPUTY COMMISSIONER MEJIA:  And in 1989 I

19    see you have 20 units of Hartnell College

20    attendance.

21         INMATE BAKER:  Yes.

22         DEPUTY COMMISSIONER MEJIA:  Did you get any

23    degree with that?

24         INMATE BAKER:  No, I got my -- First, I got

25    my GED in '89.

26         DEPUTY COMMISSIONER MEJIA:  '89?

27         INMATE BAKER:  Yes, and no, I didn't

37

1   complete the Hartnell College.

2          DEPUTY COMMISSIONER MEJIA:  So you've got 20

3   units of that?

4          INMATE BAKER:  Yes, Sir.

5          DEPUTY COMMISSIONER MEJIA:  And you're

6   currently attending the Coastal Crimanon?

7          INMATE BAKER:  Yeah, Crimanon.

8          DEPUTY COMMISSIONER MEJIA:  Crimanon

9   (indiscernible) Independent Study Program.  And

10  what do you take from that?

11         INMATE BAKER:  I'm basically studying --

12         DEPUTY COMMISSIONER MEJIA:  And how long

13  have you been there?

14         INMATE BAKER:  I've been there since about a

15  year.

16         DEPUTY COMMISSIONER MEJIA:  2004 you

17  started, December 1st [sic]?

18         INMATE BAKER:  Yes.  That's stuff I just

19  completed.  I'm waiting for a completion to come

20  back on that now.

21         DEPUTY COMMISSIONER MEJIA:  Okay.  And then

22  you have a (indiscernible) administration course

23  completed in 1998?

24         INMATE BAKER:  Yes.

25         DEPUTY COMMISSIONER MEJIA:  Okay.  You've

26  been attending NA, AA, since 1997?

27         INMATE BAKER:  Since '90 -- Well here, at

38

1   this institution.  But I've been in since '91, is

2   when I started.

3           DEPUTY COMMISSIONER MEJIA:  And in 2001 you

4   attended a Lifer Group with (indiscernible) this

5   year.  Are you still attending that Lifer Process

6   Group?  Are you still part of that?

7           INMATE BAKER:  No, that group doesn't run

8   anymore.  It ran for like a year then they

9   transferred him out and the program stopped.

10          DEPUTY COMMISSIONER MEJIA:  Anything else

11  that you've done that I haven't included in my

12  presentation?

13          ATTORNEY TARDIFF:  Yeah, he's done a lot.

14          DEPUTY COMMISSIONER MEJIA:  Just for this

15  year.

16          ATTORNEY TARDIFF:  Right.  He's got the

17  Protestant Chapel.  Why don't you hand that over to

18  him.  I don't know why you don't have that in his

19  Central File.

20          DEPUTY COMMISSIONER MEJIA:  No, I don't have

21  it that's why I asked for additional documents

22  earlier today.

23          ATTORNEY TARDIFF:  I couldn't make that out.

24          DEPUTY COMMISSIONER MEJIA:  You have

25  attending meetings, (indiscernible) you're still

26  with AA and NA?

27          INMATE BAKER:  Yes.

39

1    **DEPUTY COMMISSIONER MEJIA:**  And let's see,

2    Arts and Corrections Program over the last 18

3    years?

4    **INMATE BAKER:**  Yes.

5    **ATTORNEY TARDIFF:**  He's been doing Bible

6    studies.  He should have a chrono from 6/04.  The

7    Christmas Festival, Body of Protestant Chapel,

8    5/04.

9    **DEPUTY COMMISSIONER MEJIA:**  Let me just read

10   through this.

11   **ATTORNEY TARDIFF:**  And then apparently you

12   didn't get these updates.

13   **DEPUTY COMMISSIONER MEJIA:**  What's that?

14   **PRESIDING COMMISSIONER FISHER:**  I don't

15   think we did.  There is some stuff in the back of

16   this Board packet, but I don't know if

17   (indiscernible).

18   **DEPUTY COMMISSIONER MEJIA:**  Okay, so I

19   mentioned AA since 1997 here, and then you say it's

20   1991?

21   **INMATE BAKER:**  Yes.

22   **DEPUTY COMMISSIONER MEJIA:**  I've seen some

23   earlier AA attendance in there.  And you're

24   (indiscernible) choir director, Music

25   (indiscernible) since June 2002, 2003?

26   **INMATE BAKER:**  Yes.

27   **DEPUTY COMMISSIONER MEJIA:**  You participated

40

1   in the Christmas Festival in 2004 [sic], Arts and

2   Corrections, I mentioned that.  Active member of

3   the Body of Protestant Chapel for several years

4   according to this chrono in 2004.

5           **ATTORNEY TARDIFF:**  Do you have anything from

6   that Amazing Facts Bible Studies?

7           **DEPUTY COMMISSIONER MEJIA:**  Is that this

8   year?

9           **INMATE BAKER:**  Yeah, I completed it since my

10  last hearing.

11          **DEPUTY COMMISSIONER MEJIA:**  Okay.  You got a

12  laudatory chrono from (indiscernible) Barnes, Task

13  Coordinator.  (Indiscernible) conscientious, hard

14  working, performance of his duties.

15  (Indiscernible) education, completed the Amazing

16  Facts Bible Study course, October 6th, 2003.  Now

17  you've been -- I read that one.  You're still

18  attending AA?

19          **INMATE BAKER:**  Yes, I am.

20          **DEPUTY COMMISSIONER MEJIA:**  And I have the

21  chrono here.

22          **ATTORNEY TARDIFF:**  And NA also, right?

23          **INMATE BAKER:**  Yes.

24          **DEPUTY COMMISSIONER MEJIA:**  How do you do

25  both of them?

26          **INMATE BAKER:**  Well it happened, I go to AA

27  on Saturdays, and NA on --

41

1    **DEPUTY COMMISSIONER MEJIA:** And NA?

2    **INMATE BAKER:** And NA on Thursdays.

3    **PRESIDING COMMISSIONER FISHER:** I can't tell

4    you how many people come in here and tell us they

5    can't go to either.

6    **INMATE BAKER:** Well one thing I've learned

7    is that you've got to apply yourself to it.

8    **DEPUTY COMMISSIONER MEJIA:** You have to be

9    resourceful.

10   **INMATE BAKER:** Amen.

11   **DEPUTY COMMISSIONER MEJIA:** And you have

12   the, what's this Accessories and Things, what's

13   this for?

14   **ATTORNEY TARDIFF:** That's the -- forget

15   that. That's a support letter. Is there anything

16   else?

17   **INMATE BAKER:** No.

18   **DEPUTY COMMISSIONER MEJIA:** Okay, we'll go

19   to your disciplinary history. You have one July

20   2000, in 1989?

21   **INMATE BAKER:** Yeah, I had '89 and '84.

22   **DEPUTY COMMISSIONER MEJIA:** And '84. So two

23   of them, the last being in '89?

24   **INMATE BAKER:** Yes.

25   **DEPUTY COMMISSIONER MEJIA:** And you have one

26   128?

27   **INMATE BAKER:** No, Sir.

42

1      **PRESIDING COMMISSIONER FISHER:**   I show none.

2      **DEPUTY COMMISSIONER MEJIA:**   Let's see where

3   did I get that one?

4      **ATTORNEY TARDIFF:**   He's got another 115 in

5   '84.

6      **DEPUTY COMMISSIONER MEJIA:**   That's what I'm

7   saying, there's two of them.

8      **INMATE BAKER:**   Two.

9      **ATTORNEY TARDIFF:**   But no 128s.

10      **DEPUTY COMMISSIONER MEJIA:**   Okay, no 128s.

