# EXHIBIT 1
# part 4 of 5

12

1   evaluation, there's no evidence for a known or thought

2   disorder, and he denied any suicidal or homicidal

3   ideation.   Inmate Baker's judgment is very good, and

4   he has demonstrated excellent into himself and his

5   commitment offense.   (Indiscernible) information from

6   prior psychological reports (indiscernible) inmate

7   Bakers discussion today for this interview.   He

8   clearly stated, "I feel really bad about the crime of

9   Mr. Dixon.   I ask myself did he have a child or a

10  wife, if he was married, and how would this affect his

11  family."   Inmate Baker stated further what was so

12  overwhelming that when my uncle was shot and paralyzed

13  from the neck down, sometimes I wake up in the night.

14  I understand how I have affected everyone.   That what

15  you do to others comes back to you.   The shot that

16  paralyzed his uncle gave him clear insight into how

17  Mr. Dixon's family felt.   Inmate Baker offered the

18  following information and affirmed that he

19  understanding of his actions.   Quote, "The Parole

20  Board asked me why I should be found suitable for

21  release.   I said no, because there's no way I can give

22  back what I took from Mr. Dixon.   I cannot tell you

23  that whether I am suitable for release.   That is up to

24  God.   There is no way I can give them back which I

25  have taken from Mr. Dixon."   Unquote.   Assessment of

26  dangerousness:   Inmate Baker has made exceptional

27  gains during his incarceration having taken full

13

1  advantage of self-help opportunities and educational

2  programs. What is even more relevant in importance,

3  inmate Baker's intrinsic right to be (indiscernible)

4  mature, responsible, conscientious. As anyone who is

5  familiar with the prison system can attest it is

6  (indiscernible) given the nature of the

7  (indiscernible) of this person; however, inmate Baker

8  does not have a violent history other than the

9  commitment offense as he has maintained excellent

10  self-control and good behavior toward his

11  incarceration. If released into the community --

12  given all the factors mentioned, his estimated

13  potential for violence within a controlled setting is

14  significantly below average relative to the inmate

15  population. (Indiscernible) two 115s also. If

16  released to the community, inmate Baker's potential

17  for violence is estimated to be the same as that for

18  an average citizen. In fact, one may make the case

19  given his ability to remain free of violence for his

20  incarceration which is an inherently no violence

21  setting than the community. He may have a below

22  average probability of being involved in the violence

23  as compared to the average citizen. The only apparent

24  risk factor for which Mr. Baker which could be a

25  precursor to violence would be a return to illicit

26  substance use; however, inmate Baker does not have a

27  significant substance abuse history, and has attended

14

1    AA and NA since 1991, a period of 15 years.  He has

2    also (indiscernible) a very mature attitude towards

3    understanding substance abuse as it occurred in his

4    family.  (Indiscernible) a very insightful

5    (indiscernible).  Counsel, do you want to make some

6    additions or comments?

7           ATTORNEY TARDIFF:  Not at this time.

8           DEPUTY COMMISSIONER MEJIA:  I'll return back to

9    the chair.

10          ATTORNEY TARDIFF:  I would just like to clarify

11    something.  Is the transcript that's being

12    incorporated into this hearing, does that consist of

13    an 84 page transcript from September 24, 2004?

14          PRESIDING COMMISSIONER FISHER:  If my

15    understanding of the court order is correct, that's

16    what they're instructing us to do.  What I have

17    specifically incorporated for the purposes of this

18    hearing is the summary of the offense, and I'll leave

19    it to our legal department.

20          ATTORNEY TARDIFF:  All right.  Well, I just --

21          PRESIDING COMMISSIONER FISHER:  What the court

22    is ordering.  It does - that's what it looks like to

23    me.

24          ATTORNEY TARDIFF:  84 pages of a transcript

25    from September of '04?

26          PRESIDING COMMISSIONER FISHER:  Yes.

27          DEPUTY DISTRICT ATTORNEY DUNN:  All right.  I

15

1    would like to know at what point the victim may give a

2    statement.  He's come a long way today.

3            PRESIDING COMMISSIONER FISHER:  He'll be the

4    last one.

5            DEPUTY DISTRICT ATTORNEY DUNN:  He's come a

6    long way today, and it's difficult for me to say

7    without repeating what's in the transcript.  So please

8    bear with me.

9            PRESIDING COMMISSIONER FISHER:  Okay.  And

10   he'll get the last word.

11           DEPUTY DISTRICT ATTORNEY DUNN:  I understand.

12   I understand that everybody has a copy of the

13   transcript, and I would like to have us make a

14   statement by pointing out what happened last year.

15   First of all, I'd like to refer everybody to page 49

16   of the transcript.  This inmate did not take

17   responsibility for his crime.  When he was questioned

18   by the Deputy Commissioner on page 49 beginning at

19   line 6, when the Deputy Commissioner asked him, how

20   did the victim get shot twice, the inmate, beginning

21   on page 49 line 8 said, by claiming he had the gun

22   pointing out, and I believe this.  I don't know, but I

23   believe he pulled the trigger thinking I pulled the

24   trigger, and that's how that happened because both

25   barrels were, like, right there.  Inmate, on line 12

26   of page 49.  That is not taking responsibility because

27   it's a direct contradiction to what is pointed out

16

1    clearly by the appellate court in their opinion, which

2    is based, of course, on the transcript of the trial,

3    beginning on page 4 at the bottom, and ending at the

4    top of page 5, where the appellate court pointed out

5    that the laboratory tests of gunshot residue indicated

6    that defendant Baker was the one who shot Dixon and

7    ballistic tests indicated that the bullet had been

8    fired from one of the guns taken at the hardware

9    burglary that evening.  In other words, as recently as

10    last September, the inmate was not taking

11    responsibility for one of the victims, that being

12    Mr. Dixon, by claiming that his co-defendant, who he

13    refers to as his crimee, was responsible for the

14    second shot.  That's a fundamental part of his crime,

15    if not the most important portion of his crime, and

16    still as recently as September 24th of '04, he was

17    untruthful about how this crime happened.  The

18    psychiatrist, in his report from April 29th, says that

19    Mr. Baker demonstrates excellent insight and has

20    remorse.  There cannot be excellent insight when one

21    is denying the fundamental occurrences of the crime.

22    Insight means full acceptance and responsibility for

23    everything that happened.  It does not mean that one

24    continues to misrepresent what really happened that

25    night as Mr. Baker has continued to do as recently as

26    last year.  He does that in other ways as well.  On

27    page 54 of the transcript, as Deputy District Attorney

17

1    Danville (phonetic), beginning on line 11, pointed out

2    the information that was referred to by the appellate

3    court regarding to the gunshot residue and regarding

4    that the bullets were fired from one of the guns, she

5    points that out, and at that point, all persons

6    present at the hearing, which I believe are all

7    parties here with the exception of myself, were given

8    a copy of the appellate report to read.   It is clear

9    that Mr. Dixon has not acknowledged that he fired the

10   shot --

11          PRESIDING COMMISSIONER FISHER:  Mr. Baker.

12          DEPUTY DISTRICT ATTORNEY DUNN:  Mr. Baker has

13   not acknowledged that he fired the shot, not once, but

14   twice.  Again, on page 60 of the transcript, there is

15   another issue he has not told the truth about.

16   Beginning on line 20 when questioned by Deputy

17   District Attorney Danville, inmate Baker is asked

18   through the Commissioner for what purpose did his

19   cousin go acquire the gun and the inmate responded,

20   beginning on line 22, that the cousin and the father

21   were going hunting and that they had gone hunting and

22   fishing.   That is not true.  According to what the

23   appellate court said on page 4 and 5 of their report,

24   the gun that was traced to a bullet in Mr. Dixon was

25   stolen from a hardware store.  So the inmate was only

26   lying about who fired the second shot, but he's lying

27   about where the guns came from.   That's fundamental to

18

1    this case, and it does not again demonstrate any

2    insight, let alone excellent insight, for him to

3    continue to lie about where the guns came from.  Again

4    on page 62 of the transcript, at line 22, beginning on

5    line 19 and continuing to line 23, Deputy District

6    Attorney Danville is asking inmate about where he got

7    the clothing and the make-up.  And then Mr. Baker,

8    beginning on page 62, line 24, says, "That was after

9    all that was done, after all that was done, and then I

10   believe my cousin's baby started crying, and she said

11   there was no milk, and we didn't have a way to get to

12   the store or nothing like that, and so that's when

13   this stuff about going out there and getting a car on

14   the road."  The inmate continued to claim that these

15   people went out to steal a car for the purpose of

16   buying milk for a baby.  That's not true.  That's a

17   misrepresentation of the facts, and so again, there's

18   no insight, and there's no acceptance of

19   responsibility.  When the plan was that these people

20   would all go out and commit a carjacking and a

21   robbery.  Nobody had to buy milk, so as recently as

22   September 24th of 2004, the inmate has continued to

23   misrepresent the truth.  Again, there's another

24   example.  Beginning on page 64 of this transcript,

25   Deputy District Attorney Danville, at line 8, asks the

26   inmate when they left the house, had he seen the other

27   guns yet, and the inmate responded, "Right when we

19

1    started leaving the house, that's when I seen them.

2    That's when I seen them." We know from all the facts

3    that that cannot be true. That the guns, in fact,

4    were in the hands of those people as they walked the

5    three to four miles to the point where they stole the

6    first car. He knew there were guns because those guns

7    were stolen in a hardware burglary the night before or

8    the same day. So the inmate had the guns. He didn't

9    just see them for the first time when they walked out

10   of the house. Now, again on page 69, Deputy District

11   Attorney Danville asked the inmate, "Does the inmate

12   recall Bernice (phonetic), referring to the

13   co-defendant, coming back out to the car where the

14   three men were waiting to tell them the condition of

15   the store, that she only saw a female, go ahead, go on

16   in." The inmate, beginning on page 69, line 11, says,

17   "That absolutely didn't happen. That didn't happen.

18   I don't remember nothing like that because the way

19   that went down when my cousin went in to get the milk,

20   while she was in the store, that's when the decision

21   was made to rob the store. So she didn't know nothing

22   about that." Well, the circumstances indicate that

23   that is not true, that the plan was made that day to

24   go out and commit a robbery. So that for the inmate

25   to say at recently at September 24th that they made a

26   decision out in the parking lot to rob flies in the

27   face of the circumstances, and again, there's no

20

1    demonstration of responsibility or insight when the

2    inmate is continuing to claim that they never decided

3    to rob until they were sitting out in the parking lot.

4    Now, on page 74 of the transcript, again beginning in

5    the middle of the page, Deputy District Attorney

6    Danville says, "Once they released the two women, who

7    fired the shot over their heads?"  Inmate Baker

8    replies, beginning online 17, "I believe that had to

9    be Steven.  It had to be.  It had to be Steven because

10   I was driving."  Now, when Mr. Baker says that --

11   indicates that he does not know who fired the shots.

12   However, he according to his own statement was sitting

13   next to the person who was firing the shots, so he

14   knew full well who it was that was firing the shots.