11   No gang affiliation noted.   And we're going to go

12   to your Psych Reports.   I'll keep this one out so I

13   can -- The Psych Report I have is May 30, 2003.   Do

14   you have a 2004?

15      **ATTORNEY TARDIFF:**   No.

16      **DEPUTY COMMISSIONER MEJIA:**   So this is the

17   most current?

18      **ATTORNEY TARDIFF:**   Yes.

19      **DEPUTY COMMISSIONER MEJIA:**   By Dr. Jeff

20   Howlin, H-O-W-L-I-N, dated May 30, 2003.   And

21   diagnostic impression is Axis I, No Contributory

22   Clinical Disorder.   Axis II, No Contributory

23   Personality Disorder.   Axis III, No Contributory

24   Physical Disorder.   Axis IV, Long Term

25   Incarceration.   Axis V, GAF of 85.   His prognosis

26   is positive for being able to maintain his current

27   mental status in the community upon release.   There

43

1   is no evidence of mood or thought disorder.  At

2   that time his judgment appeared to be in tact.

3   Demonstrated excellent insight into his commitment

4   offense.  Review of life crime, as Baker discussed

5   the circumstances surrounding his commitment

6   offense (indiscernible) version was similar to that

7   discussed in the Central File.  As mentioned

8   previously he had smoked marijuana cigarette that

9   day he said which had been laced with PCP, white

10  powder.  (Indiscernible) led to choices that led to

11  a store being robbed, two females being kidnapped

12  and taken away and dropped off a couple miles from

13  the store.  Later while driving what inmate Baker

14  described as a joy ride, they saw an individual by

15  the road and wanted to scare him.  They stuck guns

16  out of the window after which the victim slapped

17  inmate Baker's gun and since his hand was on the

18  trigger the gun went off.  Mr. Dixon, the victim,

19  was paralyzed from the waist down.  Inmate Baker

20  discussed the crime in detail and his reflection

21  and thoughts about why such things might have

22  happened.  He said that in particular after taking

23  Dr. (indiscernible) Lifer Group he realized that

24  about a week prior to the commitment offense --

25      [Thereupon, the tapes were turned over.]

26      **DEPUTY COMMISSIONER MEJIA:**  Okay, we're on

27  side B of this hearing.  I'm reading the

44

1    Psychological Report.   Prior to his commitment

2    offense he had become very angry due to learning

3    that his ex-girlfriend has aborted his child.   He

4    said, "this really messed me up," quote, unquote.

5    Therefore, he said he was feeling both anger and

6    depression as a result of what happened and now

7    thinks that the use of PCP and marijuana only

8    elevated these intense feelings.   Inmate Baker

9    accepted responsibility for the crime.   He did not

10   attempt to minimize his part.   However, he

11   acknowledged the role that his life events played

12   as well as the use of illicit substances.   He did

13   not (indiscernible) premeditation involved in the

14   crime itself.   He demonstrated what appeared to be

15   a genuine remorse when discussing the victims.   And

16   it was clear after his (indiscernible) discussion

17   that he has spent much time reflecting on the

18   crimes generating alternatives to his choices at

19   that time.   Since being incarcerated for a period

20   of about 23 years, inmate Baker has only two, has

21   had two CDC 115s, the last being in 1989.   Neither

22   of the 115s were of a violent nature.   He denied

23   any gang prior to or since his incarceration and

24   has rather minimal criminal record.   He has a one-

25   time burglary charge as a juvenile and stated he

26   spent approximately nine months in the Youth

27   Authority.   Inmate Baker has made considerable

45

1   gains since his incarceration.  It appears he has

2   taken advantage of many self-help (indiscernible)

3   as well as more internally driven changes and

4   attempts at self-improvement such as his training

5   in computer programming and his music.  In

6   consideration of these factors as well as his lack

7   of additional violent history outside his

8   commitment offense, his relative lack of

9   significant CDC 115 violation history, it is

10  estimated that his violence potential within a

11  controlled setting is estimated to be significantly

12  below average relative to the Level Two inmate

13  population.  If released to the community his

14  violence potential is estimated to be no more than

15  higher, no more than, to be no higher than the

16  average citizen in the community.  Possible risk

17  factors for this inmate which could be a precursor

18  to violence will be a return to the use of illicit

19  substances.  Should he choose to abuse illicit

20  substances again, particularly PCP, his violence

21  potential would be considered much higher than the

22  average citizen in the community.  And the

23  counselor had him as posing a low degree of threat

24  when released to the community.  Do you have

25  anything to add or anything to comment

26  (indiscernible) my presentation, Counsel?

27          **ATTORNEY TARDIFF:**  Not at this time.

46

1    **DEPUTY COMMISSIONER MEJIA:**  Then we'll

2    return this back to the Chair.

3    **PRESIDING COMMISSIONER FISHER:**  I want to go

4    back to some of your Psych Reports.  And they've

5    talked over the years about your feelings of

6    remorse for what happened.  Can you articulate that

7    for us, please, how you feel about how your actions

8    affected other people's lives?

9    **INMATE BAKER:**  Absolutely.  I know when I

10   first caught this offense, I didn't really think

11   about other people.  But since going through all

12   the psychiatric programs and the self-help, what

13   I've learned is that, feeling-wise, man, excuse me.

14   **PRESIDING COMMISSIONER FISHER:**  It's all

15   right.

16   **INMATE BAKER:**  What I've learned,

17   particularly with the victim program that they have

18   set up to where they have a victim outreach

19   program, and I didn't understand how deeply victims

20   were hurt by crime.  And what I meant by that is

21   this here, is I didn't understand the long range

22   effects of crime on people and particularly for Mr.

23   Dixon, I'm so sorry.  I'm so sorry.  And I think

24   because of my uncle, because when he got paralyzed,

25   it's like I saw that as a calling come back to me

26   for what I did to him.  And that helped me to

27   understand, to get a deeper understanding of how

47

1    actually deep this crime was.  And what I've
2    learned is this here, particularly, Mr. Dixon, is
3    this here.  I not only affected him, but I've
4    affected his immediately family and his extended
5    family.  And what I mean by that is this here.  If
6    he didn't have any children, then I took that from
7    him.  I took that from him.  If he was married at
8    the time, that could have split his marriage.  None
9    of these things ever crossed my mind during this
10   crime, none of these.  But I understand now.  Like
11   I said, the far-reaching effects of it, he could,
12   as far as working-wise, he can't do the things he
13   used to do, and I understand that now.  And those
14   are things that really I think about every day.
15   And it's because of him and the other victims which
16   have prompted me to change my life.  Prior to this
17   crime I was never considered a bad person, I was
18   never considered a bad person.  And during this
19   crime, that was the worst time of my life.  And
20   after that crime, I've dedicated myself to helping
21   others.  I may not can give back that which I've
22   taken from them, but what I can do is, while I'm
23   here on this earth, is to help people the best I
24   can and how the Lord is using me to do that is
25   through ministering the word.  Now there's a lot of
26   people within this environment and I'm sure is out
27   there on the streets out there.  We take for

48

1    granted every day that we're going to be here.  We

2    take for granted that you know, nothing on earth is

3    going to happen.  But what I've learned is that God

4    can come at any time and take us.  And my whole

5    thing is to be right with God regardless of what

6    happens, to be right with God.  And I know that the

7    only way that I'm going to do that is to stand firm

8    on his word and do what he tells me to do.  And

9    it's because of my conviction to the scripture as

10   well as that to the victims.  I want them to

11   understand the things that they went through is not

12   going to go in vain.  It's not going to be in vain.