15   He saw him do it.  Now, there is another indication

16   that Mr. Baker again not taking responsibility, and

17   this goes back to the issue that I started with.  Look

18   at page 75 of the transcript from September 24th, '04,

19   beginning on line 19 in response to a question by the

20   Deputy District Attorney.  Inmate Baker says, "Like I

21   said earlier, I believe it was two guns.  Like I said,

22   I pulled the trigger once.  And I'm saying if they're

23   saying he got shot twice, the other gun had to be

24   there.  It had to be there.  There were three guns in

25   the car.  He got shot twice.  I pulled the trigger

26   once.  It had to be another gun."  That statement by

27   inmate Baker made as recently at September of last

1   year, again, indicates that he's not taking

2   responsibility for the second shot.  He knows who

3   fired those shots.  The ballistics tests indicated he

4   fired both shots.  He had the gunshot residue on his

5   hands.  How can a man have excellent insight when he's

6   still not taking responsibility?  Well, he doesn't,

7   and he's not.  The gun did not just go off.  On page

8   76 of the transcript when asked by Deputy District

9   Attorney Danville why his finger was on the trigger,

10  inmate Baker gives a long, rambling, and disjointed

11  statement that never answers the question.  He's

12  basically saying if this happened, it's true, but

13  yeah, my finger was on the trigger, I felt, because

14  that was a logical place for it to be at that time in

15  that state of mind.  That is not an acceptance of

16  responsibility.  What he's not saying and this victim

17  would like him to say is that he did fire the gun.  He

18  did mean to fire the gun.  He not only fired it once,

19  but he fired it twice.  And our position is that until

20  he takes complete responsibility for what he actually

21  did that night, he should not be granted parole.  He's

22  not suitable.  Suitability should be reserved for

23  those rare individuals who have actually said, yes, I

24  did it.  I did everything I'm charged with.  He's still

25  dancing around the truth.  He is not telling the full

26  and complete truth, and until that happens, he should

27  not be found suitable because the public is still

22

1   going to be at risk when Mr. Baker is released.  And

2   secondly, his parole plans -- it's very interesting

3   that he is plan A in Rancho Cucamonga, plan B in

4   Marino Valley, and plan C in Fontana.  All of these

5   plans, by the way, are several years old.  It sounds

6   like Mr. Baker has some people in his life who are

7   saying sure, we'll help you.  But the reality is, once

8   he's out there, they're dealing with the reality of

9   him living with them, it appears that those are not

10  very tangible, solid plans, and that is going to lead

11  Mr. Baker into making the same kind of horrible

12  decisions that he made that day.  And for that reason,

13  we understand what the Board may do, but we feel that

14  his suitability is severely in question.  Thank you.

15       ATTORNEY TARDIFF:  In terms of the DA's first

16  issue regarding Mr. Baker not taking responsibility in

17  which she took out from the prior transcripts -- this

18  is precisely why the law states that the re-hearing

19  should take place within 120 days of the prior

20  decision, because it's well over a year since that

21  decision, since any of us have gone through all of

22  this, and that's why the order was that the date be

23  reaffirmed.  Things were taken out of context by the

24  District Attorney from that hearing.  We only heard

25  several questions with the answer, and it's not a true

26  reflection, and that's precisely why the Board has no

27  jurisdiction today to even hear this.  Because the

1    time factor has really made it -- whatever the DA is

2    saying, almost impossible to address.   In either

3    event, in terms of not taking responsibility, we have

4    psych evals -- not the most current ones, but we'll

5    include the most current ones, but prior ones as well

6    -- and this is from trained individuals who have

7    spoken at length with Mr. Baker regarding the

8    commitment offense since -- in the '97 and '98, the

9    '03 and the '05, they all four psych evals are

10   positive and supportive of Mr. Baker's release.   And I

11   think that they certainly know more than any of us

12   here in terms of -- I don't think four of them would

13   have been completely off base.   In terms of the 1997

14   psych eval, it states that his violence potential is

15   below average relative to the inmate population, and

16   at that time they weren't assessing with the free

17   community.   That was based on his lack of violent

18   115s, his lack of violent criminal history, as well as

19   his current pro-social attitude.   He does not seem to

20   have a substance abuse problem, and it concludes, I

21   agree with the conclusions of both Cat X evaluation in

22   '95 as well as the previous BPT psychological

23   evaluation in '94, which both felt that this inmate

24   had made great strides in understanding his commitment

25   offense as well as its causes.   The next report was

26   dated in '98, prognosis for community living is quite

27   positive.   He showed excellent insight into his

24

1   commitment offense.  His judgment appears now to be

2   sound.  High GAF score of 85.  His prognosis is quite

3   positive for being able to maintain his current mental

4   state upon parole.  Under the review of the life

5   crime, all of this remorse appears to be genuine and

6   appropriate.  In consideration of several factors,

7   including his minimal criminal history as well as his

8   lack of any violent criminal history, his minimal

9   history of 115s, as well as his greater maturity and

10  given his pro-social attitude, his violence potential

11  -- and I'm paraphrasing here, if released to the

12  community is to be no more than the average citizen.

13  And then it points out that the risk factor would be

14  the abuse of illegal drugs; however, it concludes, it

15  did not seem likely he would ever abuse again.  And it

16  states under the last page on that '98 report, this

17  man should be commended for taking full advantage of

18  his self-help opportunities during his incarceration.

19  The '03 psych eval is also again supportive, and is

20  contra to the District Attorney's remarks saying my

21  client does not take responsibility.  Under the review

22  of the life crime, inmate Baker discussed the crime in

23  detail, his reflection and thoughts about why such a

24  thing might have happened.  He stated in particular

25  after taking Dr. Fishback's life groups -- lifer's

26  group, and that's what kind of got him to this point.

27  He is feeling both -- at the time of the crime, and

25

1    this is where we're getting into the insight -- he was
2    feeling both angry and depressed as a result of what
3    had been happening and this and that, and it goes on
4    to state, "Inmate Baker accepted responsibility for
5    the crime and did not attempt to minimize his part.
6    He demonstrated what appeared to be genuine remorse
7    when discussing the victims, and it was clear after
8    his detailed discussion, that he has spent much time
9    reflecting on the crimes and generating alternatives
10   to his choices at the time." Since being incarcerated
11   for a period of about 23 years, inmate Baker has had
12   two 115 violations, the last one in '89, neither of
13   them were violent, and then again the minor criminal
14   history concluding under the assessment of
15   dangerousness, he's made considerable gains since his
16   incarceration. He has taken advantage of many
17   self-help opportunities, and his violence potential is
18   no higher than the average citizen. He does not have
19   a significant substance abuse history, and he should
20   be commended for taking advantage of self-help
21   opportunities. And then we have the '05 report, which
22   much has been read into the record, concludes that he
23   poses no degree of risk, the same as the average
24   citizen, he has excellent self-control, good behavior,
25   exceptional gains, and just pretty much reiterates the
26   psych eval since '97. So he's had four psych evals in
27   a row, and I didn't go back further than that, but

1    apparently the Cat T, and X as well, were favorable

2    that substantiate that he does have insight into the

3    commitment offense, he accepts responsibility, and his

4    programming has been exceptional.  His prehistory is

5    supportive of release in the sense that he had only

6    one prior conviction, no adult convictions or arrests.

7    I would submit that he has a very stable social

8    history and that includes currently he has strong

9    family support.  I'm not sure of where the District

10   Attorney gets this information that his family is

11   going to abandon him when he gets out on parole.  The

12   evidence presented at the -- at this hearing, which is

13   the rehearing, is that he has solid parole plans, he

14   has strong family support, and all those documents

15   were presented at that time and are here and are

16   incorporated as if they were being discussed.  And I

17   don't believe we went into that, but we're going to

18   incorporate it from the prior record.  And at that

19   time his parole plans were very suitable.  The Board

20   reports are supportive of release.  The '04 Board

21   report states considering the commitment offense,

22   prior record in prison adjustment -- excuse me.  This

23   writer's impressions are that inmate Baker would

24   probably pose a low risk to the public if released

25   from prison.  He received his GED.  He's taking

26   college courses.  He appears to be mature, following

27   the right path, making right decisions for his life,

1   realizing that what was in his past was wrong and not

2   acceptable.  He has found understanding in his study

3   of religion.  He practices his religious beliefs.

4   Baker stated during the interview that he feels that

5   incarceration and self-help programs have combined to

6   make him better understand who he is as a person, what

7   his path was all about, and how important it is to be

8   positive on the right path.  Now he continues to

9   improve his life and help others.  So we not only have

10  four prior psychologists stating that he poses -- does

11  not pose an unreasonable risk, we have the counselor

12  stating that as well.  His self-help, I'm not going to

13  go into.  That's on the record in the transcript from

14  the September '04 hearing.  He's got a job offer -- he

15  has job offers, he has housing, he has strong family

16  support.  And again, I still am objecting to this

17  hearing because I don't believe this panel has

18  jurisdiction, and I think that there obviously -- what

19  has come out particularly in the District Attorney's

20  closing remarks, there's a reason why there's a 120-

21  day rule.  Because this type of thing, taking things

22  out of context and such as was in the District

23  Attorney's closing is the problem when you hold a

24  hearing this late or this far after the granted

25  decision of September 24, '04.  And obviously is a

26  violation of due process, and I'll submit it.

27          PRESIDING COMMISSIONER FISHER:  Mr. Dixon, are

1    you both going to be speaking, or just you?

2           MR. DIXON:  Just me.

3           PRESIDING COMMISSIONER FISHER:  All right.

4    Would you please, when you speak, just say your name

5    and spell your last name again.

6           MR. DIXON:  Val Dixon.  V-A-L D-I-X-O-N.

7                        [End of tape.]

8           DEPUTY COMMISSIONER MEJIA:  Okay.

9    (Indiscernible) and we have the victim making a

10   statement.

11          PRESIDING COMMISSIONER FISHER:  Go ahead.

12          MR. DIXON:  Val Dixon, D-I-X-O-N.  First off, I

13   would like to apologize for me blowing up last time.

14   I do -- I'm not that (indiscernible).  I was caught

15   off guard, so I just want to tell you that I'm sorry

16   about that.

17          PRESIDING COMMISSIONER FISHER:  Okay.

18          MR. DIXON:  I'd like to now get a little more

19   in depth than I was last time. I've been in this

20   situation now for 25 years, and I'll be this way for a

21   lot longer.  (Indiscernible) it's hard (indiscernible)

22   trying to survive and not hold things in and go on

23   from there.  It's not easy for me to talk about this,

24   but I'd rather be a survivor than a victim I guess so

25   that's what -- let's see. (indiscernible).  The last

26   25 years wasn't so hot for me.  I was (indiscernible),

27   I was working as a warehouse manager, I was coming

1    home from my job when my car broke down and all of

2    this went down. Everybody knows that (indiscernible)

3    after they stopped and asked me if I needed any help,

4    and I said no, that I had somebody to come and get me.

5    They (indiscernible) came back and shoot me, not once,

6    but twice. Now even I can say, okay, maybe it was my

7    fault the first time for (indiscernible), but you

8    can't accidentally shoot somebody twice with

9    (indiscernible) it's impossible. Let's see, I can go

10   on and on about that, but the long and the short of it

11   is that he left me -- or they left me there to die.

12   Why? I mean, if it was an accident, he wouldn't have

13   left. (Indiscernible) I'll ask, and you already know,

14   and I'm hear to show it, I can't just get up and walk

15   out that door right now. I can't take my daughter for

16   a walk. Things like that (indiscernible) involved

17   are, I'm not vindictive. I'm not. But, when he won't

18   even admit to the things that he did that are facts,

19   not hearsay (indiscernible) but certain parts of this

20   thing that I don't recall wrongly. I know exactly

21   what happened. So the long and short of it -- a

22   couple of things have changed. Like, I was in the

23   hospital (indiscernible) over a year between the

24   attack (indiscernible) and it has been like three

25   years of hospital time. That's not including all

26   (indiscernible). I mean I've been in pain

27   (indiscernible). My nerves are shot. (Indiscernible)

1    be able to talk.  The point is, (indiscernible) and no

2    big deal, right?  That doesn't mean I don't keep

3    going.  Like, (indiscernible) ask anybody for help,

4    but there are times that I will break down and lose

5    it.  (Indiscernible) years and years of holding things

6    in, and like I said, I do apologize for that, but it's

7    not easy.  I'm not a vengeful person.  I'm really not

8    able.  And until he's ready to accept responsibility

9    and say yeah, I did it, how's any of this

10   (indiscernible) words are easy.  (Indiscernible) the

11   actions that follow-up on words like that -- it's a

12   lot harder.  I'll (indiscernible) suffering down, and

13   I think it pretty much covers what I'm trying to say

14   and what I think you should take into consideration,

15   and that is if he's not ready to take responsibility,

16   how's he going to go out there?