13   Even if I have to spend the rest of my life in

14   prison, it's not going to be in vain because I'm

15   going to make a difference whether it's here or out

16   there.  And there's just no words that I can really

17   express to you put in word that would really

18   express to you the pain that I feel for what I've

19   done.  And it's like if you think about the

20   Category X report they gave me, when I was going

21   through that, Dr. Gooday, he told me, he says,

22   there are, he says you're doing good here, but

23   there are underlying occurrences that you need to

24   deal with.  I didn't understand what he was talking

25   about.  But I see the underlying occurrences come

26   is with the new insight of how I affected people.

27   And in turn what can I do to make things better.

49

1  That's where the insight came.  I didn't understand

2  that then but I do now.

3         PRESIDING COMMISSIONER FISHER:  Okay, that

4  answered my question.  Do you have any questions,

5  Commissioner?

6         DEPUTY COMMISSIONER MEJIA:  Yeah, how did

7  the victim get shot twice?

8         INMATE BAKER:  My crimie, he had the gun

9  pointing out.  And I believe this, I don't know,

10  but I believe he pulled the trigger thinking I

11  pulled the trigger, and that's how that happened.

12  Because both barrels were right there.

13         DEPUTY COMMISSIONER MEJIA:  Okay, did you

14  see the victim fall on the ground?

15         INMATE BAKER:  No, I didn't.  That's my

16  cousin, she just drove off.

17         DEPUTY COMMISSIONER MEJIA:  Why did he have

18  high powered rifles in the back seat?

19         INMATE BAKER:  Well that's what we had.  We

20  left the house --

21         DEPUTY COMMISSIONER MEJIA:  What kind of

22  rifles were they?

23         INMATE BAKER:  I'm not an expert.  That's

24  why I say, that's my first time ever of being

25  around a weapon.

26         DEPUTY COMMISSIONER MEJIA:  The gun that you

27  shot the victim with?

50

1      INMATE BAKER:  That's what I'm saying.  It

2  was a rifle.  I know it was a rifle.

3      DEPUTY COMMISSIONER MEJIA:  Was it a 22?

4      INMATE BAKER:  Commissioner, I really

5  couldn't tell you that.

6      DEPUTY COMMISSIONER MEJIA:  Okay now, I was

7  going to ask you about the remorse, but you

8  answered that.  If you get released in the streets,

9  what kind of employment are you going to be able to

10  get yourself into in order for you to be a

11  productive member of society?

12      INMATE BAKER:  Okay I have --

13      DEPUTY COMMISSIONER MEJIA:  What have you

14  learned?  Because I see academics here.  I haven't

15  really seen any -- Do you have any vocation that

16  you've completed?

17      ATTORNEY TARDIFF:  Computer programming.

18      INMATE BAKER:  I've taken computer

19  programming.

20      DEPUTY COMMISSIONER MEJIA:  Computer

21  programming?

22      INMATE BAKER:  Yes, Sir.

23      ATTORNEY TARDIFF:  And right now he's in PIA

24  Textiles.

25      INMATE BAKER:  Yes.

26      DEPUTY COMMISSIONER MEJIA:  So what can you

27  use out there on the streets if you get released?

51

1       INMATE BAKER:  Well the skills, it's like
2  with a tax firm, he wants me to come there to
3  upgrade his system and to get employment there.
4  And I also could use that skill, this is why I'm
5  talking about going back to college, go to college
6  out there to upgrade it so that I can be right with
7  the mainstream of things.  The skills I learned
8  here, particularly, like I say, with the computer
9  programming, you know, it's a viable skill.  And I
10  see like even in this area here it talks about all
11  the time how the computer industry is still --
12       DEPUTY COMMISSIONER MEJIA:  I was basically
13  trying to review your file when Commissioner was
14  doing your parole plans.  Does he have any?
15       PRESIDING COMMISSIONER FISHER:  Yes, he has
16  a couple of offers of residences.
17       DEPUTY COMMISSIONER MEJIA:  How about
18  employment.
19       PRESIDING COMMISSIONER FISHER:  He has an
20  offer of employment.
21       DEPUTY COMMISSIONER MEJIA:  And the next
22  question is I've been listening of your description
23  of how you got, what led you to end up committing
24  those crimes.
25       INMATE BAKER:  Yes, Sir.
26       DEPUTY COMMISSIONER MEJIA:  You said what,
27  PCP, stresses in your life, lost your baby, not

52

1    getting along with your parents, with your dad, you

2    were angry.  If you're going to look at it, how

3    many percentage of personal responsibility with

4    that crime?

5        INMATE BAKER:  I take full responsibility

6    for that crime.  And the reason I say that is here,

7    because even though, this is why I was

8    (indiscernible) to the Panel, this is not an

9    excuse, because that was just for informational

10   purposes.  Because I understand that regardless of

11   what was going on in my life, I made that decision

12   to do that, so that makes me responsible.  Even

13   when I look at my crimies, and like Commissioner

14   Fisher just said right now, two of them was quite

15   young, two of them.  They in essence became victims

16   as well.  The reason I said that --

17       DEPUTY COMMISSIONER MEJIA:  You were the

18   eldest?

19       INMATE BAKER:  Pardon me?

20       DEPUTY COMMISSIONER MEJIA:  You were the

21   eldest?

22       INMATE BAKER:  Yes, Sir, I was 18.  They

23   became victims as well because of poor leadership

24   and judgment on my part.  I can only hope now that

25   their lives weren't effected by a life of crime.

26   But I accept responsibility for my actions and

27   their actions, because at any given point

53

1   throughout this crime there were windows of

2   opportunity for me to say we're not going to do

3   this.  There were windows of opportunity and I

4   never stopped to take either one of them.  But I

5   absolutely take full responsibility for this crime.

6        **DEPUTY COMMISSIONER MEJIA:**  No other

7   questions from me.

8        **PRESIDING COMMISSIONER FISHER:**  Okay, Ms.

9   Danville, any questions?

10       **DEPUTY DISTRICT ATTORNEY DANVILLE:**  I have a

11   lot of questions.

12       **PRESIDING COMMISSIONER FISHER:**  And let me

13   remind you, Mr. Baker, because I usually forget,

14   she's going to ask the questions through me and you

15   should answer through me, okay.

16       **INMATE BAKER:**  Yes, Ma'am.

17       **PRESIDING COMMISSIONER FISHER:**  Okay, go

18   ahead.

19       **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Who

20   would he consider the leader of these people

21   between he and Bernice?

22       **INMATE BAKER:**  Me, I am.  Like I say, she

23   was 18, but I was the male figure there.  That was

24   me.

25       **DEPUTY DISTRICT ATTORNEY DANVILLE:**  In the

26   Appellate Opinion at the top of page three it

27   starts out essentially the statement of facts

54

1  discussing a hardware store in the city of Perris

2  that was burglarized some time right around

3  midnight, a little bit before the first victim,

4  Joseph Burger was carjacked.  My question to the

5  inmate is did he and or his crime partners

6  burglarize this hardware store in Perris,

7  California, where numerous guns and ammunition were

8  stolen just before the Joseph Burger incident?

9      **INMATE BAKER:**  Absolutely not and we was

10  acquitted of that, in fact, in the court.

11      **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Well the

12  Appellate Opinion on page five, the bottom of page

13  four, top of page five says, laboratory tests of

14  gunshot residue indicate that defendant Baker was

15  the one who shot Dixon and ballistics tests

16  indicate that the bullet had been fired from one of

17  the guns taken at the hardware burglary earlier

18  that evening.  And then the last sentence at the

19  bottom of page five says, I'm at the bottom of this

20  paragraph on page five, the car contained rifles

21  taken from the hardware store and used during the

22  crime spree.  Ammunition removed from the Seven 11

23  Store and Burger (indiscernible).

24      **ATTORNEY TARDIFF:**  I don't -- Do we have the

25  Appellate?

26      **PRESIDING COMMISSIONER FISHER:**  I don't have

27  (indiscernible).