17                    R E C E S S

18                      --oOo--

19

20

21

22

23

24

25

26

27

31

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          DEPUTY COMMISSIONER MEJIA:  Thank you.  We're

4    back on the record for your decision in the matter of

5    Mr. Baker, inmate Baker.

6          PRESIDING COMMISSIONER FISHER:  After, once

7    again considering all of the information received from

8    the public, Commissioner Mejia and I are relying on

9    the following circumstances in concluding that we

10   erred in the last hearing.  There is information that

11   either was not presented to us in the same manner that

12   it was at this hearing or that we somehow

13   (indiscernible) because we.  This is going to be a

14   denial, a one-year denial, and it's going to be based

15   entirely on the commitment offense and insight.  And

16   I'll tell you why.  We went back through every part of

17   the transcript based on what was said and talked about

18   today, which was the second shot that was fired.  And

19   we went back through the (indiscernible) and the

20   ballistics evidence, and I don't know that we had that

21   in front of us last time.  If we did, certainly, we

22   overlooked what it meant, because the ballistics

23   evidence clearly states that Mr. Baker was the person

24   who shot Mr. Dixon.  It doesn't say that Mr. Baker and

25   another gun shot Mr. Dixon.  It says that Mr. Baker

26   (indiscernible) that he had to have fired twice.  And

27   FRED BAKER  C-22918  DECISION PAGE 1  10/4/05

32

1    then every transcript that I have here, he has said

2    that he only fired the gun once. And in his early

3    days, he said that the gun went off, but it still was

4    one time going off. That was in '99. In 2003, he

5    said that Steven shot him too. Mr. Cordero (phonetic)

6    asked him how did Mr. Dixon get shot. He was shot

7    twice. And inmate Baker said I believe it was once

8    because I pulled the trigger just once

9    (indiscernible). And in the most recent hearing in

10   response to Mr. Mejia saying how did the victim get

11   shot twice, Mr. Baker said my crimee, he had the gun

12   pointed out, and I believe this. I don't know, but I

13   believe he pulled the trigger thinking I pulled the

14   trigger, and that's how it happened (indiscernible).

15   That's clearly not what the ballistics said. And for

16   that reason, as well as the gravity of the crime, this

17   is going to be a one-year denial. Mr. Baker has done

18   very well, and it is obvious by the fact that this

19   same panel granted his parole last time. He has been

20   an exemplary inmate and he's done very well. He

21   demonstrated, I think, sincere remorse when he was at

22   his last hearing. But because of the outcome of this

23   kidnap for robbery and the gravity of it based on what

24   the outcome was, it's just too important for him to

25   have good insight (indiscernible) into his culpability

26   (indiscernible) we need to talk about having an

27   FRED BAKER  C-22918  DECISION PAGE 2  10/4/05

1    understanding of (indiscernible).  And that concludes

2    the discussion.  Any comments, Commissioner?

3            DEPUTY COMMISSIONER MEJIA:  No further

4    comments.

5                        --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR          NOV. 16 2005

24    THIS DECISION WILL BE FINAL ON: _____

25    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    FRED BAKER  C-22918  DECISION PAGE 3  10/4/05

34

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, PATRICIA CHAPIN, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do hereby
declare and certify under penalty of perjury that I
have transcribed tape(s) which total one in number and
cover a total of pages numbered 1 - 33, and which
recording was duly recorded at THE CORRECTIONAL
TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter
of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF FRED
BAKER, CDC NO. C-22918, ON OCTOBER 4, 2005, and that
the foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned tape to
the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated OCTOBR 20, 2005, at Sacramento,
California.


PATRICIA CHAPIN
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

No. 06-16099

## IN THE UNITED STATES COURT OF APPEALS

### FOR THE NINTH CIRCUIT

FREDERICK LEE BAKER,      )   CV-04-3733-CW
                        )   (N.D. Cal. Oakland)
   Petitioner-Appellant,   )
                        )
    v.                 )
                        )
ANTHONY KANE, Warden, et al.,  )
                        )   **CERTIFICATE OF SERVICE**
   Respondents-Appellees.   )
                        )
                        )

    I, the undersigned, hereby certify that I am a resident of the state of California, County of Monterey.  I am over the age 18 years and a party to the within action.  My business/ residence address is P.O. Box 689, Soledad, California, 93960-0689.

    On _____, 2006, I caused to be served on the parties a true and correct copy of the **October 4, 2005, COURT-ORDERED REHEARING Transcript** and **JUDICIAL NOTICE** thereof, as follows:

#### U.S. MAIL

Elizabeth S. Kim
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

    I declare under penalty of perjury that the following is true and correct.

_____
                       Declarant

Exh. Y

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

COURT OF APPEAL, FOURTH DISTRICT

DIVISION TWO

STATE OF CALIFORNIA

COURT OF APPEAL-FOURTH DIST.

F I L E D

MAR 30 1990

RICHARD J. SMITH, ACTING , Clerk

Deputy Clerk

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, ) | |
| Plaintiff and Respondent, ) | 4 Crim. 12415 |
| v. ) | (Super.Ct.No. CR 17643) |
| FRED L. BAKER and ) | |
| VERNICE ROSE HABBITT, ) | |
| Defendant and Appellant. ) | O P I N I O N |

APPEAL from a judgment of the Superior Court of Riverside County. Gerald F. Schulte, Judge. Affirmed.

David Morse Hammond, under appointment by the Court of Appeal, for Defendant and Appellant Fred L. Baker.

Jacalyn T. Drexler, under appointment by the Court of Appeal, for Defendant and Appellant Vernice Rose Habbitt.

George Deukmejian, Attorney General, and Robert M. Foster, Deputy Attorney General, for Plaintiff and Respondent.

Following a jury trial, defendants Fred L. Baker and Vernice Rose Habbitt were each found guilty of three counts of robbery (Pen. Code, § 211), two counts of kidnapping for the purpose of robbery (Pen. Code, § 209, subd. (b)), one count of grand theft (Pen. Code, § 487, subd. 3), one count of car theft (Veh. Code, § 10851), and one count of assault with intent to

murder (Pen. Code, § 217). Allegations in each count that a principal was armed within the meaning of Penal Code section 12022, subdivision (a), were found to be true. Allegations that Baker had personally used a firearm in the commission of the offense within the meaning of Penal Code section 12022.5 and that he had inflicted great bodily injury on one of the victims within the meaning of Penal Code section 12022.7 were also found to be true. Defendants were each sentenced to state prison and have prosecuted separate appeals from the judgment of conviction.[1]

This court appointed separate counsel for each defendant. Counsel for defendant Habbitt has filed an appellate brief raising several contentions. Counsel for defendant Baker has filed a Wende brief (People v. Wende (1979) 25 Cal.3d 436), stating that he has reviewed the entire record and has been unable to find any arguable issues on appeal.

## FACTS

The pertinent facts will be stated in accordance with the settled rule on appeal that the evidence be viewed in the light most favorable to respondent.

---

[1]    Defendant Habbitt was sentenced to life with possibility of parole on one count of kidnapping for the purpose of robbery, plus one year enhancement pursuant to section 12022, subdivision (a). A like sentence was imposed on the other kidnapping for robbery count, the sentence to run concurrently with the other kidnapping conviction. Sentences were imposed on the other counts to run concurrently with the sentence on the kidnapping count, or were imposed and permanently stayed. Defendant Baker was sentenced to state prison for seven years on the assault with intent to murder count. He was also sentenced to life with possibility of parole on the kidnapping for robbery count with an additional 1 2/3 years for the robbery conviction and weapons use findings, the sentences to run consecutively to the sentence on the assault with intent to murder conviction.

Sometime during the night of May 18-19, 1980, a hardware store in Perris, California, was burglarized. Among other items taken were numerous guns and ammunition.

That evening sometime after midnight, Joseph Berger was driving home from work in his red Vega on Wood Road near Perris. He saw a black female hitchhiking and stopped to give her a ride. She was defendant Habbitt. When Berger stopped, defendant Baker and two others (Early Farris and Steven Scoby) emerged from the darkness carrying rifles which had been taken from the hardware store. Berger was ordered out of his car; his wallet was taken; and defendant and their companions got into the Vega and drove off. As they did, one said "Don't let the white boy get away." Berger heard a shot fired over his head and he fled into the shrubs nearby.

About 2 a.m. that same evening defendant Habbitt entered a 7 - 11 market in Woodcrest. She picked up some items, went to the front counter and then left saying she forgot her money and would be back. There were no other customers in the store. Robin Ingram and her mother Harriet Rommel were tending the store. Moments after defendant Habbitt left, defendant Baker (wearing a red dress) along with Farris and Scoby entered the store. Each wore facial covering and carried a rifle. They forced Ingram and Rommel to open the cash register and hand over the contents amounting to approximately $235. Ingram and her mother were then ordered outside. One of the participants

-3-

demanded the keys to Rommel's blue Pinto which was parked outside. When Ingram went into the store to get the keys she was followed by two of the gunmen who took Rommel's purse and cash from Ingram.

After Ingram delivered the keys to the Pinto to one of the individuals, she was ordered into the Pinto and Rommel was ordered to get into the Vega. The two were then driven several miles from the store. Defendant Habbitt drove the Vega and defendant Baker drove the Pinto. Eventually the two cars stopped in an orange grove and Ingram and Rommel were released. They fled into the orange grove and as they did so, a shot was fired over their heads.

After leaving the orange grove, defendants and their companions ditched the Pinto in some weeds alongside a lot and they all got into the Vega with defendant Habbitt driving.

About 3 or 3:30 a.m., Val Dixon was driving down a street just outside of Perris when one of his tires went flat. He stopped to call his automobile club. A red Vega driven by defendant Habbitt pulled up and asked if Dixon needed help. He said he was doing fine and the Vega drove off but shortly it returned and someone in it said "Hey sucker." When Dixon turned he saw a rifle pointed at him. Dixon tried to knock the barrel away but failed and was shot twice. His spinal cord was struck and he has been paralyzed from the waist down. Laboratory tests of gunshot residue indicated that defendant Baker was the one who shot Dixon and ballistics tests indicated that the bullet had been fired

~~from one of the guns taken at the hardware burglary earlier that evening.~~

A police radio broadcast the description of the Vega. A Perris police officer spotted a vehicle matching the description of the broadcast and called for a backup. The car was finally stopped and defendant Habbitt was the driver. Defendant Baker managed to crawl under the car unnoticed but was later discovered and arrested. ~~The car contained rifles taken from the hardware store and used during the crime spree, ammunition, the loot from the 7-11 store and Berger's wallet.~~

## HABBITT'S APPEAL

Defendant Habbitt contends (1) she was denied effective assistance of counsel and (2) the court erred in denying her motion for a mistrial grounded on a denial of a right to confront and cross-examine witnesses. For the reasons to be stated, we find no merit to the contentions.

I

Defendant Habbitt bases her charge of incompetency of trial counsel on his failure to present a diminished capacity defense and for his failure to make a timely written motion for severance.