55

1    **ATTORNEY TARDIFF:**  I don't have the

2    Appellate Opinion I don't think.

3    **INMATE BAKER:**  Can I address that, please?

4    **ATTORNEY TARDIFF:**  No, not yet.  Here it is,

5    but you can't read it.

6    **PRESIDING COMMISSIONER FISHER:**  Is that part

7    of the stuff that's unreadable back there?

8    **ATTORNEY TARDIFF:**  Yes.

9    **PRESIDING COMMISSIONER FISHER:**  I thought

10    that was all Probation Officer's Reports.

11    **DEPUTY DISTRICT ATTORNEY DANVILLE:**  I have a

12    readable copy.

13    **PRESIDING COMMISSIONER FISHER:**  This is what

14    we've got.

15    **ATTORNEY TARDIFF:**  Well no, I don't know if

16    that's it.  I don't even know if that's it.

17    **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Yeah, it

18    says Fred L. Baker and Bernice Rose Habbit Opinion.

19    **PRESIDING COMMISSIONER FISHER:**  Should we

20    take a break and go to copy it?

21    **ATTORNEY TARDIFF:**  Yes.

22    **PRESIDING COMMISSIONER FISHER:**  Why don't we

23    do that.  We're going to have to take a quick

24    recess, so we're just going to put everybody on

25    mute and on hold and it should only take a few

26    minutes.

27                    [Off record.]

56

1    **ATTORNEY TARDIFF:**  Can they hear us?

2    **DEPUTY COMMISSIONER MEJIA:**  Can you hear us?

3    **MS. GARTHWAITE:**  Yes, we can hear you.

4    **PRESIDING COMMISSIONER FISHER:**  Okay, do you

5    want to go ahead, Ms. Danville.

6    **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Yes.

7    **PRESIDING COMMISSIONER FISHER:**  Just let us

8    know what page you're referring to.

9    **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Okay,

10   and I was referring to page five, the last sentence

11   before it says Habbit's appeal.  The sentence

12   reads, the car contained rifles taken from the

13   hardware store and used during the crime spree,

14   ammunition, the loot from the Seven 11 Store, and

15   Burger's wallet.  So my question, first question

16   specifically to Mr. Baker, did he participate in

17   the robbery of the hardware store shortly before

18   Mr. Burger was accosted or victimized?

19   **INMATE BAKER:**  No, Ma'am.

20   **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Is he

21   aware of whether or not the two male juveniles who

22   were with him were involved in the burglary of the

23   hardware store?

24   **INMATE BAKER:**  I can't speak on their behalf

25   because I don't know that.

26   **PRESIDING COMMISSIONER FISHER:**  You don't

27   know, you have no information?

57

1    **INMATE BAKER:**  No, Ma'am, I have no

2    information on that, no.

3    **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Was he

4    with the two male juveniles and Bernice all evening

5    prior to them going out and coming up to Mr.

6    Burger?

7    **INMATE BAKER:**  No, Ma'am, I wasn't.

8    **DEPUTY DISTRICT ATTORNEY DANVILLE:**  At what

9    time did he get together with his three crime

10   partners?

11   **INMATE BAKER:**  Well they came over to my

12   grandmother's house when I was over there and I

13   guess this was, it was kind of late.  I don't know

14   if it was dark.  I don't know the exact time.  I

15   couldn't tell that.  It could have been between

16   eight and 10 or something like that.  I don't know.

17   **PRESIDING COMMISSIONER FISHER:**  Okay, but it

18   was evening?

19   **INMATE BAKER:**  Yes.

20   **DEPUTY DISTRICT ATTORNEY DANVILLE:**  So the

21   three of them arrived at his grandmother's house

22   together between eight and 10?

23   **INMATE BAKER:**  Well Bernice didn't, just the

24   two, my cousin and Scobie (phonetic) did, I mean

25   and Ferris arrived there.  Bernice was at my

26   auntie's house, my aunt Della's house and Scobie

27   and Ferris, to my grandmother's house, which was in

58

1    the Midway Apartments, and that's where we all met

2    up right there.  That's where he met me at.  I was

3    over there.

4         DEPUTY DISTRICT ATTORNEY DANVILLE:  Okay, so

5    then did Ferris and his cousin pick him up and then

6    the three of them went to the auntie's house to get

7    Bernice?  Is that how that happened?

8         INMATE BAKER:  We went to my auntie's house

9    just to go over there because it wasn't to pick up

10   Bernice or nothing like that, we just go over

11   there.  That was my aunt.  That was my auntie's

12   house and I was just going over to her house.

13        PRESIDING COMMISSIONER FISHER:  Okay, but

14   was that where you picked up Bernice?

15        INMATE BAKER:  Yes, absolutely.

16        PRESIDING COMMISSIONER FISHER:  Whether it

17   was the purpose to go there or not.

18        INMATE BAKER:  Right, absolutely.

19        ATTORNEY TARDIFF:  So the three of you went

20   to your aunt's house?

21        INMATE BAKER:  That's correct.

22        DEPUTY DISTRICT ATTORNEY DANVILLE:  And does

23   he recall approximately what time it was that the

24   three of them went to the aunt's house and then

25   they happened to see Bernice there?

26        INMATE BAKER:  I really can't give you that

27   time.  I just don't, I don't know the time.

59

1    **DEPUTY DISTRICT ATTORNEY DANVILLE:** Does he

2 have a sense of roughly like how long, was it like

3 hours?

4    **INMATE BAKER:** Between like I said, 10,

5 eight, nine, 10, between there. All of this

6 happened within this time frame.

7    **PRESIDING COMMISSIONER FISHER:** Sort of

8 middle of night, middle of the evening.

9    **INMATE BAKER:** There you go. See it's hard

10 for me to gauge it because it got darker, I don't

11 know if it was late. It had to get dark early, and

12 out there in Perris it gets dark. It's dark, so

13 you lose track of time unless you're looking at a

14 watch all he time. I really couldn't tell you, but

15 I believe it was within that time frame.

16    **DEPUTY DISTRICT ATTORNEY DANVILLE:** Perhaps

17 he would know the answer to this question then.

18 Can he give us an idea of how long the four of them

19 were together at the auntie's house before they

20 left to go on this crime spree?

21    **INMATE BAKER:** I guess that would be about

22 an hour, an hour and a half, something like that.

23    **DEPUTY DISTRICT ATTORNEY DANVILLE:** What was

24 going on in that hour, hour and a half?

25    **INMATE BAKER:** Playing music, being

26 teenagers, just messing around with each other,

27 that's what we were doing.

60

1   **DEPUTY DISTRICT ATTORNEY DANVILLE:** Was that

2   when he smoked the marijuana laced with PCP?

3   **INMATE BAKER:** Yes, it was.

4   **DEPUTY DISTRICT ATTORNEY DANVILLE:** At what

5   point did he first see the guns?

6   **INMATE BAKER:** I saw the guns like --

7   Actually I saw the guns earlier, like when we made

8   it over to my auntie's, as a matter of fact that's

9   when it was, at my auntie's house because my cousin

10  had went I believe to the back of the house or

11  somewhere and got the guns. So I seen the guns

12  that night, so it was just before we had smoked PCP

13  that I had seen the guns.

14  **DEPUTY DISTRICT ATTORNEY DANVILLE:** And how

15  many did he see?

16  **INMATE BAKER:** I only saw one.