The standard governing adequacy of counsel is whether defendant received the assistance of a reasonably competent attorney acting as a diligent, conscientious advocate. (People v. Pope (1979) 23 Cal.3d 412, 423-424.) The burden of proving a

-5-

claim of inadequate trial counsel is on the defendant. He or she must show that trial counsel failed to act as a reasonably competent attorney acting as a conscientious and diligent advocate and that counsel's failure resulted in the withdrawal of a potential meritorious defense. (Id., at p. 425.) Where the record on appeal fails to shed any light on the charges of any alleged act or omission of counsel, a claim of ineffective assistance of counsel should be made by a petition for writ of habeas corpus. (Id., at p. 426.)

The record fails to substantiate defendant's claim of incompetency of counsel for failure to investigate the availability of a diminished capacity defense and to present the same at trial.

Defendant contends that the record contains evidence that she and her companions might have been on drugs during the evening in question. She refers to testimony of the victims Berger, Ingram and Rommel that defendant and her companions were jabbering and mumbling at one another, gave conflicting and confusing orders and on the testimony of Ingram that she thought at least two of the group might have been on drugs. Defendant Habbitt also maintains that the testimony of Farris concerning his recollection of the events of the night suggests that he must have been under the influence of drugs.

The record, however, sheds no light on why trial counsel did not present a diminished capacity defense. The record

includes neither an explanation as to why counsel did not raise
the defense nor an indication that he was asked for an explana-
tion. Nor is this a case where this court can conceive of no
satisfactory explanation for counsel's failure to present the
defense. Insofar as the present record is concerned, counsel may
have investigated the viability of the defense and found that it
could not be substantiated. Or, he may have decided for tactical
reasons that reliance on the questionable defense of diminished
capacity would have harmed defendant's case.

Defendant concedes that the record is silent as to why
a diminished capacity defense was not presented and states that
that was the reason she filed the petition for writ of habeas
corpus with this court on the ground of incompetency of trial
counsel, reciting the same reasons for her claim as are asserted
on appeal. Because an evidentiary hearing would be required to
resolve the factual issues raised by the petition, this court
denied it without prejudice to her right to file the same peti-
tion in the superior court. (4 Crim. 12760, Aug. 7, 1981.)

For the foregoing reasons, the contention that defendant
was denied effective assistance of counsel for failure to raise
the diminished capacity defense must be rejected on this appeal.

Defendant also contends that her trial counsel's failure
to make a timely written motion for severance constituted a denial
of effective assistance of counsel. The record shows that when
the case was called to trial, defendant Habbitt and her counsel

told the court that she wished to waive a jury. The people declined to waive because codefendant Baker had not waived a jury. Counsel for defendant Habbitt thereupon orally moved to have her trial severed. The motion was denied.

Inasmuch as the motion to sever was denied on the merits and not because it had not been made in writing, defendant suffered no prejudice by the failure to make a formal written motion. Morover, defendant Habbitt concedes that when, as here, the record fails to show why the motion to sever was not made earlier, any claim of incompetency of counsel for failure to make a timely motion to sever must be raised by habeas corpus. (People v. Hall (1980) 28 Cal.3d 143, 158.) Defendant Habbitt has raised that contention in her petition for writ of habeas corpus which was denied without prejudice of the right to file the same petition in the superior court. The contention of inadequacy of counsel with respect to the motion of severance must therefore be rejected.

## II

Defendant contends the court committed prejudicial error in denying her motion for a mistrial on the ground that the prosecution was guilty of misconduct in calling Scoby as a witness with the knowledge that he would exercise his Fifth Amendment right not to testify.

Scoby, who was a juvenile, was called as a witness for the prosecution and testified to the following: His relationship with

the other participants; that they all lived in Perris; that he lived in an apartment near Wood Road in Perris with his parents, his sister defendant Habbitt and another sister; that at about 4 a.m. on the night in question he was arrested at the apartment of yet another sister; that he arrived there in a red Vega and that the first time he saw the red Vega was on Wood Road. Thereafter he refused to answer any further questions and the court found him in contempt. Defendant moved for a mistrial on the ground the prosecutor knew that Scoby would refuse to testify but called him for the purpose of having him invoke his Fifth Amendment privilege in front of the jury to create an adverse inference against defendant. The court denied the motion.

A prosecutor may be guilty of misconduct for calling a witness for the sole purpose of having the witness invoke his Fifth Amendment privilege in front of the jury in order to create an inference reflecting adversely on the party against whom the witness has been called. (People v. Johnson (1974) 39 Cal.App.3d 749, 760; People v. Chandler (1971) 17 Cal.App.3d 798, 803-804.) However, here there was no abuse of discretion in the denial of the mistrial motion for prosecutorial misconduct. The prosecutor represented to the court that he had talked to Scoby the night before and that while Scoby indicated some reluctance to testify, he gave no indication he would refuse or claim the Fifth Amendment privilege; in fact, according to the prosecutor, Scoby said he would appear and testify truthfully. The fact that Scoby gave

considerable testimony before refusing to testify tends to sub-
stantiate the prosecutor's representation that he did not call
the witness for the sole purpose of having him invoke the Fifth
Amendment in front of the jury.

Furthermore defendant did not request the court to give
an instruction under Evidence Code section 913[2/] not to draw
any inference from the witness' exercise of the Fifth Amendment
privilege.  In the present case such an instruction would have
cured any harm resulting from the witness' refusal to testify.
Defendant is therefore precluded from complaining on appeal of
the order denying mistrial.  (See People v. Green (1980) 27 Cal.
3d 1, 34-35.)

The judgment of conviction as to defendant Habbitt is
affirmed.

## APPEAL OF DEFENDANT BAKER

As we indicated earlier, defendant Baker's appointed
counsel filed a Wende brief stating that he is unable to find any

---

[2/]    Evidence Code section 913 provides:
"(a)  If in the instant proceeding or on a prior occasion
a privilege is or was exercised not to testify with respect to
any matter, or to refuse to disclose or to prevent another from
disclosing any matter, neither the presiding officer nor counsel
may comment thereon, no presumption shall arise because of the
exercise of the privilege, and the trier of fact may not draw any
inference therefrom as to the credibility of the witness or as to
any matter at issue in the proceeding.
"(b)  The court, at the request of a party who may be
adversely affected because an unfavorable inference may be
drawn by the jury because a privilege has been exercised,
shall instruct the jury that no presumption arises because
of the exercise of the privilege and that the jury may not
draw any inference therefrom as to the credibility of the
witness or as to any matter at issue in the proceeding."

arguable issues on appeal. He states he has written to the defendant asking for his comments concerning any issues he would like to have raised on appeal and has also sent him a copy of the brief advising him that he may request this court to have present counsel relieved. This court has received no communication from defendant concerning any issues he would like to raise nor has he requested that present counsel be relieved.

We are faced with an anomalous situation where one defendant has filed a Wende brief and the other defendant has filed a brief raising several issues on appeal. We have earlier concluded that the contentions raised by codefendant Habbitt are either not cognizable on this appeal or otherwise lack merit. We have reviewed the entire record in this case and find no arguable issues on appeal on behalf of defendant Baker. We nevertheless give defendant Baker the benefit of doubt and treat the issues raised by defendant Habbitt as having also been raised on behalf of defendant Baker. Our conclusions on the merits of these contentions as to defendant Baker are the same as those we reached as to defendant Habbitt.

The judgment of conviction as to defendant Baker is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

_____
Tamura
        J.*

We concur:

_____
Morris
Acting P. J.

_____
McDaniel
        J.

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

-11-

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )    CDC Number C-22918
Hearing of:                )
                           )
FRED BAKER (BABER)         )
_____)

COPY
INMATE

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

SEPTEMBER 24, 2004

PANEL PRESENT:

SUSAN FISHER, Presiding Commissioner
ROLANDO MEJIA, Deputy Commissioner

NOT APPROVED

OTHERS PRESENT:

FRED BAKER, Inmate
MARY ANN TARDIFF, Attorney for Inmate
SARA DANVILLE, Deputy District Attorney
VAL DIXON, Victim
STEPHANIE GARTHWAITE, Observer

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

Patricia Ricci        Capitol Electronic Reporting

ii

## INDEX

|                          | Page |
|--------------------------|------|
| Proceedings............................................. | 1 |
| Case Factors........................................... | 10 |
| Pre-Commitment Factors.............................. | 19 |
| Post-Commitment Factors............................. | 35 |
| Parole Plans........................................... | 27 |
| Closing Statements.................................... | -- |
| Recess.................................................. | -- |
| Decision............................................... | -- |
| Adjournment........................................... | -- |
| Transcriber Certification............................. | 85 |

--oOo--

1

1        **P R O C E E D I N G S**

2            DEPUTY COMMISSIONER MEJIA:  We're now on

3    record.

4            PRESIDING COMMISSIONER FISHER:  All right,

5    thank you.  This is going to be a Subsequent Parole

6    Consideration Hearing for Fred Baker, CDC number

7    C-22918.  Today's date is 9/24/04 and we're located

8    at the California [sic] Training Facility at

9    Soledad.  Inmate was received on 11/6/80 from

10   Riverside County.  The life term began on 7/31/87

11   and a minimum eligible parole date of 7/31/94.  The

12   controlling offense for which the inmate was

13   committed is kidnap for robbery, case number

14   CR17643, count six, Penal Code Section 209, with an

15   additional finding of use of a firearm, Penal Code

16   Section 12022.5, count eight, which is assault with

17   intent to commit murder, and count one, which is

18   Penal Code Section 211, robbery.  There is a

19   finding of use of a firearm in that count also.

20   Counts two, three, four, five, and seven were all

21   stayed.  Inmate received a term of seven years to

22   life with a two-year enhancement.  And the minimum

23   eligible parole date, once again, is 7/31/94.  Mr.

24   Baker, we're going to tape record the hearing so

25   for the purpose of voice identification we're going

26   to state our first and last name and spell our last

27   name.  When we get to you would you give us your

2

1    CDC number, please.

2           INMATE BAKER:  Yes, Ma'am.

3           PRESIDING COMMISSIONER FISHER:  Okay, thank

4    you.  I'm going to start with myself and go to my

5    left, and for those of you who are on video

6    conference, once we have had everyone in the room

7    here identify themselves, I'd like for you to also

8    identify yourselves for the record, all right.

9           MS. GARTHWAITE:  Okay.

10          PRESIDING COMMISSIONER FISHER:  Thank you.

11   All right, once again I'll start with myself and go

12   to my left.  Susan Fisher, F-I-S-H-E-R,

13   Commissioner.

14          DEPUTY COMMISSIONER MEJIA:  Rolando Mejia,

15   M-E-J-I-A, Deputy Commissioner.

16          DEPUTY DISTRICT ATTORNEY DANVILLE:  Sara

17   Danville, D-A-N-V-I-L-L-E, Deputy District

18   Attorney, Riverside County.

19          ATTORNEY TARDIFF:  Mary Ann Tardiff,

20   T-A-R-D-I double F, attorney for Mr. Baker.

21          INMATE BAKER:  Fred Baker, B-A-K-E-R,

22   C-22918.

23          PRESIDING COMMISSIONER FISHER:  Thank you.

24   Go ahead.

25          MR. DIXON:  Val Dixon, D-I-X-O-N.

26          MS. GARTHWAITE:  Stephanie Garthwaite,

27   G-A-R-T-H-W-A-I-T-E, just for technical support.

3

1          PRESIDING COMMISSIONER FISHER:  Okay, thank

2     you.  Okay, before we can go any further, Mr.

3     Dixon, I need to ask you to read that --

4          INMATE BAKER:  Baker.

5          PRESIDING COMMISSIONER FISHER:  I'm sorry,

6     Mr. Baker, if you'd read that Americans with

7     Disabilities Act for me, and just read it out loud

8     into the record.