17  **DEPUTY DISTRICT ATTORNEY DANVILLE:** And that

18  was his cousin who had it in his possession?

19  **INMATE BAKER:** That's correct.

20  **DEPUTY DISTRICT ATTORNEY DANVILLE:** And for

21  what purpose did his cousin go acquire the gun?

22  **INMATE BAKER:** Well, as I mentioned earlier,

23  my cousin and his father, they went hunting as far

24  as I know. I don't, other than that, that's what

25  they did. They went hunting, they did fishing.

26  They did --

27  **PRESIDING COMMISSIONER FISHER:** Let me get

61

1   you back --

2        **ATTORNEY TARDIFF:**  Why they took it with

3   them.

4        **PRESIDING COMMISSIONER FISHER:**

5   (Indiscernible).

6        **ATTORNEY TARDIFF:**  (Indiscernible.)

7        **INMATE BAKER:**  I don't understand.

8        **PRESIDING COMMISSIONER FISHER:**  She wants to

9   know why he went and got the gun that night.  Why

10  did he leave the room and go get the gun?

11       **INMATE BAKER:**  I don't know.  I don't know.

12  Maybe he just wanted to show it to me because one

13  thing as a teen, and I'm sure we can all relate to

14  this, we do things like that, and that's he was 15,

15  he could have wanted to show it to me.

16       **DEPUTY DISTRICT ATTORNEY DANVILLE:**  So when

17  his cousin comes back with this gun, does he say

18  anything to him about the gun or ask him why he's

19  bringing in the gun?  Is there a conversation about

20  the gun?

21       **INMATE BAKER:**  No, there is not.  I just

22  look at and I just says nice.  It wasn't nothing

23  where'd this come from or what the purpose you go

24  and do this for.  See those are things -- It's like

25  what she's asking, that a responsible person would

26  ask.  And my whole frame of mind at that time is I

27  wasn't thinking rationally so I couldn't, I didn't

62

1    think to ask those questions.

2    **DEPUTY DISTRICT ATTORNEY DANVILLE:**  How long

3    before they left the house was it that the cousin

4    brought the gun into the room?

5    **PRESIDING COMMISSIONER FISHER:**  Before you

6    guys left to go out, about how long before that do

7    you think he --

8    **INMATE BAKER:**  Maybe 30 minutes, 40 minutes,

9    something like that.

10    **DEPUTY DISTRICT ATTORNEY DANVILLE:**  How long

11    after he brought the gun out was it before they

12    started smoking the PCP?

13    **INMATE BAKER:**  We smoked PCP, like I said,

14    it was just a joint with me, you know.  But now

15    they were smoking it and they could have been in

16    contact, I don't know.  But I guess about 15

17    minutes after I seen it, that's when they gave it

18    to me and I smoked it.

19    **DEPUTY DISTRICT ATTORNEY DANVILLE:**  When did

20    he get the female clothing and the makeup?

21    **INMATE BAKER:**  Prior to leaving.

22    **DEPUTY DISTRICT ATTORNEY DANVILLE:**  But when

23    prior to leaving?

24    **INMATE BAKER:**  That was after all that was

25    done.  After all that was done and then I believe

26    my cousin's baby started crying and she said there

27    was no milk in there.  And we didn't have a way to

63

1    get to the store or nothing like that.  And so

2    that's when all this, this stuff about going out

3    there and getting a car on the road, stopping and

4    taking their car, basically is what we did.  All

5    that happened within that time.  That was I guess

6    10, 20 minutes after my smoking PCP all this stuff

7    came up about the dress and all this stuff.

8        **DEPUTY DISTRICT ATTORNEY DANVILLE:**  How long

9    did it take him to put on the female makeup?

10       **INMATE BAKER:**  It didn't take no time at

11   all.

12       **PRESIDING COMMISSIONER FISHER:**  And did you

13   do it before you left the house?

14       **INMATE BAKER:**  Actually all I had was a

15   stocking.  I didn't have any makeup and lipstick

16   and all.  I didn't have that.

17       **PRESIDING COMMISSIONER FISHER:**  Okay, and a

18   dress or something?

19       **INMATE BAKER:**  Yeah, the dress just dropped

20   right over me.

21       **PRESIDING COMMISSIONER FISHER:**  Okay.

22       **DEPUTY DISTRICT ATTORNEY DANVILLE:**  How far

23   away from his auntie's house was it where he and

24   Bernice stood by the road flagging down who

25   ultimately turned out to be Mr. Burger?

26       **INMATE BAKER:**  Maybe about three, four

27   miles.

64

1    **DEPUTY DISTRICT ATTORNEY DANVILLE:**  How long

2    did it take them to get that three or four miles?

3        **INMATE BAKER:**  I don't know.  I just can't

4    tell you that.

5        **PRESIDING COMMISSIONER FISHER:**  Did you go

6    on foot?

7        **INMATE BAKER:**  Yeah, we walked.

8        **DEPUTY DISTRICT ATTORNEY DANVILLE:**  When

9    they left the house had he seen the other guns yet?

10       **INMATE BAKER:**  Right when we started leaving

11   the house, that's when I seen them.  That's when I

12   seen them.

13       **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Was a

14   gun handed to him when they left the house?

15       **INMATE BAKER:**  No, it was not.

16       **DEPUTY DISTRICT ATTORNEY DANVILLE:**  When did

17   he come into possession of the gun?

18       **INMATE BAKER:**  I got possession of the gun

19   after we had got into the vehicle, that's when I

20   got possession of a gun.

21       **DEPUTY DISTRICT ATTORNEY DANVILLE:**  From

22   whom?

23       **INMATE BAKER:**  From my cousin Steven.

24       **DEPUTY DISTRICT ATTORNEY DANVILLE:**  And was

25   he aware that the other two men at that point were

26   armed, the other two young boys?

27       **INMATE BAKER:**  Yes, I was actually.

65

1    **DEPUTY DISTRICT ATTORNEY DANVILLE:**  When

2    they took the car, according to the Appellate

3    Opinion, and I'm reading from page three, the top

4    larger paragraph, it says Burger was ordered out of

5    his car, his wallet was taken, and defendant and

6    their companions got into the Vega and drove off.

7    As they did one said, quote, "don't let the white

8    boy get away," close quote.  My question to the

9    inmate is who in the group said don't let the white

10   boy get away?

11       **INMATE BAKER:**  It had to be either Steven or

12   Ferris because I was in the car, in the passenger

13   seat.  I wouldn't even know that.  That's news to

14   my ears right there.

15       **DEPUTY DISTRICT ATTORNEY DANVILLE:**  This is

16   making it sound as though as Mr. Burger is getting

17   out of the car and all of the four crime partners

18   are getting -- well, and they're sending Mr. Burger

19   out of the car and they're getting in the car the

20   one says don't let the white boy get away.

21       **INMATE BAKER:**  Right, well the one thing --

22   Let me say this, please.  Right now she's getting

23   into an area that's murky.  Like I'm saying, I was

24   high on PCP at that time, so I'm not going to

25   discount anything that she's reading because that's

26   facts, that is the law of the case, and so whatever

27   she's reading right now I'm going to agree with it

66

1   because, like I said, I'm not going to refute that

2   because I accept responsibility.  That's what the

3   court of law said happened.  That's what happened

4   in my mind and I believe it.

5       PRESIDING COMMISSIONER FISHER:  Okay, just

6   to clarify, let me ask you.  So are you saying that

7   you believe that that probably happened since it's

8   been recorded --

9       INMATE BAKER:  Absolutely.

10      PRESIDING COMMISSIONER FISHER:  -- but that

11  you have no memory of it?