9          INMATE BAKER:  "The Americans with

10              Disabilities Act, ADA, is a law to

11              help people with disabilities.

12              Disabilities are problems that make

13              it harder for some people to see,

14              hear, breathe, talk, walk, learn,

15              think, work, or take care of

16              themselves than it is for others.

17              Nobody can be kept out of public

18              places or activities because of a

19              disability.  If you have a disability

20              you have the right to ask for help to

21              get ready for your BPT hearing, get

22              to the hearing, talk, read forms and

23              papers, and understand the hearing

24              process.  BPT will look at what you

25              ask for to make sure that you have a

26              disability that is covered by the ADA

27              and that you have asked for the right

4

1          kind of help.  If you do not get help

2          or if you don't think you got the

3          kind of help you need, ask for a BPT

4          1074 Grievance Form.  You can also

5          get help to fill it out."

6          PRESIDING COMMISSIONER FISHER:  Thank you.

7   Do you understand that?

8          INMATE BAKER:  Yes, Ma'am, I do.

9          PRESIDING COMMISSIONER FISHER:  All right.

10  I do want to note for the record that on April

11  14th, 2004, Mr. Baker did sign the BPT 1073 Form

12  stating that he has no disabilities.  And I just

13  have a few specific questions that I have to ask

14  you before we can move forward.  Do you have any

15  problems walking up and down stairs or walking

16  distances of 100 yards or more?

17         INMATE BAKER:  No, Ma'am.

18         PRESIDING COMMISSIONER FISHER:  Do you need

19  glasses in order to read documents?

20         INMATE BAKER:  No, Ma'am.

21         PRESIDING COMMISSIONER FISHER:  Do you have

22  any hearing impairments?

23         INMATE BAKER:  No, Ma'am.

24         PRESIDING COMMISSIONER FISHER:  Have you

25  ever been included in the Triple CMS or EOP

26  Programs?

27         INMATE BAKER:  No, Ma'am.

5

1    **PRESIDING COMMISSIONER FISHER:**  Ever taken

2 any psych meds?

3    **INMATE BAKER:**  No.  No, Ma'am, excuse me.

4    **PRESIDING COMMISSIONER FISHER:**  Prior to

5 this offense and prior to coming to prison for this

6 offense, how far did you get in school?

7    **INMATE BAKER:**  Eleventh grade.

8    **PRESIDING COMMISSIONER FISHER:**  Okay.  Is

9 there any disability that you suffer from that

10 would prevent you from participating today in the

11 hearing?

12    **INMATE BAKER:**  No, there isn't, Commissioner

13 Fisher.

14    **PRESIDING COMMISSIONER FISHER:**  Okay.  This

15 hearing is being conducted pursuant to Penal Code

16 Sections 3041 and 3042 and the Rules and

17 Regulations of the Board of Prison Terms governing

18 parole consideration hearings for life inmates.

19 And as you know, the purpose of the hearing today

20 is to consider again the crimes that you were

21 committed for, your prior criminal and social

22 history, and your behavior and programming since

23 your commitment offense.  We have had the

24 opportunity to review your files and your prior

25 transcripts, and we'll give you the opportunity to

26 make any corrections that you need to today, all

27 right.

6

1     INMATE BAKER:  Thank you.

2         PRESIDING COMMISSIONER FISHER:  We're going

3     to be deciding today as to your suitability.  If we

4     do find you suitable today we'll explain to you

5     also today what the length of your confinement will

6     be.

7         INMATE BAKER:  Yes, Ma'am.

8         PRESIDING COMMISSIONER FISHER:  Prior to

9     recessing to deliberate we're going to give the

10    District Attorney and your attorney and you the

11    opportunity to make a statement about your

12    suitability.  And then once you've done that we'll

13    allow Mr. Dixon to make his statement.  After that

14    is completed we will have everyone leave the room.

15    We'll turn off the camera here and we'll

16    deliberate.  As soon as we have a decision we'll

17    bring you all back in, okay.

18        INMATE BAKER:  Yes, Ma'am.

19        PRESIDING COMMISSIONER FISHER:  The

20    California Code of Regulations states that

21    regardless of time served a life inmate shall be

22    found unsuitable for and denied parole if in the

23    judgment of the Panel the inmate would pose an

24    unreasonable risk of danger to society if released

25    from prison.  You do have certain rights relating

26    to this hearing.  You have the right to a timely

27    notice of the hearing, the right to review your

7

1    Central File, and the right to present relevant

2    documents.

3         INMATE BAKER:  Bless you.

4         PRESIDING COMMISSIONER FISHER:  Ms. Tardiff,

5    have your client's rights been met thus far?

6         ATTORNEY TARDIFF:  Yes.

7         PRESIDING COMMISSIONER FISHER:  All right.

8    You also have the right to an impartial Panel.

9    Having seen your two Panel members today, do you

10   have any objections to your Panel?

11        INMATE BAKER:  No, Ma'am, I don't.

12        PRESIDING COMMISSIONER FISHER:  Okay, Ms.

13   Tardiff?

14        ATTORNEY TARDIFF:  No objection.

15        PRESIDING COMMISSIONER FISHER:  Okay.  We're

16   going to give you a written copy today of our

17   tentative decision and that decision will be final

18   within 120 days.  And then a copy of the decision

19   and a copy of the transcript of the hearing will be

20   sent to you.  Are you familiar with the changes

21   just this year as to how you appeal Board

22   decisions?

23        INMATE BAKER:  No, Ma'am, I'm not.

24        PRESIDING COMMISSIONER FISHER:  Okay.  Let

25   me just tell you as briefly as I can.  There were

26   15 California Code of Regulations Sections that

27   were repealed.  Those were 2050 through 2056.  And

1   the current policy is in the Board's Administrative

2   Directive 0401 entitled Administrative Appeals,

3   Correspondence, and Grievances Concerning Board of

4   Prison Terms Decision.  I told you that because

5   that's available in the prison library or through

6   your correctional counselor.  Basically what it

7   boils down to is that appeals used to go directly

8   to the Board of Prison Terms on the 1040 Form.

9       INMATE BAKER:  Yes.

10      PRESIDING COMMISSIONER FISHER:  Now they go

11  directly to the courts, okay, so it's just a

12  different process.

13      INMATE BAKER:  Thank you.

14      PRESIDING COMMISSIONER FISHER:  I want to

15  remind you that you're not obligated today to

16  either admit or discuss the offense, but that this

17  Panel does accept the findings of the court to be

18  true.

19      INMATE BAKER:  Yes, Ma'am.

20      PRESIDING COMMISSIONER FISHER:  You

21  understand, all right.  Okay, I'm going to pass my

22  Hearing Checklist to the two attorneys and make

23  sure that we all have the same paperwork.

24  Commissioner Mejia, do we have any confidential to

25  be used today?

26      DEPUTY COMMISSIONER MEJIA:  None to be used

27  at this time.  Yes, we do have the victim's impact

9

1    letters.

2        **PRESIDING COMMISSIONER FISHER:**   Original

3    letters from the victims, all right.

4        **ATTORNEY TARDIFF:**   Yes, I have these

5    documents, thank you.

6        **PRESIDING COMMISSIONER FISHER:**   Do you have

7    anything else that needs to be submitted?

8        **ATTORNEY TARDIFF:**   No.

9        **PRESIDING COMMISSIONER FISHER:**   Okay.  Any

10   preliminary objections?

11       **ATTORNEY TARDIFF:**   No.

12       **DEPUTY DISTRICT ATTORNEY DANVILLE:**   I have

13   them as well.

14       **PRESIDING COMMISSIONER FISHER:**   All right,

15   thank you.  Is Mr. Baker going to be speaking with

16   us today?

17       **ATTORNEY TARDIFF:**   Yes.

18       **PRESIDING COMMISSIONER FISHER:**   Mr. Baker,

19   if you'll raise your right hand, I'm going to swear

20   you in.  Do you solemnly swear or affirm that the

21   testimony you give at this hearing will be the

22   truth and nothing but the truth?

23       **INMATE BAKER:**   I do.

24       **PRESIDING COMMISSIONER FISHER:**   All right,

25   thank you.  What I'm going to do, Mr. Baker, is I'm

26   going to read a summary of the crime into the

27   record and then I'm going to ask you to tell me in

10

1    your own words what happened, okay.  And we'll just

2    go from there.  I'm using the current Board Report,

3    or the 2002 Board Report.  Why is it 2002, I know

4    why, there's no summary in the current one.  I'm

5    using the 2002 Board Report under Summary of the

6    Crime.

7         **ATTORNEY TARDIFF:**  No, there's, oh, okay,

8    you're going to use the --

9         **PRESIDING COMMISSIONER FISHER:**  The longer

10   version, because I figure it's got to be closer to

11   the Probation Officer's Report, which is not

12   readable in its copied form.  It's really bad.

13            "On 5/22/80 at approximately 1:30

14            a.m., Riverside County Sheriff's

15            Office was contacted by Joseph

16            Burger, that's B-U-R-G-E-R, who

17            reported his car stolen by two

18            females later identified as Bernice

19            Habbit, that's B-E-R-N-I-C-E capital

20            H-A-B-B-I-T, and Fred Baker,

21            disguised as a female.  Both were

22            hitchhiking on -- I can only assume

23            it's Cajalio Road, it's

24            C-A-J-A-L-I-O.  Burger stopped and

25            offered them a ride.  A black male

26            then came from the opposite side of

27            the street and pointed a gun at him.

11

1    Burger was then pulled from the car

2    by the suspects.  Subsequently his

3    wallet was also taken from him.

4    Burger got scared, jumped into a

5    ditch, and ran for his life as a shot

6    was fired by one of the suspects.  As

7    he fled, the suspects took his red

8    Vega station wagon and left the area.

9    As this investigation was in process,

10   a report of a robbery at the Seven 11

11   Store at VanBurgen, B-U-R-G-E-N, and

12   Washington Streets was received.  The

13   suspect vehicle was a red Vega

14   station wagon.  At approximately two

15   a.m. Bernice Habbit went to the Seven

16   11 Store where Harriet Rommel,

17   R-O-M-M-E-L, and her daughter Robin

18   Ingram, I-N-G-R-A-M, worked.  Habbit

19   walked around the store selecting

20   items.  She placed them on the

21   counter for purchase.  When at the

22   counter to pay for her items, Habbit

23   stated that she had to go to her car

24   outside to get more money.  A short

25   time later three male suspects,

26   Baker, Ferris, F-E-R-R-I-S, who was a

27   co-defendant that was 14 years old at

12

1    the time, and Canado, C-A-N-A-D-O,

2    who was also a co-defendant, 14 years

3    old at the time, entered the store

4    carrying rifles and wearing stocking

5    masks. Rommel, who was at the back

6    of the store at the time observed

7    Canado and Baker pointing their guns

8    at Ms. Ingram who was near the cash

9    register. About 140 dollars was

10   taken from the register.

11   Subsequently, Rommel and Ingram were

12   taken outside by the suspects. Ms.