12      INMATE BAKER:  Well some of this, like she

13  was saying about the language that we used, I don't

14  recall that.  But I do recall going down there and

15  getting into the vehicle.  I remember that.

16      DEPUTY DISTRICT ATTORNEY DANVILLE:  Does he

17  remember Mr. Burger testifying to that fact during

18  the course of his trial when he wasn't on PCP?

19      INMATE BAKER:  Absolutely, yes.

20      DEPUTY DISTRICT ATTORNEY DANVILLE:  Did he

21  ever have a discussion with his crime partners

22  about that statement?

23      INMATE BAKER:  No.  No, Ma'am.

24      DEPUTY DISTRICT ATTORNEY DANVILLE:  And then

25  the next sentence says Burger heard a shot fired

26  over his head and he fled into the shrubs nearby.

27  My question to the inmate is who fired the shot

67

1  that went over Mr. Burger's head?

2      **INMATE BAKER:**  It was either Ferris or

3  Scobie.  They're the only two that had guns at the

4  time.  I didn't have a gun getting into the car.

5      **PRESIDING COMMISSIONER FISHER:**  It sounds

6  like the, let me just clarify, because I think you

7  might be a little confused too.  It's my

8  understanding from reading this that all of this

9  happened when you were all in the car.

10     **DEPUTY DISTRICT ATTORNEY DANVILLE:**  That's

11  my understanding as well.

12     **PRESIDING COMMISSIONER FISHER:**

13  (Indiscernible) so the shot that was fired over his

14  head was fired once the four of you were already in

15  the car, just to clarify it.

16     **INMATE BAKER:**  Okay if that's the case I was

17  in the front passenger seat.  I didn't have a gun.

18  They were in the back, is what I'm saying, and my

19  cousin Bernice was driving the car, so I wouldn't

20  really know that.

21     **PRESIDING COMMISSIONER FISHER:**  Okay, you

22  said -- Can I?

23     **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Please.

24     **PRESIDING COMMISSIONER FISHER:**  Okay.  You

25  said earlier that you had gotten possession of a

26  gun once you were in the car.

27     **INMATE BAKER:**  Right.

68

1    **PRESIDING COMMISSIONER FISHER:**  At what

2    point?

3        **INMATE BAKER:**  Like when we got into the car

4    they were in the back.  And when we started

5    driving, going toward the Seven 11, that's when I

6    got possession of a gun.

7        **PRESIDING COMMISSIONER FISHER:**  Okay, and

8    how did you get it?  Did somebody hand it up to you

9    or did you reach back and get it?

10        **INMATE BAKER:**  Yes, my cousin handed it over

11    to me.

12        **PRESIDING COMMISSIONER FISHER:**  Okay,

13    thanks.

14        **DEPUTY DISTRICT ATTORNEY DANVILLE:**  So if

15    I'm understanding him correctly his cousin didn't

16    hand him a gun until after Mr. Burger was long

17    gone.  Is that his testimony today?

18        **INMATE BAKER:**  Yes, absolutely.

19        **PRESIDING COMMISSIONER FISHER:**  Okay

20        **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Okay,

21    then when they went to the next scene, did they go

22    directly to the store on VanBuren and Washington at

23    the Seven 11 there?

24        **INMATE BAKER:**  Yes, we did.

25        **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Or did

26    they make any stops along the way?

27        **INMATE BAKER:**  Directly.

69

1      **DEPUTY DISTRICT ATTORNEY DANVILLE:** And then

2  at the Seven 11 Store, prior to anyone going in,

3  was there talk of taking another vehicle since

4  another vehicle was ultimately taken?

5      **INMATE BAKER:** No, Ma'am, there wasn't.

6      **DEPUTY DISTRICT ATTORNEY DANVILLE:** Does he

7  recall Bernice coming back out to the car where the

8  three young men were waiting to tell them the

9  condition of the store, that she only saw a female

10  and it was clear, go ahead, go on in?

11      **INMATE BAKER:** That didn't happen. That

12  absolutely did not happen. No, I don't remember

13  nothing like that because the way that went down,

14  when my cousin went in to get the milk, while she

15  was in that store, that's when the decision was

16  made to rob the store. So she didn't know nothing

17  about that. That was between me and my cousin and

18  Ferris. That's when that occurred.

19      **DEPUTY DISTRICT ATTORNEY DANVILLE:** So then

20  if his cousin said that this had all been

21  preplanned and that she actually chose him and the

22  other two because they'd been doing a string of

23  robberies right leading up to this, would she have

24  been lying when she said that?

25      **INMATE BAKER:** Absolutely.

26      **DEPUTY DISTRICT ATTORNEY DANVILLE:** And if

27  she said that the plan was for her to go in, act

1   like a shopper, bring things up to the cash

2   register so that she could scope out the store and

3   see if there were any other people in there besides

4   the clerk, leave the stuff on the counter, say she

5   was going to go out and get money, but really she

6   used that as a ploy to go out and tell them, okay,

7   it's clear, go in and do the robbery.  Is that all

8   a lie?

9       INMATE BAKER:  That's all fabrication,

10  Ma'am, absolutely, absolutely.

11      DEPUTY DISTRICT ATTORNEY DANVILLE:  So whose

12  idea was it then when the three of them were

13  sitting in the car when Bernice went in to get

14  milk, whose idea was it to do the robbery?

15      INMATE BAKER:  That was between me and

16  Steven.  We kind of tossed that back and forth and

17  as she was coming out we was getting out and going

18  in to rob the store.

19      DEPUTY DISTRICT ATTORNEY DANVILLE:  Does he

20  recall who thought of it first, him or Steven?

21      INMATE BAKER:  I can't tell you that.  But I

22  will say this here, it's like I said, I accept full

23  responsibility for whoever said what.  I accept

24  that responsibility.  Like I said, I was the oldest

25  and I could have prevented that crime anywhere

26  along that crime.  I didn't.  So I was responsible.

27  That was a 15 year old kid.  I did that.  I'm

71

1  responsible for that.  If you want to know that, I

2  was responsible.  Give me the responsibility.

3  **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Why did

4  they take a car from the Seven 11?

5  **INMATE BAKER:**  Because there happened to

6  just be another vehicle out there and they just

7  wanted to take another car.  My cousin Steven, he

8  seen the car, and he asked where the keys was.  And

9  I don't know who took him back there but they got

10  the keys and he come out and he got in the other

11  car and I got in the car with him.  My cousin

12  Bernice got in the other car with Ferris and the

13  other victims and we drove off.

14  **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Was this

15  planned or talked about that it would be one victim

16  in each car with two suspects in each car or did

17  that just kind of happen?

18  **INMATE BAKER:**  Well everything happened

19  spontaneously.  It's what, you know, it's like,

20  what I've come to learn is this here.  It's like

21  they call it control of impulses.  This is the

22  terminology that they use.  And with me it was the

23  lack of control of impulses.  So in other words,

24  impulsivity took over.  It's like when we was in

25  the car we was just impulsively doing things.

26  **PRESIDING COMMISSIONER FISHER:**  And I think

27  she's just trying to get into how much thought you

72

1    put into it, so you're saying that you saw the car,

2    he got the keys, and just --

3        INMATE BAKER:  Got in the car and drove.

4        PRESIDING COMMISSIONER FISHER:  You just did

5    it?

6        INMATE BAKER:  Just did it.

7        PRESIDING COMMISSIONER FISHER:  All right.

8        DEPUTY DISTRICT ATTORNEY DANVILLE:  Did

9    anyone order the victims into the respective cars?

10   Did anybody take a leadership role in how this

11   kidnapping was going to go down?