13   Rommel was placed in the back of the

14   Vega station wagon and Ms. Ingram was

15   ordered to give up her mother's car

16   keys so the perpetrators could take

17   her to -- I'm sorry, to take her

18   mother's Pinto car with them. Canado

19   and Baker put Ms. Ingram into the

20   Pinto car with them and they followed

21   the Vega station wagon. In an orange

22   grove area the suspects stopped the

23   cars and ordered both victims out of

24   the cars. They were told to run into

25   the grove and were given a count of

26   five to get out of sight or they

27   would be killed. Subsequently the

13

1    perpetrators drove to an isolated
2    area and pushed the Pinto into some
3.   bushes.   Shortly thereafter the
4    victims called the Sheriff's Office.
5    While this investigation was
6    proceeding at approximately three
7    a.m., officers were notified of a
8    shooting on Perris Boulevard near
9    John F. Kennedy Street.   Val Dixon,
10   in parentheses it says (victim), had
11   been shot in the stomach and was
12   lying in the street.   He stated that
13   his car broke down and he was
14   returning from calling a tow truck
15   when he was approached by a red Vega
16   station wagon driven by a black
17   female who asked if he needed a ride.
18   When he answered negatively, the car
19   kept going and made a U-turn.   When
20   the car approached again Dixon
21   noticed a male holding a rifle
22   pointed at him.   He attempted to push
23   the gun barrel away from his body.
24   He was shot and the suspects drove
25   away.   The victim was later taken to
26   the hospital for medical treatment.
27   Doctors discovered that he'd been

14

1    shot twice.  Val Dixon is now

2    paralyzed from the waist down.  At

3    approximately 3:45 a.m. Perris Police

4    observed a red Vega station wagon in

5    the city of Perris.  A vehicle stop

6    was affected.  Ms. Habbit got out of

7    the driver's door immediately.

8    Ferris got out next and stood between

9    Ms. Habbit and the vehicle while

10   throwing away live ammunition.

11   Canado exited next and placed himself

12   between the other two suspects, and

13   Baker was found hiding under the

14   vehicle.  Backup units arrived and

15   they were all searched and

16   handcuffed.  Two high-powered rifles

17   were found in the back seat of the

18   vehicle and one was found in the

19   front passenger seat.  The suspects

20   stated that Baker had put on makeup

21   and dressed to disguise himself.

22   They also stated that both Canado and

23   Baker had their guns pointed out the

24   car window when Dixon, and when Dixon

25   grabbed the guns both suspects fired

26   and Ms. Habbit drove away.  Baker did

27   not discuss the offense with officers

1            at the time of his arrest."

2    And this notes that the source of information was

3    the Probation Officer's Report pages three through

4    seven dated 10/16/80.  Now Mr. Baker, tell me what

5    happened.

6         INMATE BAKER:  That's pretty accurate there.

7    That's very accurate there.  I guess what I would

8    like to add to that is why these things occurred,

9    at least to the best of my understanding.  And what

10   I would like for the Panel to know is that the

11   information that I give to you is not a means for

12   me to lessen the (indiscernible) offense or take

13   anything away from it or as an excuse, but it's

14   only for --

15        PRESIDING COMMISSIONER FISHER:  I'm sorry.

16   I don't mean to interrupt you.  I think you're

17   probably about to talk to me about some insight

18   about what was going on with you?

19        INMATE BAKER:  Yes.

20        PRESIDING COMMISSIONER FISHER:  And for my

21   purposes right now, I'm just looking to set down

22   the facts of the crime.  We are going to talk about

23   that, but I just want to, I want to make sure the

24   facts are on record first.  So is there anything

25   factually that you would change?

26        INMATE BAKER:  No, that's it.

27        PRESIDING COMMISSIONER FISHER:  Okay, we're

1   going to talk about what you were about to bring

2   up, but I wanted to make sure that that's --

3          **INMATE BAKER:**  That's accurate.

4          **PRESIDING COMMISSIONER FISHER:**  Okay, so

5   tell me what was going on with you at the time?

6          **INMATE BAKER:**  I was up under a lot of

7   stress prior to this crime occurring.  And what

8   I've come to realize through all the psychological

9   programs I've been involved in throughout the years

10  is that the things that was going on in my life

11  that affected this crime occurred like a week prior

12  to this crime.  And what had happened then was I

13  found out that my child had been aborted, and when

14  I heard that, it just kind of, it twisted me.  It

15  just sent me in a rage.  I didn't know how to deal

16  with that at that time.  I didn't talk to no one

17  about that then.  When I heard, I didn't even talk

18  to my girl about that, my girlfriend at the time

19  who did that.  And what happened leading up to the

20  crime was that I got away from her to go be with my

21  family for support, because I was really distraught

22  behind that because I was looking forward to

23  becoming a father at that time.  And like we had

24  smoked marijuana laced with PCP.  And what, how

25  that came about was because I smoked a joint one

26  other time in my life and that was during my

27  birthday.  And my cousin who observed me smoking

1    that joint -- See all the joint did for me was it
2    made me happy, but it made me eat a lot, but it
3    didn't make me violent or anything. So I can only
4    roughly think in terms of why they would give me a
5    joint at that time to smoke was to bring me up out
6    of that depression. But what no one accounted for
7    was the effects of the PCP. And I say that too
8    because -- This is not an excuse. This is not an
9    excuse.

10           **PRESIDING COMMISSIONER FISHER:** Well what
11    were the effects of the PCP?

12           **INMATE BAKER:** It kind of, it deepened my
13    feelings of remorse. I mean, the pain I was
14    feeling for my kid, it deepened that. It made me,
15    what I come to learn, to become narcissistic. In
16    other words, it made me stop thinking about people.
17    It made me think about me. And what I further
18    learned about that is this here. Is as the
19    psychologist -- just bear with me for a minute here
20    so I can get this right --.As I was going through
21    my Category X and all these programs to understand
22    why I did these things, what the psychiatrist
23    discovered in me was this here. When I was 10
24    years old I observed my mother getting robbed and
25    beat to the point where she couldn't have any
26    children as we exited a store and I was pushed to
27    the side. And I remember being upset at myself

18

1    because I couldn't do anything.  But I also

2    remember being upset at society because nobody came

3    to our aid.  But what I didn't realize then was

4    that's when the Bloods and Crips had just come out

5    and people were scared to get involved.  But that

6    pain and that anger I had then stayed with me

7    because I never dealt with that pain or anger.  And

8    so what happened, as soon as I heard about that

9    with my child, I felt again that I had let somebody

10   down that I loved, that I wasn't there to protect

11   that person.  And so that sent me over the edge.

12   It really did.  And I just, I don't know the proper

13   words to convey to you the things that I was

14   feeling at that time, but it just, it made me, I

15   got numb.  It made me like feel just unreal.  I

16   just didn't matter anymore.  I just didn't exist.

17   And what the PCP did was it made the anger grow

18   more because that anger that I established way back

19   when had never been dealt with and it came to

20   surface.  And what that did, it just put it at a

21   real high level.  And then that accompanied with

22   the remorse, I mean with the pain I felt for my

23   kid, I just didn't care.  And that's what it did to

24   me, I just didn't care.

25        PRESIDING COMMISSIONER FISHER:  Okay, let me

26   ask you a couple things related to that.

27        INMATE BAKER:  Yes.

19

1      PRESIDING COMMISSIONER FISHER: You were 18

2   when this happened?

3      INMATE BAKER: Yes, I was.

4      PRESIDING COMMISSIONER FISHER: When, and

5   you said that right before, shortly before this

6   crime occurred was when you found out about the

7   abortion?

8      INMATE BAKER: Yes, Ma'am.

9      PRESIDING COMMISSIONER FISHER: But that,

10  this wasn't the first crime you committed?

11     INMATE BAKER: Yeah, no, there was a

12  burglary I committed. I did a burglary. I went

13  into the store. This wouldn't even be in my file,

14  I was going through changes. I went into the store

15  because I didn't have nothing to eat. I didn't rob

16  the store, I wanted to eat. But the only way I

17  could do that was I sat back and the store closed

18  and I ate. And as I exited that's when the police

19  came.

20     PRESIDING COMMISSIONER FISHER: All right,

21  but then, when you were sent to Juvenile Camp, you

22  escaped.

23     INMATE BAKER: Yeah, I walked away. I

24  walked away from a ranch.

25     PRESIDING COMMISSIONER FISHER: Okay, so

26  what I'm saying is that before this crime happened

27  there was something going on with your attitude.

20

1          INMATE BAKER:  Absolutely.  I absolutely

2   agree.

3          PRESIDING COMMISSIONER FISHER:  Okay, I just

4   wanted to make sure that was clear on that.

5          INMATE BAKER:  Yes, you're right.

6          PRESIDING COMMISSIONER FISHER:  So why do

7   you think you took it out on people that you didn't

8   know instead of taking it out on the person that

9   aborted the baby?

10          INMATE BAKER:  Well I think it had to do

11   with, like I said earlier, is that I really didn't

12   care because at that time responsibility, thinking

13   responsible and all those things went out the

14   window.  And I think, you know and it wasn't, it

15   had nothing to do with them, in that sense that I

16   had met them, because I had never met them before.

17   I didn't even know them people from anyone.  So it

18   just happened that they were in that path, that

19   line of path, that path I chose to go down at that

20   time.

21          PRESIDING COMMISSIONER FISHER:  In the 2003

22   Psych Report it says that you, when you were

23   talking to the counselor about the review of the

24   crime, it says that your gun went off.  Is that

25   correct?

26          INMATE BAKER:  No.

27          PRESIDING COMMISSIONER FISHER:  What

21

1    happened?

2        INMATE BAKER:  Because I remember like when

3    Mr. Dixon went to slap the gun, right, and my

4    finger, it was on the trigger, and my finger

5    pulled.  That's what that was.

6        PRESIDING COMMISSIONER FISHER:  Okay, I just

7    want to be clear on that.

8        INMATE BAKER:  Yes, Ma'am.

9        PRESIDING COMMISSIONER FISHER:  All right.

10   Okay, is there anything else about the facts of the

11   crime that we haven't covered that you think would

12   be important?

13       INMATE BAKER:  No, that's fairly accurate.

14       PRESIDING COMMISSIONER FISHER:  Okay,

15   because we'll revisit the other things we talked

16   about within the hearing.  I want to go through

17   your social history.  And normally I start with

18   your, any contacts with law enforcement prior to

19   this crime, but we already talked about the fact

20   that you were arrested for burglary at 17.  We

21   talked about what that was, and you walked away and

22   then you went to the Youth Authority, right?

23       INMATE BAKER:  Yes, Ma'am.

24       PRESIDING COMMISSIONER FISHER:  Okay.  Let's

25   see, okay, so was that the reason that you didn't

26   finish high school?

27       INMATE BAKER:  Yes, at that time there, like

22

1    I said, me and my father, we was kind of going

2    through changes.  I was upset with my father

3    because my father was, he was drinking heavily, and

4    I didn't like that, because I seen him argue with

5    my step mom.  And we was going through it and so I

6    didn't want to be around that and so even when he

7    was trying to tell me to go to school and things, I

8    just wouldn't listen to him.  I was rebelling at

9    that point in my life.

10          PRESIDING COMMISSIONER FISHER:  Were you

11   living with your father?

12          INMATE BAKER:  Yes, I was.

13          PRESIDING COMMISSIONER FISHER:  Okay, so you

14   were living with your father and your step mom?

15          INMATE BAKER:  Yes.

16          PRESIDING COMMISSIONER FISHER:  Okay.  And

17   again, and I'm looking at the 2003 Psych Report

18   right now, but it says that your mom died in 1995

19   at 46.  Is that actually your biological mother?

20          INMATE BAKER:  Yes, that's my mom.

21          PRESIDING COMMISSIONER FISHER:  It just

22   wasn't clear if that was your mother.  And your

23   father died in 1995?

24          INMATE BAKER:  Yes, Ma'am.

25          PRESIDING COMMISSIONER FISHER:  And at the

26   time that this was written it says you weren't sure

27   what caused his death.  Do you know what that was?