12       INMATE BAKER:  No, I know Ferris left with

13   one victim, and me and Steven was in, we left out

14   second with the other victim into the blue Pinto or

15   whatever that was.  So that's the extent of that.

16   It wasn't --

17       DEPUTY DISTRICT ATTORNEY DANVILLE:  So how

18   did the victims know where to go?  Did somebody

19   tell them who to go where or did it just, did

20   somebody physically grab them, or how did that

21   happen?

22       INMATE BAKER:  What I'm saying, Ferris, I

23   believe it was Ferris had to take the other one to

24   the Pinto, that had to be Ferris.  I was driving

25   the blue Pinto because I had the keys.  My cousin

26   gave me the keys, and him and the other victim

27   walked and got into the passenger side of the blue

73

1    Pinto.

2        **PRESIDING COMMISSIONER FISHER:**  How did you

3    get the victims in there, did you just tell them

4    (indiscernible)?

5        **INMATE BAKER:**  See what it was was like

6    (indiscernible).  It's like that was, from my

7    understanding, a mother and daughter.  This is what

8    came out in the court.  It's like with me and my

9    parent, if my parent was taken up out of there,

10   then yes, you would tell me, you would instruct me

11   and I'm going to go.  So that's what happened in

12   that case.

13       **PRESIDING COMMISSIONER FISHER:**  Okay, you're

14   getting too far into insight here.  We're just

15   looking for facts, okay.  What we're trying to do

16   is reconstruct so that we can picture what's going

17   on, okay.  So did somebody walk up to the two

18   victims with guns and point the guns at them and

19   say, okay, you get in this car, you get in this

20   car?

21       **INMATE BAKER:**  Not, okay, Ferris walked up

22   to, I think it was the mother --

23       **PRESIDING COMMISSIONER FISHER:**  Okay, well

24   it doesn't matter.

25       **INMATE BAKER:**  Well he walked up to her and

26   he took her out, took her to the car.

27       **PRESIDING COMMISSIONER FISHER:**  By how?

74

1    **INMATE BAKER:**  Well he had a gun.

2    **PRESIDING COMMISSIONER FISHER:**  Okay, and so

3    he walked up to her and he said come with me, get

4    in the car.

5    **INMATE BAKER:**  Right, exactly.  Then I had

6    one gun here and I was just standing like behind

7    the counter, in front of the counter, rather, and

8    my cousin Steven went behind the counter, got the

9    other victim, and walked her back to get the car

10   keys and when they came out he walked right with

11   her to the car.

12   **PRESIDING COMMISSIONER FISHER:**  Okay, does

13   that answer what you were looking for?

14   **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Yes.

15   Then once they released the two women, who fired

16   the shot over their heads?

17   **INMATE BAKER:**  I believe that had to be

18   Steven.  It had to be.  (Indiscernible.)  That was

19   Steven because I was driving.  Steven was in the

20   passenger seat.

21   **DEPUTY DISTRICT ATTORNEY DANVILLE:**  So that

22   came from the car in which inmate was in?

23   **INMATE BAKER:**  Absolutely, yes.

24   **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Then the

25   next thing I wanted to go to was the Val Dixon

26   incident.  I just have a few questions there.

27   According to the Appellate Opinion on page four, it

75

1   says that as the red Vega came up near Val Dixon,

2   first it asked, somebody asked if Val Dixon needed

3   help.  I believe that was Bernice.  He says he's

4   okay.  The Vega drives off, but when it comes back

5   someone in the car says to Dixon, hey sucker.  When

6   he turns in response to that hey sucker, he sees a

7   rifle pointing at him, not two, but one.  My first

8   question is who said hey sucker?

9       **INMATE BAKER:**  I believe that was me.  That

10  was me.

11      **DEPUTY DISTRICT ATTORNEY DANVILLE:**  And then

12  it's very clear from here that there is only one

13  gun and not two, and from here I mean the Appellate

14  Opinion.  Yet in the Psych Report and the Board

15  Report, it repeatedly talks about two guns being

16  pointed at Mr. Dixon.  And I would like to know the

17  inmate's explanation.  Is it one gun or is it two

18  guns?

19      **INMATE BAKER:**  Like I said earlier, I

20  believe it was two guns.  Like I said, I pulled the

21  trigger once.  And I'm saying, if they're saying he

22  got shot twice, the other gun had to be there, it

23  had to be there.  There were three guns in the car.

24  He got shot twice.  I pulled the trigger once.  It

25  had to be another gun.

26      **DEPUTY DISTRICT ATTORNEY DANVILLE:**  And Mr.

27  Dixon testified at the trial apparently, because

76

1    this is from the Appellate Opinion that he tried to
2    knock the barrel of the gun away and as he did he
3    was shot twice, indicating from that same gun.  Yet
4    in some of the Board Reports and Psych Reports it
5    stated there was a struggle between Mr. Dixon and
6    the inmate over the gun as compared to Mr. Dixon
7    just trying to move it away.  So I would like to
8    know what is the inmate's account of what happened?
9    Was there some sort of a struggle between he and
10   Mr. Dixon wherein the gun goes off, or is it as
11   reported in the Appellate Opinion that he's
12   pointing it, saying hey sucker, and as he tries to
13   move the gun it goes off.
14        **INMATE BAKER:**  He tried to slap it and it
15   goes off.
16        **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Why was
17   Mr. Baker's finger on the trigger of the gun?
18        **INMATE BAKER:**  Like I said earlier, I wasn't
19   thinking like logically, but I'm saying well where
20   else would it be?  I'm saying, but see I wasn't in
21   my right frame of mind.  Everything that the
22   District Attorney is saying, it could be true, all
23   of this.  If it's in this paper it's true.  The
24   thing I'm saying is if I were in my right frame of
25   mind none of this would have happened.  But yeah,
26   my finger was on the trigger I felt because that
27   was the logical place for it to be at that time in

77

1    that state of mind.

2         **DEPUTY DISTRICT ATTORNEY DANVILLE:** Why was

3    Val Dixon shot?

4         **INMATE BAKER:** Like I said, he slapped at

5    the gun.  It wasn't like I was intentionally trying

6    to hurt Mr. Dixon.  That wasn't my intention.  He

7    slapped at the gun, my finger is on the trigger, it

8    moved and it went off.

9         **DEPUTY DISTRICT ATTORNEY DANVILLE:** But the

10   inmate is saying only once.  He is denying that he

11   fired the second shot?

12        **INMATE BAKER:** Absolutely.  Absolutely.

13        **DEPUTY DISTRICT ATTORNEY DANVILLE:** When did

14   his brother become a Crip member?

15        **INMATE BAKER:** I can't tell you that.

16        **DEPUTY DISTRICT ATTORNEY DANVILLE:**

17   Approximately.  Like within the last two years or

18   three years ago (indiscernible)?

19        **INMATE BAKER:** No, it's been like all his

20   life.  For me, and I've been in here almost 25

21   years, so she's asking me to go way back somewhere

22   where I really I don't know.  I wasn't with my

23   brother all the time, so I couldn't tell you when

24   he decided to join a gang.  I can't tell you that.

25        **DEPUTY DISTRICT ATTORNEY DANVILLE:** I'm not

26   asking for the specific year, I'm just trying to

27   get a gauge of where during the inmate's life it

78

1   was he became aware his brother was a Crip member?

2          **INMATE BAKER:**  That was about when I was 16,

3   15.

4          **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Because

5   in the December 18, 1998, Psychological Report on

6   page one under the Section Four entitled Family

7   History, it says no other family members have a

8   history of criminal, substance abuse, or

9   psychiatric problems.  So what we heard today about

10  his brother being a Crip member, I'm wondering if

11  he told, and I believe it was Dr. Terrini in '98,

12  yes it was Dr. Terrini.  Did you tell Dr. Terrini

13  back in 1998 when the doctor asked him about his

14  family members that he had a brother who was a Crip

15  and who was incarcerated in the system?