23

1       INMATE BAKER:   No.

2       PRESIDING COMMISSIONER FISHER:   But you said

3   that he smoked a lot and --

4       INMATE BAKER:   Yeah, my father did a lot of

5   drinking.  It contributed to that.  I don't know

6   what the factors were that caused it, but I believe

7   it had something to do with his drinking.

8       PRESIDING COMMISSIONER FISHER:   And then it

9   says here that you were raised by your mother and

10  grandparents until you were 15, and then when you

11  were 15 you went to live with your father.  You

12  have two brothers?

13      INMATE BAKER:   Yes, Ma'am.

14      PRESIDING COMMISSIONER FISHER:   Okay, and

15  you're still in communication with them?

16      INMATE BAKER:   Yes, I am.

17      PRESIDING COMMISSIONER FISHER:   And what

18  about your brothers?  Did they have any problems

19  with law enforcement?

20      INMATE BAKER:   Well the one, my younger

21  brother did.  He joined the Crips and all kinds of

22  problems followed that.  I haven't really been in

23  contact with him.  But my -- I believe he's in the

24  system somewhere, my younger brother.  My older

25  brother is a minister and he's been a minister as

26  long as I can remember.

27      PRESIDING COMMISSIONER FISHER:   Okay.

1    INMATE BAKER:  So he hasn't had any problem

2    with the law.

3    PRESIDING COMMISSIONER FISHER:  Okay.  And

4    you've been married two times, right?

5    INMATE BAKER:  Yes, I have.

6    PRESIDING COMMISSIONER FISHER:  It says your

7    first marriage lasted about six years and it

8    started when you were 18.

9    INMATE BAKER:  Yes, Ma'am.

10   PRESIDING COMMISSIONER FISHER:  And you have

11   no children from that marriage.

12   INMATE BAKER:  That's true.

13   PRESIDING COMMISSIONER FISHER:  Okay, and

14   then you married again in 2002?

15   INMATE BAKER:  Yes.

16   PRESIDING COMMISSIONER FISHER:  And are you

17   still married?

18   INMATE BAKER:  Yes, I am.

19   PRESIDING COMMISSIONER FISHER:  Okay.  And

20   it says here that you do receive visits

21   (indiscernible).

22   INMATE BAKER:  Yes, Ma'am, I do.

23   PRESIDING COMMISSIONER FISHER:  But you have

24   no children at this point, right?

25   INMATE BAKER:  Yes, that's true.

26   PRESIDING COMMISSIONER FISHER:  All right.

27   You say you'd only smoked pot once before this

25

1   happened?

2          INMATE BAKER:   That's true.

3          PRESIDING COMMISSIONER FISHER:   What about

4   alcohol?

5          INMATE BAKER:   No, Ma'am, I never drank.

6          PRESIDING COMMISSIONER FISHER:   All right.

7   Who are these people that were involved in the

8   crime with you?   How did you know them?

9          INMATE BAKER:   I had, well, two of them was

10   my cousins.   My cousins Bernice and my other cousin

11   Steven.   And Ferris was a friend of theirs.   And

12   that's who they were.   They just happened to be

13   there.   I think Ferris, when I went over there to

14   be around people and to kind of up my spirits, and

15   they happened to all be there at that time.

16          PRESIDING COMMISSIONER FISHER:   How old was

17   Bernice?

18          INMATE BAKER:   I believe Bernice was 18.

19          PRESIDING COMMISSIONER FISHER:   The other

20   two were really young.

21          INMATE BAKER:   Yeah, like 15 or 16,

22   something like that?

23          PRESIDING COMMISSIONER FISHER:   Whose idea

24   was this?

25          INMATE BAKER:   Well initially this started

26   out with my cousin Bernice saying that she needed

27   some milk for her baby.   And we just couldn't, we

26

1    didn't have a ride or nothing there, and I wasn't

2    familiar with the area.  And then we was talking

3    about going out to the road to get a ride of some

4    type.  Initially and the idea of that, about the

5    car taking was mine and Steven, to get to the

6    store.

7          PRESIDING COMMISSIONER FISHER:  And three of

8    you had guns, right?

9          INMATE BAKER:  Yes, Ma'am.

10         PRESIDING COMMISSIONER FISHER:  Did you

11   normally have a gun?

12         INMATE BAKER:  No, Ma'am.  My cousin, with

13   them, that's sort of like my aunt Della and her

14   husband Hop, they had weapons like that because he

15   used to always go hunting, fishing, and things like

16   that.  He was in law enforcement too, so they had

17   things like that around the house.

18         PRESIDING COMMISSIONER FISHER:  So at what

19   point did you decide to bring the guns along with

20   you?

21         INMATE BAKER:  When we decided to go out

22   there and get the car.

23         PRESIDING COMMISSIONER FISHER:  Okay, and

24   why did you disguise yourself as a woman?

25         INMATE BAKER:  Because she didn't want to

26   stand out there by herself, and it was dark.  And I

27   told her I would dress in a dress and stand there

1   with her.

2          PRESIDING COMMISSIONER FISHER:  Because you

3   figured it would be easier to get somebody to pull

4   over?

5          INMATE BAKER:  That's one of the reasons.

6   That's one of the reasons.

7          PRESIDING COMMISSIONER FISHER:  Okay.  Do

8   you have any questions?  I'm sorry, I'm moving way

9   ahead in the hearing without actually going through

10  (indiscernible) after I finish asking questions.

11  Is there anything else about your social history

12  that we should talk about before we move on?

13  Anything important?

14          INMATE BAKER:  No we basically covered it.

15          PRESIDING COMMISSIONER FISHER:  We covered

16  it?

17          INMATE BAKER:  Yes, Ma'am.

18          PRESIDING COMMISSIONER FISHER:  All right.

19  Let me tell you what I have here regarding parole

20  plans.  It says that if you were to receive a

21  parole date that you would live with your fiancée.

22  Is that correct?

23          INMATE BAKER:  My wife.

24          PRESIDING COMMISSIONER FISHER:  That would

25  be your wife?

26          INMATE BAKER:  Yes.

27          PRESIDING COMMISSIONER FISHER:  All right.

28

1    And that you -- Now this is back in the Board

2    Report in 2002.  I think the current one says to

3    refer back to it, as I recall, yes, it does.  It

4    says that you've received an offer of employment

5    from Ethel Martin?

6         INMATE BAKER:  Yes.

7         PRESIDING COMMISSIONER FISHER:  Okay.  She's

8    your aunt?

9         INMATE BAKER:  Yes.

10        PRESIDING COMMISSIONER FISHER:  Who has

11   arranged employment as a bookkeeper in an

12   accounting firm.  Is that right?

13        INMATE BAKER:  That's true.

14        PRESIDING COMMISSIONER FISHER:  Okay.  It

15   also says you plan to upgrade your computer

16   technology vocational skills by attending college

17   in the evening.

18        INMATE BAKER:  That's true.

19        PRESIDING COMMISSIONER FISHER:  Okay, is

20   there anything else about your parole plans that we

21   should talk about?

22        INMATE BAKER:  Well, I guess I can add into

23   that is that I've had a calling.  And what I mean

24   by that, is that God is directing my life in other

25   ways to where He is directing me to become part of

26   a ministry and as a choir director because I've

27   done music all my life since I've been

1  incarcerated. And I didn't understand it at the
2  time I would get into the music, but over the past
3  several years I understand why God put in me such
4  an interest in music, and that's for me to, the
5  calling that He's got me on now. So that's going
6  to be part of my parole plans as well.
7       PRESIDING COMMISSIONER FISHER: And would
8  that be as a volunteer at the church or would that
9  be a paid position?
10      INMATE BAKER: A pastor. I'm going to
11  college also to become a pastor.
12      PRESIDING COMMISSIONER FISHER: Okay, so
13  you're going to actually pursue that as an
14  education program?
15      INMATE BAKER: Yes, Ma'am, absolutely.
16      PRESIDING COMMISSIONER FISHER: All right.
17  I've got some letters of support here and I'm going
18  to read these. I'm not going to read them
19  verbatim. This first one is pretty long. So I'm
20  going to try and pull out the most important parts.
21  If there's anything in any of the letters that I
22  miss that you think would be important for me to
23  read into the record, let me know, okay.
24      INMATE BAKER: Yes.
25      PRESIDING COMMISSIONER FISHER: The first
26  one is from Helen June Smith, and the heading on
27  the letterhead says Accessories and Things and this

30

1    is in Pomona, California.  And she says, this is

2    your aunt, and she says she's in Pomona.  She's

3    telling me about her business and her church and

4    where she lives and so on and so forth.  She says

5    my position has not changed.  I'm here for my

6    nephew Frederick.  For many years I have given my

7    support with phone calls, care packages, visits,

8    and prayer.  I have noted a great change in

9    Frederick's attitude and outlook on life.  He has

10    made great strides in preparing himself for society

11    in education and soul searching.  Frederick has

12    voiced his regret for the unlawful deeds he

13    committed as a young man of 18 years old many

14    times.  He is ready to give back to society the

15    greatest gift he has, a law-abiding, gifted,

16    talented, well-balanced, educated black man and

17    husband with high morals, self-esteem, and true

18    love for Christ.  She talks about your marriage and

19    talks about the fact that you've lost your parents

20    and grandparents and she says that she has a

21    position for you in her retail store industry with

22    great benefits.  And I know he'll be a great asset.

23    My husband and I have a large four bedroom home

24    that Frederick and his wife Linda could reside in

25    until they get their foot on solid ground.  If they

26    don't wish these arrangements, I've spoken to other

27    relatives that will step in and help make that

1    difference.  This one is from Joe Draper and is

2    this her husband?

3         INMATE BAKER:  Yes, Ma'am.

4         PRESIDING COMMISSIONER FISHER:  All right,

5    he says that he has conversed with you through

6    telephone calls and visitations.  He says that

7    you're a God-fearing young man and he says that

8    he's seen you grow in a very positive way and that

9    you have a good attitude.  He says that you show

10   great remorse and compassion for people that you

11   (indiscernible) you've taken positive steps to

12   educate yourself while you've been in the system.

13   And he says our home and support will be there for

14   Frederick and his wife Linda.  And this one is

15   from, this is from Linda.  Is this your wife?

16        INMATE BAKER:  Yes, that's my wife.

17        PRESIDING COMMISSIONER FISHER:  And I think

18   it's supposed to say Williams Baker, but it looks

19   like a B instead of a K.

20        INMATE BAKER:  Well my name is actually

21   Baber.

22        PRESIDING COMMISSIONER FISHER:  Is it?

23        INMATE BAKER:  Yeah, but they got a K in it

24   in the county jail and I guess the only way I can

25   rectify that is go back to court or something.

26        PRESIDING COMMISSIONER FISHER:  Okay.  All

27   right, well that explains that.  So

32

1    (indiscernible).  She says that she's resided in

2    the same gated community complex in San Bernardino

3    County for five years.  She says should the Board

4    decide not to allow Frederick to parole to San

5    Bernardino County, I have agreed to accept

6    temporary residency in a suitable facility until we

7    can establish a much more reliable and permanent

8    residence in Riverside County.  She's talking about

9    staying in like a hotel (indiscernible) I assume

10   one of those long-term residential kind of things.

11        INMATE BAKER:  Yes, Ma'am.

12        PRESIDING COMMISSIONER FISHER:  She says

13   that she's been in contact with your aunt and

14   uncle.  And that you can live with them if you need

15   to.  She says I am financially able to take care of

16   my husband while he is seeking employment.  I have

17   my own business as a caterer, wedding consultant,

18   and event planner.  The company's name is LaJoyce

19   Creative Designs, and for the transcriber that's

20   capital L-A capital J-O-Y-C-E, and that the

21   business is located in (indiscernible).  That's

22   everything I have in the file.  Is there anything

23   I've missed?

24        ATTORNEY TARDIFF:  There's some updates.

25        PRESIDING COMMISSIONER FISHER:  Are there?

26        ATTORNEY TARDIFF:  Yes, you should have it.

27        PRESIDING COMMISSIONER FISHER:  Once again,

33

1    I have some updates, but not that update.  I have

2    the, I have two copies of the District Attorney's

3    letter.