16         **INMATE BAKER:**  No, I just found out my

17  brother has been incarcerated two weeks ago, so no,

18  I didn't tell him that.  And Dr. Terrini never even

19  asked me that because at that time the doctor was

20  asking me specific questions and I was answering

21  like I'm answering now, specifically.

22         **ATTORNEY TARDIFF:**  But did he ask you if any

23  other family members were involved in criminal

24  activity?

25         **INMATE BAKER:**  There you go, that's the

26  question.  As far as I knew, no.  I didn't know.

27         **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Here it

79

1    is, okay.  And now I'm looking at one of the

2    reports for the Cat X, and this one is dated

3    5/19/95 authored by Psychological Social Worker by

4    the name of Dr. Hansen.  And in this report on page

5    four she talks about the inmate telling her that he

6    ran away from home when he was 15 years old because

7    of his parents' alcoholism and drug abuse.  Earlier

8    in the hearing the inmate's explanation for the

9    prior burglary, which ultimately landed him in CYA

10   because of his escape, he said the reason he did

11   that burglary was because of his dad's drinking

12   problem.  But it seems like from this report to Dr.

13   Hansen that his dad had a drinking problem then.

14   So what was different between his dad's drinking

15   problem during the time he ran away --

16        **INMATE BAKER:**  Well prior to that I'd never

17   seen my dad hit my step mom.  And when I left at

18   that time my dad hit my step mom and I didn't like

19   that.  I didn't appreciate that.  And since I was

20   just a kid there was nothing I could physically do

21   to my father, so that's when that happened.

22        **DEPUTY DISTRICT ATTORNEY DANVILLE:**  And then

23   in the same report on the same page it says, the

24   paragraph next to the bottom, the inmate was not in

25   the military and stated he had not been married

26   although the C-File indicates that he did marry a

27   girlfriend when he was in county jail on the

80

1    instant offense.  My question to the inmate is why

2    would he tell her that he had not been married when

3    he in fact had been married for six years to this

4    woman?

5        INMATE BAKER:  Well the only explanation I

6    can give you for that is that's a typo because

7    everybody knows in anything they talked to me is

8    I'm married.  I'm proud of my marriage.  I love my

9    wife.  So it's not like I was trying to hide

10   anything.  So that has to be a typo or something,

11   that's all I can put to that.

12       DEPUTY DISTRICT ATTORNEY DANVILLE:  And the

13   woman that he married when he was in county jail,

14   his first wife, is that the woman who aborted the

15   child that led to his depression, that led to the

16   commitment offense?

17       INMATE BAKER:  No, Ma'am, it wasn't.

18       DEPUTY DISTRICT ATTORNEY DANVILLE:  So the

19   woman that he married, how long had he known her?

20       INMATE BAKER:  I'd known her because I'd met

21   her over a few years.  But w  didn't really do

22   anything until after I cau        case.  My wife

23   then was Annette McCray.              aborted my

24   baby was April Ratliff

25       DEPUTY DISTRICT A                And then

26   one thing I wanted to ask him          was talking

27   about God had directed him to be a    ir director

81

1    and I'm wondering does he have a church and a choir

2    specifically picked out or is this just in general

3    what he wants to do?

4      **INMATE BAKER:**  There is a church which is

5    called From the Heart Church Ministries of Southern

6    California.  It's located in Pomona.  And that's

7    pastored by Reverend Joseph J. Owens.  That's one

8    of the pastors that I'm going to speak with.  I

9    don't want to sit here and tell you that I've made

10   a definite commitment to him because the Lord may

11   direct me somewhere else.

12     **PRESIDING COMMISSIONER FISHER:**  Let me ask

13   you this.  How do you know him?

14     **INMATE BAKER:**  I've known him through my

15   family.

16     **DEPUTY DISTRICT ATTORNEY DANVILLE:**  I have

17   no further questions.

18     **PRESIDING COMMISSIONER FISHER:**  All right.

19   Ms. Tardiff, do you --

20     **DEPUTY COMMISSIONER MEJIA:**  I have one last

21   question.

22     **PRESIDING COMMISSIONER FISHER:**  All right,

23   go ahead.

24     **DEPUTY COMMISSIONER MEJIA:**  You claimed

25   earlier that you take leadership or ownership of

26   the group, you were the oldest.

27     **INMATE BAKER:**  Absolutely.

82

1    **DEPUTY COMMISSIONER MEJIA:**  Could you

2    explain to me why you weren't aware or very much

3    aware of where the gun came from, the guns came

4    from.

5    **INMATE BAKER:**  I didn't even think to ask,

6    Sir, I really didn't.  It's like I was saying

7    earlier --

8    **DEPUTY COMMISSIONER MEJIA:**  When did you

9    find out that those guns -- The Appellate Report

10   says that the guns were stolen from a hardware

11   store.  When did you become aware of that?

12   **INMATE BAKER:**  Right now at this very moment

13   when she just mentioned that to me.

14   **DEPUTY COMMISSIONER MEJIA:**  So you were

15   under the belief that those rifles were your

16   uncle's?

17   **INMATE BAKER:**  My uncle's house, he was a

18   security guard, he's been just brought up, as long

19   as I've known him he's been working in law

20   enforcement.

21   **DEPUTY COMMISSIONER MEJIA:**  I've got no

22   other questions.

23   **PRESIDING COMMISSIONER FISHER:**  Okay, I just

24   have one follow-up to that one, and it is, well

25   maybe two follow-ups to that one.  The first one is

26   when you guys were out walking or looking for a

27   place to do your hitchhiking from, who was carrying

83

1    the rifles then?

2        INMATE BAKER:  At that time it had to be

3    Steven and Ferris, because I was in the dress and I

4    was up there walking in front with my cousin.

5        PRESIDING COMMISSIONER FISHER:  Okay.  Do

6    you remember before you left, so this is a third

7    question.  Do you remember before you left if

8    anybody said we ought to bring some guns with us?

9        INMATE BAKER:  No.

10        PRESIDING COMMISSIONER FISHER:  Okay, nobody

11    ever said that?  Somebody just went and got the

12    guns and brought them?

13        INMATE BAKER:  Yes, Commissioner.

14        PRESIDING COMMISSIONER FISHER:  And during

15    the trial, did anybody testify during the trial to

16    the fact that the guns were part of a --

17        INMATE BAKER:  Well, they separated us so as

18    far as the juveniles I don't know because we were

19    in different proceedings as far as I know.

20        PRESIDING COMMISSIONER FISHER:  Okay, but

21    you don't remember anybody testifying in your trial

22    about whether they came from the hardware store?

23        INMATE BAKER:  No, I don't recall that.

24        PRESIDING COMMISSIONER FISHER:  Okay, that

25    answered my questions.  Do you have any questions,

26    Ms. Tardiff?

27        ATTORNEY TARDIFF:  So originally this whole

84

1    thing got started because you needed to go

2    hitchhike --

3          **DEPUTY COMMISSIONER MEJIA:**  Okay, we've got

4    to go to another tape.

5          [Thereupon, no further tapes were

6             received for transcription.]

7                    --o0o--

8

9

NOT APPROVED

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

85

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, PATRICIA RICCI, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 84, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of FRED BAKER, CDC Number C-22918, on SEPTEMBER 24, 2004, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated OCTOBER 15, 2004, at Sacramento County, California.

Patricia Ricci
Transcriber
**CAPITOL ELECTRONIC REPORTING**