4         DEPUTY COMMISSIONER MEJIA:  That's what I

5    have too.

6         ATTORNEY TARDIFF:  I got this sent to me in

7    the mail.

8         PRESIDING COMMISSIONER FISHER:  All right,

9    thank you.

10        DEPUTY COMMISSIONER MEJIA:  You're welcome.

11        PRESIDING COMMISSIONER FISHER:  All right,

12   let's see.  (Indiscernible.)  This I have.

13        DEPUTY COMMISSIONER MEJIA:  Do you have the

14   June 25th, 2004?

15        PRESIDING COMMISSIONER FISHER:  Yeah, I

16   think I've got everything (indiscernible) copies of

17   what I already read.  The first one is from

18   Stephanie Velez, V-E-L-E-Z, and she says she's

19   known you all of her life but that in 1993 she

20   became close to you.  This is your cousin?

21        INMATE BAKER:  Yes, it is.

22        PRESIDING COMMISSIONER FISHER:  Okay.  She

23   says since that time I've gotten to know my cousin

24   better.  I've discovered that he's a very warm,

25   smart, and talented individual.  She says that our

26   family is ready to help Frederick in any way

27   possible financially and spiritually.  We stand

34

1   ready to support, assist, and encourage Frederick.

2   This one is from Ethel Martin Miller.  And she

3   says, this is your aunt, right?

4         INMATE BAKER:  Yes.

5         PRESIDING COMMISSIONER FISHER:  She says

6   that she's aware of the crimes that you committed

7   and that she's been in contact with you through

8   telephone calls.  And she says I would like it

9   known that this letter is valid indefinitely until

10  Frederick is released.  She says that she loves you

11  and she'll help you in every area that you need

12  help in making a smooth transition.  She says I

13  have in every letter to the Board members stated

14  that Frederick can live with me and now that he's

15  married I extend the same invitation to him and his

16  wife.  She lives in San Bernardino County, and she

17  mentions the job offer that you have from your

18  other aunt.  And this says, is it pronounced Hail?

19        INMATE BAKER:  Hail.

20        PRESIDING COMMISSIONER FISHER:  Hail.  This

21  is your uncle?

22        INMATE BAKER:  Yes.

23        PRESIDING COMMISSIONER FISHER:  And for the

24  transcriber that's H-A-I-L.  He says I have seven

25  children and many adopted community children.  I

26  have several businesses and he says, he talks about

27  being the victim of a crime.  He was shot in an

35

1    attempted robbery when he was opening one of his

2    stores. He says I lost 80 percent mobility of my

3    body. I'm a quadriplegic and confined to a

4    wheelchair for the rest of my life. He says I am

5    aware that someone was shot and paralyzed in the

6    robbery that was committed by my nephew. I can

7    relate to the victim because of my condition. I am

8    very sorry for what happened, as is my nephew. And

9    he says that you've reversed the direction of your

10   life and has made, that you've made the decision to

11   be an asset to society. And this is another letter

12   from your aunt, which just basically restates what

13   I read. And another copy of the one from your aunt

14   Ethel. This is another copy of the one

15   (indiscernible). I think we have everything. Is

16   that it?

17        INMATE BAKER: Yes, that's it.

18        PRESIDING COMMISSIONER FISHER: Okay, if

19   there's nothing else that we need to talk about as

20   far as your parole plans go, if you will turn your

21   attention to Commissioner Mejia, he's going to go

22   through your program with you.

23        INMATE BAKER: Okay.

24        DEPUTY COMMISSIONER MEJIA: Okay, Mr. Baker,

25   I'll be covering your institutional adjustment in

26   this portion of this hearing since your last Board

27   appearance. I have reviewed your Central File,

36

1    Board Reports, and Psychiatric Report.  If I miss

2    anything I'll give you and your attorney the

3    opportunity to make comments at the end of my

4    presentation.  Your last Board appearance was on

5    August 5th, 2003, where you received a one-year

6    denial.  The recommendations were for you to remain

7    disciplinary free and participate in self-help.

8    Classification score is 19, Medium A custody level.

9    You're now currently working in the clothing room?

10         INMATE BAKER:  Yes, I am.

11         DEPUTY COMMISSIONER MEJIA:  Satisfactory to

12    above-average work reports.  You're an assistant

13    tailor now?

14         INMATE BAKER:  Yes, I am.

15         DEPUTY COMMISSIONER MEJIA:  And you have a

16    GED in 1981?

17         INMATE BAKER:  Yes.

18         DEPUTY COMMISSIONER MEJIA:  And in 1989 I

19    see you have 20 units of Hartnell College

20    attendance.

21         INMATE BAKER:  Yes.

22         DEPUTY COMMISSIONER MEJIA:  Did you get any

23    degree with that?

24         INMATE BAKER:  No, I got my -- First, I got

25    my GED in '89.

26         DEPUTY COMMISSIONER MEJIA:  '89?

27         INMATE BAKER:  Yes, and no, I didn't

37

1   complete the Hartnell College.

2           DEPUTY COMMISSIONER MEJIA:  So you've got 20

3   units of that?

4           INMATE BAKER:  Yes, Sir.

5           DEPUTY COMMISSIONER MEJIA:  And you're

6   currently attending the Coastal Crimanon?

7           INMATE BAKER:  Yeah, Crimanon.

8           DEPUTY COMMISSIONER MEJIA:  Crimanon

9   (indiscernible) Independent Study Program.  And

10  what do you take from that?

11          INMATE BAKER:  I'm basically studying --

12          DEPUTY COMMISSIONER MEJIA:  And how long

13  have you been there?

14          INMATE BAKER:  I've been there since about a

15  year.

16          DEPUTY COMMISSIONER MEJIA:  2004 you

17  started, December 1st [sic]?

18          INMATE BAKER:  Yes.  That's stuff I just

19  completed.  I'm waiting for a completion to come

20  back on that now.

21          DEPUTY COMMISSIONER MEJIA:  Okay.  And then

22  you have a (indiscernible) administration course

23  completed in 1998?

24          INMATE BAKER:  Yes.

25          DEPUTY COMMISSIONER MEJIA:  Okay.  You've

26  been attending NA, AA, since 1997?

27          INMATE BAKER:  Since '90 -- Well here, at

38

1    this institution.  But I've been in since '91, is

2    when I started.

3        DEPUTY COMMISSIONER MEJIA:  And in 2001 you

4    attended a Lifer Group with (indiscernible) this

5    year.  Are you still attending that Lifer Process

6    Group?  Are you still part of that?

7        INMATE BAKER:  No, that group doesn't run

8    anymore.  It ran for like a year then they

9    transferred him out and the program stopped.

10       DEPUTY COMMISSIONER MEJIA:  Anything else

11   that you've done that I haven't included in my

12   presentation?

13       ATTORNEY TARDIFF:  Yeah, he's done a lot.

14       DEPUTY COMMISSIONER MEJIA:  Just for this

15   year.

16       ATTORNEY TARDIFF:  Right.  He's got the

17   Protestant Chapel.  Why don't you hand that over to

18   him.  I don't know why you don't have that in his

19   Central File.

20       DEPUTY COMMISSIONER MEJIA:  No, I don't have

21   it that's why I asked for additional documents

22   earlier today.

23       ATTORNEY TARDIFF:  I couldn't make that out.

24       DEPUTY COMMISSIONER MEJIA:  You have

25   attending meetings, (indiscernible) you're still

26   with AA and NA?

27       INMATE BAKER:  Yes.

39

1          DEPUTY COMMISSIONER MEJIA:  And let's see,

2    Arts and Corrections Program over the last 18

3    years?

4          INMATE BAKER:  Yes.

5          ATTORNEY TARDIFF:  He's been doing Bible

6    studies.  He should have a chrono from 6/04.  The

7    Christmas Festival, Body of Protestant Chapel,

8    5/04.

9          DEPUTY COMMISSIONER MEJIA:  Let me just read

10   through this.

11         ATTORNEY TARDIFF:  And then apparently you

12   didn't get these updates.

13         DEPUTY COMMISSIONER MEJIA:  What's that?

14         PRESIDING COMMISSIONER FISHER:  I don't

15   think we did.  There is some stuff in the back of

16   this Board packet, but I don't know if

17   (indiscernible).

18         DEPUTY COMMISSIONER MEJIA:  Okay, so I

19   mentioned AA since 1997 here, and then you say it's

20   1991?

21         INMATE BAKER:  Yes.

22         DEPUTY COMMISSIONER MEJIA:  I've seen some

23   earlier AA attendance in there.  And you're

24   (indiscernible) choir director, Music

25   (indiscernible) since June 2002, 2003?

26         INMATE BAKER:  Yes.

27         DEPUTY COMMISSIONER MEJIA:  You participated

40

1    in the Christmas Festival in 2004 [sic], Arts and

2    Corrections, I mentioned that.  Active member of

3    the Body of Protestant Chapel for several years

4    according to this chrono in 2004.

5        ATTORNEY TARDIFF:  Do you have anything from

6    that Amazing Facts Bible Studies?

7        DEPUTY COMMISSIONER MEJIA:  Is that this

8    year?

9        INMATE BAKER:  Yeah, I completed it since my

10   last hearing.

11       DEPUTY COMMISSIONER MEJIA:  Okay.  You got a

12   laudatory chrono from (indiscernible) Barnes, Task

13   Coordinator.  (Indiscernible) conscientious, hard

14   working, performance of his duties.

15   (Indiscernible) education, completed the Amazing

16   Facts Bible Study course, October 6th, 2003.  Now

17   you've been -- I read that one.  You're still

18   attending AA?

19       INMATE BAKER:  Yes, I am.

20       DEPUTY COMMISSIONER MEJIA:  And I have the

21   chrono here.

22       ATTORNEY TARDIFF:  And NA also, right?

23       INMATE BAKER:  Yes.

24       DEPUTY COMMISSIONER MEJIA:  How do you do

25   both of them?

26       INMATE BAKER:  Well it happened, I go to AA

27   on Saturdays, and NA on --

41

1    DEPUTY COMMISSIONER MEJIA:  And NA?

2    INMATE BAKER:  And NA on Thursdays.

3    PRESIDING COMMISSIONER FISHER:  I can't tell

4    you how many people come in here and tell us they

5    can't go to either.

6    INMATE BAKER:  Well one thing I've learned

7    is that you've got to apply yourself to it.

8    DEPUTY COMMISSIONER MEJIA:  You have to be

9    resourceful.

10    INMATE BAKER:  Amen.

11    DEPUTY COMMISSIONER MEJIA:  And you have

12    the, what's this Accessories and Things, what's

13    this for?

14    ATTORNEY TARDIFF:  That's the -- forget

15    that.  That's a support letter.  Is there anything

16    else?

17    INMATE BAKER:  No.

18    DEPUTY COMMISSIONER MEJIA:  Okay, we'll go

19    to your disciplinary history.  You have one July

20    2000, in 1989?

21    INMATE BAKER:  Yeah, I had '89 and '84.

22    DEPUTY COMMISSIONER MEJIA:  And '84.  So two

23    of them, the last being in '89?

24    INMATE BAKER:  Yes.

25    DEPUTY COMMISSIONER MEJIA:  And you have one

26    128?

27    INMATE BAKER:  No, Sir.