# EXHIBIT 1
# part 5 of 5

42

1          PRESIDING COMMISSIONER FISHER:    I show none.

2          DEPUTY COMMISSIONER MEJIA:    Let's see where

3    did I get that one?

4          ATTORNEY TARDIFF:    He's got another 115 in

5    '84.

6          DEPUTY COMMISSIONER MEJIA:    That's what I'm

7    saying, there's two of them.

8          INMATE BAKER:    Two.

9          ATTORNEY TARDIFF:    But no 128s.

10          DEPUTY COMMISSIONER MEJIA:    Okay, no 128s.

11    No gang affiliation noted.    And we're going to go

12    to your Psych Reports.    I'll keep this one out so I

13    can -- The Psych Report I have is May 30, 2003.    Do

14    you have a 2004?

15          ATTORNEY TARDIFF:    No.

16          DEPUTY COMMISSIONER MEJIA:    So this is the

17    most current?

18          ATTORNEY TARDIFF:    Yes.

19          DEPUTY COMMISSIONER MEJIA:    By Dr. Jeff

20    Howlin, H-O-W-L-I-N, dated May 30, 2003.    And

21    diagnostic impression is Axis I, No Contributory

22    Clinical Disorder.    Axis II, No Contributory

23    Personality Disorder.    Axis III, No Contributory

24    Physical Disorder.    Axis IV, Long Term

25    Incarceration.    Axis V, GAF of 85.    His prognosis

26    is positive for being able to maintain his current

27    mental status in the community upon release.    There

1    is no evidence of mood or thought disorder.  At

2    that time his judgment appeared to be in tact.

3    Demonstrated excellent insight into his commitment

4    offense.  Review of life crime, as Baker discussed

5    the circumstances surrounding his commitment

6    offense (indiscernible) version was similar to that

7    discussed in the Central File.  As mentioned

8    previously he had smoked marijuana cigarette that

9    day he said which had been laced with PCP, white

10   powder.  (Indiscernible) led to choices that led to

11   a store being robbed, two females being kidnapped

12   and taken away and dropped off a couple miles from

13   the store.  Later while driving what inmate Baker

14   described as a joy ride, they saw an individual by

15   the road and wanted to scare him.  They stuck guns

16   out of the window after which the victim slapped

17   inmate Baker's gun and since his hand was on the

18   trigger the gun went off.  Mr. Dixon, the victim,

19   was paralyzed from the waist down.  Inmate Baker

20   discussed the crime in detail and his reflection

21   and thoughts about why such things might have

22   happened.  He said that in particular after taking

23   Dr. (indiscernible) Lifer Group he realized that

24   about a week prior to the commitment offense --

25             [Thereupon, the tapes were turned over.]

26             **DEPUTY COMMISSIONER MEJIA:**  Okay, we're on

27   side B of this hearing.  I'm reading the

1    Psychological Report.   Prior to his commitment

2    offense he had become very angry due to learning

3    that his ex-girlfriend has aborted his child.   He

4    said, "this really messed me up," quote, unquote.

5    Therefore, he said he was feeling both anger and

6    depression as a result of what happened and now

7    thinks that the use of PCP and marijuana only

8    elevated these intense feelings.   Inmate Baker

9    accepted responsibility for the crime.   He did not

10   attempt to minimize his part.   However, he

11   acknowledged the role that his life events played

12   as well as the use of illicit substances.   He did

13   not (indiscernible) premeditation involved in the

14   crime itself.   He demonstrated what appeared to be

15   a genuine remorse when discussing the victims.   And

16   it was clear after his (indiscernible) discussion

17   that he has spent much time reflecting on the

18   crimes generating alternatives to his choices at

19   that time.   Since being incarcerated for a period

20   of about 23 years, inmate Baker has only two, has

21   had two CDC 115s, the last being in 1989.   Neither

22   of the 115s were of a violent nature.   He denied

23   any gang prior to or since his incarceration and

24   has rather minimal criminal record.   He has a one-

25   time burglary charge as a juvenile and stated he

26   spent approximately nine months in the Youth

27   Authority.   Inmate Baker has made considerable

1  gains since his incarceration.  It appears he has

2  taken advantage of many self-help (indiscernible)

3  as well as more internally driven changes and

4  attempts at self-improvement such as his training

5  in computer programming and his music.  In

6  consideration of these factors as well as his lack

7  of additional violent history outside his

8  commitment offense, his relative lack of

9  significant CDC 115 violation history, it is

10  estimated that his violence potential within a

11  controlled setting is estimated to be significantly

12  below average relative to the Level Two inmate

13  population.  If released to the community his

14  violence potential is estimated to be no more than

15  higher, no more than, to be no higher than the

16  average citizen in the community.  Possible risk

17  factors for this inmate which could be a precursor

18  to violence will be a return to the use of illicit

19  substances.  Should he choose to abuse illicit

20  substances again, particularly PCP, his violence

21  potential would be considered much higher than the

22  average citizen in the community.  And the

23  counselor had him as posing a low degree of threat

24  when released to the community.  Do you have

25  anything to add or anything to comment

26  (indiscernible) my presentation, Counsel?

27          ATTORNEY TARDIFF:  Not at this time.

46

1      **DEPUTY COMMISSIONER MEJIA:**  Then we'll

2  return this back to the Chair.

3      **PRESIDING COMMISSIONER FISHER:**  I want to go

4  back to some of your Psych Reports.  And they've

5  talked over the years about your feelings of

6  remorse for what happened.  Can you articulate that

7  for us, please, how you feel about how your actions

8  affected other people's lives?

9      **INMATE BAKER:**  Absolutely.  I know when I

10  first caught this offense, I didn't really think

11  about other people.  But since going through all

12  the psychiatric programs and the self-help, what

13  I've learned is that, feeling-wise, man, excuse me.

14      **PRESIDING COMMISSIONER FISHER:**  It's all

15  right.

16      **INMATE BAKER:**  What I've learned,

17  particularly with the victim program that they have

18  set up to where they have a victim outreach

19  program, and I didn't understand how deeply victims

20  were hurt by crime.  And what I meant by that is

21  this here, is I didn't understand the long range

22  effects of crime on people and particularly for Mr.

23  Dixon, I'm so sorry.  I'm so sorry.  And I think

24  because of my uncle, because when he got paralyzed,

25  it's like I saw that as a calling come back to me

26  for what I did to him.  And that helped me to

27  understand, to get a deeper understanding of how

1    actually deep this crime was.  And what I've

2    learned is this here, particularly, Mr. Dixon, is

3    this here.  I not only affected him, but I've

4    affected his immediately family and his extended

5    family.  And what I mean by that is this here.  If

6    he didn't have any children, then I took that from

7    him.  I took that from him.  If he was married at

8    the time, that could have split his marriage.  None

9    of these things ever crossed my mind during this

10    crime, none of these.  But I understand now.  Like

11    I said, the far-reaching effects of it, he could,

12    as far as working-wise, he can't do the things he

13    used to do., and I understand that now.  And those

14    are things that really I think about every day.

15    And it's because of him and the other victims which

16    have prompted me to change my life.  Prior to this

17    crime I was never considered a bad person, I was

18    never considered a bad person.  And during this

19    crime, that was the worst time of my life.  And

20    after that crime, I've dedicated myself to helping

21    others.  I may not can give back that which I've

22    taken from them, but what I can do is, while I'm

23    here on this earth, is to help people the best I

24    can and how the Lord is using me to do that is

25    through ministering the word.  Now there's a lot of

26    people within this environment and I'm sure is out

27    there on the streets out there.  We take for

1    granted every day that we're going to be here.  We

2    take for granted that you know, nothing on earth is

3    going to happen.  But what I've learned is that God

4    can come at any time and take us.  And my whole

5    thing is to be right with God regardless of what

6    happens, to be right with God.  And I know that the

7    only way that I'm going to do that is to stand firm

8    on his word and do what he tells me to do.  And

9    it's because of my conviction to the scripture as

10   well as that to the victims.  I want them to

11   understand the things that they went through is not

12   going to go in vain.  It's not going to be in vain.

13   Even if I have to spend the rest of my life in

14   prison, it's not going to be in vain because I'm

15   going to make a difference whether it's here or out

16   there.  And there's just no words that I can really

17   express to you put in word that would really

18   express to you the pain that I feel for what I've

19   done.  And it's like if you think about the

20   Category X report they gave me, when I was going

21   through that, Dr. Gooday, he told me, he says,

22   there are, he says you're doing good here, but

23   there are underlying occurrences that you need to

24   deal with.  I didn't understand what he was talking

25   about.  But I see the underlying occurrences come

26   is with the new insight of how I affected people.

27   And in turn what can I do to make things better.

1    That's where the insight came.  I didn't understand

2    that then but I do now.

3         PRESIDING COMMISSIONER FISHER:  Okay, that

4    answered my question.  Do you have any questions,

5    Commissioner?

6         DEPUTY COMMISSIONER MEJIA:  Yeah, how did

7    the victim get shot twice?

8         INMATE BAKER:  My crimie, he had the gun

9    pointing out.  And I believe this, I don't know,

10    but I believe he pulled the trigger thinking I

11    pulled the trigger, and that's how that happened.

12    Because both barrels were right there.

13         DEPUTY COMMISSIONER MEJIA:  Okay, did you

14    see the victim fall on the ground?

15         INMATE BAKER:  No, I didn't.  That's my

16    cousin, she just drove off.

17         DEPUTY COMMISSIONER MEJIA:  Why did he have

18    high powered rifles in the back seat?

19         INMATE BAKER:  Well that's what we had.  We

20    left the house --

21         DEPUTY COMMISSIONER MEJIA:  What kind of

22    rifles were they?

23         INMATE BAKER:  I'm not an expert.  That's

24    why I say, that's my first time ever of being

25    around a weapon.

26         DEPUTY COMMISSIONER MEJIA:  The gun that you

27    shot the victim with?

50

1      INMATE BAKER:  That's what I'm saying.  It

2  was a rifle.  I know it was a rifle.

3      DEPUTY COMMISSIONER MEJIA:  Was it a 22?

4      INMATE BAKER:  Commissioner, I really

5  couldn't tell you that.

6      DEPUTY COMMISSIONER MEJIA:  Okay now, I was

7  going to ask you about the remorse, but you

8  answered that.  If you get released in the streets,

9  what kind of employment are you going to be able to

10  get yourself into in order for you to be a

11  productive member of society?

12      INMATE BAKER:  Okay I have --

13      DEPUTY COMMISSIONER MEJIA:  What have you

14  learned?  Because I see academics here.  I haven't

15  really seen any -- Do you have any vocation that

16  you've completed?

17      ATTORNEY TARDIFF:  Computer programming.

18      INMATE BAKER:  I've taken computer

19  programming.

20      DEPUTY COMMISSIONER MEJIA:  Computer

21  programming?

22      INMATE BAKER:  Yes, Sir.

23      ATTORNEY TARDIFF:  And right now he's in PIA

24  Textiles.

25      INMATE BAKER:  Yes.

26      DEPUTY COMMISSIONER MEJIA:  So what can you

27  use out there on the streets if you get released?

51

1      INMATE BAKER:  Well the skills, it's like

2   with a tax firm, he wants me to come there to

3   upgrade his system and to get employment there.

4   And I also could use that skill, this is why I'm

5   talking about going back to college, go to college

6   out there to upgrade it so that I can be right with

7   the mainstream of things.  The skills I learned

8   here, particularly, like I say, with the computer

9   programming, you know, it's a viable skill.  And I

10  see like even in this area here it talks about all

11  the time how the computer industry is still --

12     DEPUTY COMMISSIONER MEJIA:  I was basically

13  trying to review your file when Commissioner was

14  doing your parole plans.  Does he have any?

15     PRESIDING COMMISSIONER FISHER:  Yes, he has

16  a couple of offers of residences.

17     DEPUTY COMMISSIONER MEJIA:  How about

18  employment.

19     PRESIDING COMMISSIONER FISHER:  He has an

20  offer of employment.

21     DEPUTY COMMISSIONER MEJIA:  And the next

22  question is I've been listening of your description

23  of how you got, what led you to end up committing

24  those crimes.

25     INMATE BAKER:  Yes, Sir.

26     DEPUTY COMMISSIONER MEJIA:  You said what,

27  PCP, stresses in your life, lost your baby, not

1   getting along with your parents, with your dad, you

2   were angry.  If you're going to look at it, how

3   many percentage of personal responsibility with

4   that crime?

5        INMATE BAKER:  I take full responsibility

6   for that crime.  And the reason I say that is here,

7   because even though, this is why I was

8   (indiscernible) to the Panel, this is not an

9   excuse, because that was just for informational

10  purposes.  Because I understand that regardless of

11  what was going on in my life, I made that decision

12  to do that, so that makes me responsible.  Even

13  when I look at my crimies, and like Commissioner

14  Fisher just said right now, two of them was quite

15  young, two of them.  They in essence became victims

16  as well.  The reason I said that --

17       DEPUTY COMMISSIONER MEJIA:  You were the

18  eldest?

19       INMATE BAKER:  Pardon me?

20       DEPUTY COMMISSIONER MEJIA:  You were the

21  eldest?

22       INMATE BAKER:  Yes, Sir, I was 18.  They

23  became victims as well because of poor leadership

24  and judgment on my part.  I can only hope now that

25  their lives weren't effected by a life of crime.

26  But I accept responsibility for my actions and

27  their actions, because at any given point

1    throughout this crime there were windows of

2    opportunity for me to say we're not going to do

3    this.  There were windows of opportunity and I

4    never stopped to take either one of them.  But I

5    absolutely take full responsibility for this crime.

6         DEPUTY COMMISSIONER MEJIA:  No other

7    questions from me.

8         PRESIDING COMMISSIONER FISHER:  Okay, Ms.

9    Danville, any questions?

10        DEPUTY DISTRICT ATTORNEY DANVILLE:  I have a

11   lot of questions.

12        PRESIDING COMMISSIONER FISHER:  And let me

13   remind you, Mr. Baker, because I usually forget,

14   she's going to ask the questions through me and you

15   should answer through me, okay.

16        INMATE BAKER:  Yes, Ma'am.

17        PRESIDING COMMISSIONER FISHER:  Okay, go

18   ahead.

19        DEPUTY DISTRICT ATTORNEY DANVILLE:  Who

20   would he consider the leader of these people

21   between he and Bernice?

22        INMATE BAKER:  Me, I am.  Like I say, she

23   was 18, but I was the male figure there.  That was

24   me.

25        DEPUTY DISTRICT ATTORNEY DANVILLE:  In the

26   Appellate Opinion at the top of page three it

27   starts out essentially the statement of facts

54

1    discussing a hardware store in the city of Perris

2    that was burglarized some time right around

3    midnight, a little bit before the first victim,

4    Joseph Burger was carjacked.  My question to the

5    inmate is did he and or his crime partners

6    burglarize this hardware store in Perris,

7    California, where numerous guns and ammunition were

8    stolen just before the Joseph Burger incident?

9          INMATE BAKER:  Absolutely not and we was

10    acquitted of that, in fact, in the court.

11          DEPUTY DISTRICT ATTORNEY DANVILLE:  Well the

12    Appellate Opinion on page five, the bottom of page

13    four, top of page five says, laboratory tests of

14    gunshot residue indicate that defendant Baker was

15    the one who shot Dixon and ballistics tests

16    indicate that the bullet had been fired from one of

17    the guns taken at the hardware burglary earlier

18    that evening.  And then the last sentence at the

19    bottom of page five says, I'm at the bottom of this

20    paragraph on page five, the car contained rifles

21    taken from the hardware store and used during the

22    crime spree.  Ammunition removed from the Seven 11

23    Store and Burger (indiscernible).

24          ATTORNEY TARDIFF:  I don't -- Do we have the

25    Appellate?

26          PRESIDING COMMISSIONER FISHER:  I don't have

27    (indiscernible).

55

1          **ATTORNEY TARDIFF:**  I don't have the

2     Appellate Opinion I don't think.

3          **INMATE BAKER:**  Can I address that, please?

4          **ATTORNEY TARDIFF:**  No, not yet.  Here it is,

5     but you can't read it.

6          **PRESIDING COMMISSIONER FISHER:**  Is that part

7     of the stuff that's unreadable back there?

8          **ATTORNEY TARDIFF:**  Yes.

9          **PRESIDING COMMISSIONER FISHER:**  I thought

10    that was all Probation Officer's Reports.

11         **DEPUTY DISTRICT ATTORNEY DANVILLE:**  I have a

12    readable copy.

13         **PRESIDING COMMISSIONER FISHER:**  This is what

14    we've got.

15         **ATTORNEY TARDIFF:**  Well no, I don't know if

16    that's it.  I don't even know if that's it.

17         **DEPUTY DISTRICT ATTORNEY DANVILLE:**  Yeah, it

18    says Fred L. Baker and Bernice Rose Habbit Opinion.

19         **PRESIDING COMMISSIONER FISHER:**  Should we

20    take a break and go to copy it?

21         **ATTORNEY TARDIFF:**  Yes.

22         **PRESIDING COMMISSIONER FISHER:**  Why don't we

23    do that.  We're going to have to take a quick

24    recess, so we're just going to put everybody on

25    mute and on hold and it should only take a few

26    minutes.

27                         [Off record.]

1          ATTORNEY TARDIFF:  Can they hear us?

2          DEPUTY COMMISSIONER MEJIA:  Can you hear us?

3          MS. GARTHWAITE:  Yes, we can hear you.

4          PRESIDING COMMISSIONER FISHER:  Okay, do you

5    want to go ahead, Ms. Danville.

6          DEPUTY DISTRICT ATTORNEY DANVILLE:  Yes.

7          PRESIDING COMMISSIONER FISHER:  Just let us

8    know what page you're referring to.

9          DEPUTY DISTRICT ATTORNEY DANVILLE:  Okay,

10   and I was referring to page five, the last sentence

11   before it says Habbit's appeal.  The sentence

12   reads, the car contained rifles taken from the

13   hardware store and used during the crime spree,

14   ammunition, the loot from the Seven 11 Store, and

15   Burger's wallet.  So my question, first question

16   specifically to Mr. Baker, did he participate in

17   the robbery of the hardware store shortly before

18   Mr. Burger was accosted or victimized?

19         INMATE BAKER:  No, Ma'am.

20         DEPUTY DISTRICT ATTORNEY DANVILLE:  Is he

21   aware of whether or not the two male juveniles who

22   were with him were involved in the burglary of the

23   hardware store?

24         INMATE BAKER:  I can't speak on their behalf

25   because I don't know that.

26         PRESIDING COMMISSIONER FISHER:  You don't

27   know, you have no information?

1      INMATE BAKER:  No, Ma'am, I have no

2   information on that, no.

3      DEPUTY DISTRICT ATTORNEY DANVILLE:  Was he

4   with the two male juveniles and Bernice all evening

5   prior to them going out and coming up to Mr.

6   Burger?

7      INMATE BAKER:  No, Ma'am, I wasn't.

8      DEPUTY DISTRICT ATTORNEY DANVILLE:  At what

9   time did he get together with his three crime

10  partners?

11     INMATE BAKER:  Well they came over to my

12  grandmother's house when I was over there and I

13  guess this was, it was kind of late.  I don't know

14  if it was dark.  I don't know the exact time.  I

15  couldn't tell that.  It could have been between

16  eight and 10 or something like that.  I don't know.

17     PRESIDING COMMISSIONER FISHER:  Okay, but it

18  was evening?

19     INMATE BAKER:  Yes.

20     DEPUTY DISTRICT ATTORNEY DANVILLE:  So the

21  three of them arrived at his grandmother's house

22  together between eight and 10?

23     INMATE BAKER:  Well Bernice didn't, just the

24  two, my cousin and Scobie (phonetic) did, I mean

25  and Ferris arrived there.  Bernice was at my

26  auntie's house, my aunt Della's house and Scobie

27  and Ferris, to my grandmother's house, which was in

58

1   the Midway Apartments, and that's where we all met
2   up right there.  That's where he met me at.  I was
3   over there.
4       DEPUTY DISTRICT ATTORNEY DANVILLE:  Okay, so
5   then did Ferris and his cousin pick him up and then
6   the three of them went to the auntie's house to get
7   Bernice?  Is that how that happened?
8       INMATE BAKER:  We went to my auntie's house
9   just to go over there because it wasn't to pick up
10  Bernice or nothing like that, we just go over
11  there.  That was my aunt.  That was my auntie's
12  house and I was just going over to her house.
13      PRESIDING COMMISSIONER FISHER:  Okay, but
14  was that where you picked up Bernice?
15      INMATE BAKER:  Yes, absolutely.
16      PRESIDING COMMISSIONER FISHER:  Whether it
17  was the purpose to go there or not.
18      INMATE BAKER:  Right, absolutely.
19      ATTORNEY TARDIFF:  So the three of you went
20  to your aunt's house?
21      INMATE BAKER:  That's correct.
22      DEPUTY DISTRICT ATTORNEY DANVILLE:  And does
23  he recall approximately what time it was that the
24  three of them went to the aunt's house and then
25  they happened to see Bernice there?
26      INMATE BAKER:  I really can't give you that
27  time.  I just don't, I don't know the time.

59

1    DEPUTY DISTRICT ATTORNEY DANVILLE:  Does he

2  have a sense of roughly like how long, was it like

3  hours?

4    INMATE BAKER:  Between like I said, 10,

5  eight, nine, 10, between there.  All of this

6  happened within this time frame.

7    PRESIDING COMMISSIONER FISHER:  Sort of

8  middle of night, middle of the evening.

9    INMATE BAKER:  There you go.  See it's hard

10  for me to gauge it because it got darker, I don't

11  know if it was late.  It had to get dark early, and

12  out there in Perris it gets dark.  It's dark, so

13  you lose track of time unless you're looking at a

14  watch all he time.  I really couldn't tell you, but

15  I believe it was within that time frame.

16    DEPUTY DISTRICT ATTORNEY DANVILLE:  Perhaps

17  he would know the answer to this question then.

18  Can he give us an idea of how long the four of them

19  were together at the auntie's house before they

20  left to go on this crime spree?

21    INMATE BAKER:  I guess that would be about

22  an hour, an hour and a half, something like that.

23    DEPUTY DISTRICT ATTORNEY DANVILLE:  What was

24  going on in that hour, hour and a half?

25    INMATE BAKER:  Playing music, being

26  teenagers, just messing around with each other,

27  that's what we were doing.

60

1    DEPUTY DISTRICT ATTORNEY DANVILLE:  Was that
2  when he smoked the marijuana laced with PCP?
3    INMATE BAKER:  Yes, it was.
4    DEPUTY DISTRICT ATTORNEY DANVILLE:  At what
5  point did he first see the guns?
6    INMATE BAKER:  I saw the guns like --
7  Actually I saw the guns earlier, like when we made
8  it over to my auntie's, as a matter of fact that's
9  when it was, at my auntie's house because my cousin
10 had went I believe to the back of the house or
11 somewhere and got the guns.  So I seen the guns
12 that night, so it was just before we had smoked PCP
13 that I had seen the guns.
14   DEPUTY DISTRICT ATTORNEY DANVILLE:  And how
15 many did he see?
16   INMATE BAKER:  I only saw one.
17   DEPUTY DISTRICT ATTORNEY DANVILLE:  And that
18 was his cousin who had it in his possession?
19   INMATE BAKER:  That's correct.
20   DEPUTY DISTRICT ATTORNEY DANVILLE:  And for
21 what purpose did his cousin go acquire the gun?
22   INMATE BAKER:  Well, as I mentioned earlier,
23 my cousin and his father, they went hunting as far
24 as I know.  I don't, other than that, that's what
25 they did.  They went hunting, they did fishing.
26 They did --
27   PRESIDING COMMISSIONER FISHER:  Let me get

61

1   you back --

2         ATTORNEY TARDIFF:   Why they took it with

3   them.

4         PRESIDING COMMISSIONER FISHER:

5   (Indiscernible).

6         ATTORNEY TARDIFF:   (Indiscernible.)

7         INMATE BAKER:   I don't understand.

8         PRESIDING COMMISSIONER FISHER:   She wants to

9   know why he went and got the gun that night.   Why

10  did he leave the room and go get the gun?

11        INMATE BAKER:   I don't know.   I don't know.

12  Maybe he just wanted to show it to me because one

13  thing as a teen, and I'm sure we can all relate to

14  this, we do things like that, and that's he was 15,

15  he could have wanted to show it to me.

16        DEPUTY DISTRICT ATTORNEY DANVILLE:   So when

17  his cousin comes back with this gun, does he say

18  anything to him about the gun or ask him why he's

19  bringing in the gun?   Is there a conversation about

20  the gun?

21        INMATE BAKER:   No, there is not.   I just

22  look at and I just says nice.   It wasn't nothing

23  where'd this come from or what the purpose you go

24  and do this for.   See those are things -- It's like

25  what she's asking, that a responsible person would

26  ask.   And my whole frame of mind at that time is I

27  wasn't thinking rationally so I couldn't, I didn't

1    think to ask those questions.

2        **DEPUTY DISTRICT ATTORNEY DANVILLE:**   How long

3    before they left the house was it that the cousin

4    brought the gun into the room?

5        **PRESIDING COMMISSIONER FISHER:**   Before you

6    guys left to go out, about how long before that do

7    you think he --

8        **INMATE BAKER:**   Maybe 30 minutes, 40 minutes,

9    something like that.

10       **DEPUTY DISTRICT ATTORNEY DANVILLE:**   How long

11   after he brought the gun out was it before they

12   started smoking the PCP?

13       **INMATE BAKER:**   We smoked PCP, like I said,

14   it was just a joint with me, you know.  But now

15   they were smoking it and they could have been in

16   contact, I don't know.  But I guess about 15

17   minutes after I seen it, that's when they gave it

18   to me and I smoked it.

19       **DEPUTY DISTRICT ATTORNEY DANVILLE:**   When did

20   he get the female clothing and the makeup?

21       **INMATE BAKER:**   Prior to leaving.

22       **DEPUTY DISTRICT ATTORNEY DANVILLE:**   But when

23   prior to leaving?

24       **INMATE BAKER:**   That was after all that was

25   done.  After all that was done and then I believe

26   my cousin's baby started crying and she said there

27   was no milk in there.  And we didn't have a way to

1   get to the store or nothing like that.   And so

2   that's when all this, this stuff about going out

3   there and getting a car on the road, stopping and

4   taking their car, basically is what we did.   All

5   that happened within that time.   That was I guess

6   10, 20 minutes after my smoking PCP all this stuff

7   came up about the dress and all this stuff.

8       **DEPUTY DISTRICT ATTORNEY DANVILLE:**   How long

9   did it take him to put on the female makeup?

10      **INMATE BAKER:**   It didn't take no time at

11  all.

12      **PRESIDING COMMISSIONER FISHER:**   And did you

13  do it before you left the house?

14      **INMATE BAKER:**   Actually all I had was a

15  stocking.   I didn't have any makeup and lipstick

16  and all.   I didn't have that.

17      **PRESIDING COMMISSIONER FISHER:**   Okay, and a

18  dress or something?

19      **INMATE BAKER:**   Yeah, the dress just dropped

20  right over me.

21      **PRESIDING COMMISSIONER FISHER:**   Okay.

22      **DEPUTY DISTRICT ATTORNEY DANVILLE:**   How far

23  away from his auntie's house was it where he and

24  Bernice stood by the road flagging down who

25  ultimately turned out to be Mr. Burger?

26      **INMATE BAKER:**   Maybe about three, four

27  miles.

64

1    DEPUTY DISTRICT ATTORNEY DANVILLE:  How long

2    did it take them to get that three or four miles?

3    INMATE BAKER:  I don't know.  I just can't

4    tell you that.

5    PRESIDING COMMISSIONER FISHER:  Did you go

6    on foot?

7    INMATE BAKER:  Yeah, we walked.

8    DEPUTY DISTRICT ATTORNEY DANVILLE:  When

9    they left the house had he seen the other guns yet?

10   INMATE BAKER:  Right when we started leaving

11   the house, that's when I seen them.  That's when I

12   seen them.

13   DEPUTY DISTRICT ATTORNEY DANVILLE:  Was a

14   gun handed to him when they left the house?

15   INMATE BAKER:  No, it was not.

16   DEPUTY DISTRICT ATTORNEY DANVILLE:  When did

17   he come into possession of the gun?

18   INMATE BAKER:  I got possession of the gun

19   after we had got into the vehicle, that's when I

20   got possession of a gun.

21   DEPUTY DISTRICT ATTORNEY DANVILLE:  From

22   whom?

23   INMATE BAKER:  From my cousin Steven.

24   DEPUTY DISTRICT ATTORNEY DANVILLE:  And was

25   he aware that the other two men at that point were

26   armed, the other two young boys?

27   INMATE BAKER:  Yes, I was actually.

65

1        **DEPUTY DISTRICT ATTORNEY DANVILLE:**  When

2  they took the car, according to the Appellate

3  Opinion, and I'm reading from page three, the top

4  larger paragraph, it says Burger was ordered out of

5  his car, his wallet was taken, and defendant and

6  their companions got into the Vega and drove off.

7  As they did one said, quote, "don't let the white

8  boy get away," close quote.  My question to the

9  inmate is who in the group said don't let the white

10  boy get away?

11       **INMATE BAKER:**  It had to be either Steven or

12  Ferris because I was in the car, in the passenger

13  seat.  I wouldn't even know that.  That's news to

14  my ears right there.

15       **DEPUTY DISTRICT ATTORNEY DANVILLE:**  This is

16  making it sound as though as Mr. Burger is getting

17  out of the car and all of the four crime partners

18  are getting -- well, and they're sending Mr. Burger

19  out of the car and they're getting in the car the

20  one says don't let the white boy get away.

21       **INMATE BAKER:**  Right, well the one thing --

22  Let me say this, please.  Right now she's getting

23  into an area that's murky.  Like I'm saying, I was

24  high on PCP at that time, so I'm not going to

25  discount anything that she's reading because that's

26  facts, that is the law of the case, and so whatever

27  she's reading right now I'm going to agree with it

66

1   because, like I said, I'm not going to refute that

2   because I accept responsibility.  That's what the

3   court of law said happened.  That's what happened

4   in my mind and I believe it.

5           PRESIDING COMMISSIONER FISHER:  Okay, just

6   to clarify, let me ask you.  So are you saying that

7   you believe that that probably happened since it's

8   been recorded --

9           INMATE BAKER:  Absolutely.

10          PRESIDING COMMISSIONER FISHER:  -- but that

11  you have no memory of it?

12          INMATE BAKER:  Well some of this, like she

13  was saying about the language that we used, I don't

14  recall that.  But I do recall going down there and

15  getting into the vehicle.  I remember that.

16          DEPUTY DISTRICT ATTORNEY DANVILLE:  Does he

17  remember Mr. Burger testifying to that fact during

18  the course of his trial when he wasn't on PCP?

19          INMATE BAKER:  Absolutely, yes.

20          DEPUTY DISTRICT ATTORNEY DANVILLE:  Did he

21  ever have a discussion with his crime partners

22  about that statement?

23          INMATE BAKER:  No.  No, Ma'am.

24          DEPUTY DISTRICT ATTORNEY DANVILLE:  And then

25  the next sentence says Burger heard a shot fired

26  over his head and he fled into the shrubs nearby.

27  My question to the inmate is who fired the shot

1    that went over Mr. Burger's head?

2        INMATE BAKER:  It was either Ferris or

3    Scobie.  They're the only two that had guns at the

4    time.  I didn't have a gun getting into the car.

5        PRESIDING COMMISSIONER FISHER:  It sounds

6    like the, let me just clarify, because I think you

7    might be a little confused too.  It's my

8    understanding from reading this that all of this

9    happened when you were all in the car.

10        DEPUTY DISTRICT ATTORNEY DANVILLE:  That's

11    my understanding as well.

12        PRESIDING COMMISSIONER FISHER:

13    (Indiscernible) so the shot that was fired over his

14    head was fired once the four of you were already in

15    the car, just to clarify it.

16        INMATE BAKER:  Okay if that's the case I was

17    in the front passenger seat.  I didn't have a gun.

18    They were in the back, is what I'm saying, and my

19    cousin Bernice was driving the car, so I wouldn't

20    really know that.

21        PRESIDING COMMISSIONER FISHER:  Okay, you

22    said -- Can I?

23        DEPUTY DISTRICT ATTORNEY DANVILLE:  Please.

24        PRESIDING COMMISSIONER FISHER:  Okay.  You

25    said earlier that you had gotten possession of a

26    gun once you were in the car.

27        INMATE BAKER:  Right.

68

1    PRESIDING COMMISSIONER FISHER:  At what

2    point?

3    INMATE BAKER:  Like when we got into the car

4    they were in the back.  And when we started

5    driving, going toward the Seven 11, that's when I

6    got possession of a gun.

7    PRESIDING COMMISSIONER FISHER:  Okay, and

8    how did you get it?  Did somebody hand it up to you

9    or did you reach back and get it?

10    INMATE BAKER:  Yes, my cousin handed it over

11    to me.

12    PRESIDING COMMISSIONER FISHER:  Okay,

13    thanks.

14    DEPUTY DISTRICT ATTORNEY DANVILLE:  So if

15    I'm understanding him correctly his cousin didn't

16    hand him a gun until after Mr. Burger was long

17    gone.  Is that his testimony today?

18    INMATE BAKER:  Yes, absolutely.

19    PRESIDING COMMISSIONER FISHER:  Okay

20    DEPUTY DISTRICT ATTORNEY DANVILLE:  Okay,

21    then when they went to the next scene, did they go

22    directly to the store on VanBuren and Washington at

23    the Seven 11 there?

24    INMATE BAKER:  Yes, we did.

25    DEPUTY DISTRICT ATTORNEY DANVILLE:  Or did

26    they make any stops along the way?

27    INMATE BAKER:  Directly.

69

1        DEPUTY DISTRICT ATTORNEY DANVILLE:  And then

2   at the Seven 11 Store, prior to anyone going in,

3   was there talk of taking another vehicle since

4   another vehicle was ultimately taken?

5        INMATE BAKER:  No, Ma'am, there wasn't.

6        DEPUTY DISTRICT ATTORNEY DANVILLE:  Does he

7   recall Bernice coming back out to the car where the

8   three young men were waiting to tell them the

9   condition of the store, that she only saw a female

10  and it was clear, go ahead, go on in?

11       INMATE BAKER:  That didn't happen.  That

12  absolutely did not happen.  No, I don't remember

13  nothing like that because the way that went down,

14  when my cousin went in to get the milk, while she

15  was in that store, that's when the decision was

16  made to rob the store.  So she didn't know nothing

17  about that.  That was between me and my cousin and

18  Ferris.  That's when that occurred.

19       DEPUTY DISTRICT ATTORNEY DANVILLE:  So then

20  if his cousin said that this had all been

21  preplanned and that she actually chose him and the

22  other two because they'd been doing a string of

23  robberies right leading up to this, would she have

24  been lying when she said that?

25       INMATE BAKER:  Absolutely.

26       DEPUTY DISTRICT ATTORNEY DANVILLE:  And if

27  she said that the plan was for her to go in, act

70

1    like a shopper, bring things up to the cash

2    register so that she could scope out the store and

3    see if there were any other people in there besides

4    the clerk, leave the stuff on the counter, say she

5    was going to go out and get money, but really she

6    used that as a ploy to go out and tell them, okay,

7    it's clear, go in and do the robbery.  Is that all

8    a lie?

9         INMATE BAKER:  That's all fabrication,

10   Ma'am, absolutely, absolutely.

11        DEPUTY DISTRICT ATTORNEY DANVILLE:  So whose

12   idea was it then when the three of them were

13   sitting in the car when Bernice went in to get

14   milk, whose idea was it to do the robbery?

15        INMATE BAKER:  That was between me and

16   Steven.  We kind of tossed that back and forth and

17   as she was coming out we was getting out and going

18   in to rob the store.

19        DEPUTY DISTRICT ATTORNEY DANVILLE:  Does he

20   recall who thought of it first, him or Steven?

21        INMATE BAKER:  I can't tell you that.  But I

22   will say this here, it's like I said, I accept full

23   responsibility for whoever said what.  I accept

24   that responsibility.  Like I said, I was the oldest

25   and I could have prevented that crime anywhere

26   along that crime.  I didn't.  So I was responsible.

27   That was a 15 year old kid.  I did that.  I'm

71

1   responsible for that.  If you want to know that, I
2   was responsible.  Give me the responsibility.
3          DEPUTY DISTRICT ATTORNEY DANVILLE:  Why did
4   they take a car from the Seven 11?
5          INMATE BAKER:  Because there happened to
6   just be another vehicle out there and they just
7   wanted to take another car.  My cousin Steven, he
8   seen the car, and he asked where the keys was.  And
9   I don't know who took him back there but they got
10  the keys and he come out and he got in the other
11  car and I got in the car with him.  My cousin
12  Bernice got in the other car with Ferris and the
13  other victims and we drove off.
14         DEPUTY DISTRICT ATTORNEY DANVILLE:  Was this
15  planned or talked about that it would be one victim
16  in each car with two suspects in each car or did
17  that just kind of happen?
18         INMATE BAKER:  Well everything happened
19  spontaneously.  It's what, you know, it's like,
20  what I've come to learn is this here.  It's like
21  they call it control of impulses.  This is the
22  terminology that they use.  And with me it was the
23  lack of control of impulses.  So in other words,
24  impulsivity took over.  It's like when we was in
25  the car we was just impulsively doing things.
26         PRESIDING COMMISSIONER FISHER:  And I think
27  she's just trying to get into how much thought you

72

1  put into it, so you're saying that you saw the car,

2  he got the keys, and just --

3      INMATE BAKER:  Got in the car and drove.

4      PRESIDING COMMISSIONER FISHER:  You just did

5  it?

6      INMATE BAKER:  Just did it.

7      PRESIDING COMMISSIONER FISHER:  All right.

8      DEPUTY DISTRICT ATTORNEY DANVILLE:  Did

9  anyone order the victims into the respective cars?

10  Did anybody take a leadership role in how this

11  kidnapping was going to go down?

12      INMATE BAKER:  No, I know Ferris left with

13  one victim, and me and Steven was in, we left out

14  second with the other victim into the blue Pinto or

15  whatever that was.  So that's the extent of that.

16  It wasn't --

17      DEPUTY DISTRICT ATTORNEY DANVILLE:  So how

18  did the victims know where to go?  Did somebody

19  tell them who to go where or did it just, did

20  somebody physically grab them, or how did that

21  happen?

22      INMATE BAKER:  What I'm saying, Ferris, I

23  believe it was Ferris had to take the other one to

24  the Pinto, that had to be Ferris.  I was driving

25  the blue Pinto because I had the keys.  My cousin

26  gave me the keys, and him and the other victim

27  walked and got into the passenger side of the blue

73

1    Pinto.

2         PRESIDING COMMISSIONER FISHER:  How did you

3    get the victims in there, did you just tell them

4    (indiscernible)?

5         INMATE BAKER:  See what it was was like

6    (indiscernible).  It's like that was, from my

7    understanding, a mother and daughter.  This is what

8    came out in the court.  It's like with me and my

9    parent, if my parent was taken up out of there,

10   then yes, you would tell me, you would instruct me

11   and I'm going to go.  So that's what happened in

12   that case.

13        PRESIDING COMMISSIONER FISHER:  Okay, you're

14   getting too far into insight here.  We're just

15   looking for facts, okay.  What we're trying to do

16   is reconstruct so that we can picture what's going

17   on, okay.  So did somebody walk up to the two

18   victims with guns and point the guns at them and

19   say, okay, you get in this car, you get in this

20   car?

21        INMATE BAKER:  Not, okay, Ferris walked up

22   to, I think it was the mother --

23        PRESIDING COMMISSIONER FISHER:  Okay, well

24   it doesn't matter.

25        INMATE BAKER:  Well he walked up to her and

26   he took her out, took her to the car.

27        PRESIDING COMMISSIONER FISHER:  By how?

74

1    INMATE BAKER:  Well he had a gun.

2    PRESIDING COMMISSIONER FISHER:  Okay, and so

3  he walked up to her and he said come with me, get

4  in the car.

5    INMATE BAKER:  Right, exactly.  Then I had

6  one gun here and I was just standing like behind

7  the counter, in front of the counter, rather, and

8  my cousin Steven went behind the counter, got the

9  other victim, and walked her back to get the car

10  keys and when they came out he walked right with

11  her to the car.

12    PRESIDING COMMISSIONER FISHER:  Okay, does

13  that answer what you were looking for?

14    DEPUTY DISTRICT ATTORNEY DANVILLE:  Yes.

15  Then once they released the two women, who fired

16  the shot over their heads?

17    INMATE BAKER:  I believe that had to be

18  Steven.  It had to be.  (Indiscernible.)  That was

19  Steven because I was driving.  Steven was in the

20  passenger seat.

21    DEPUTY DISTRICT ATTORNEY DANVILLE:  So that

22  came from the car in which inmate was in?

23    INMATE BAKER:  Absolutely, yes.

24    DEPUTY DISTRICT ATTORNEY DANVILLE:  Then the

25  next thing I wanted to go to was the Val Dixon

26  incident.  I just have a few questions there.

27  According to the Appellate Opinion on page four, it

75

1   says that as the red Vega came up near Val Dixon,

2   first it asked, somebody asked if Val Dixon needed

3   help. I believe that was Bernice. He says he's

4   okay. The Vega drives off, but when it comes back

5   someone in the car says to Dixon, hey sucker. When

6   he turns in response to that hey sucker, he sees a

7   rifle pointing at him, not two, but one. My first

8   question is who said hey sucker?

9       **INMATE BAKER:** I believe that was me. That

10  was me.

11      **DEPUTY DISTRICT ATTORNEY DANVILLE:** And then

12  it's very clear from here that there is only one

13  gun and not two, and from here I mean the Appellate

14  Opinion. Yet in the Psych Report and the Board

15  Report, it repeatedly talks about two guns being

16  pointed at Mr. Dixon. And I would like to know the

17  inmate's explanation. Is it one gun or is it two

18  guns?

19      **INMATE BAKER:** Like I said earlier, I

20  believe it was two guns. Like I said, I pulled the

21  trigger once. And I'm saying, if they're saying he

22  got shot twice, the other gun had to be there, it

23  had to be there. There were three guns in the car.

24  He got shot twice. I pulled the trigger once. It   —

25  had to be another gun.

26      **DEPUTY DISTRICT ATTORNEY DANVILLE:** And Mr.

27  Dixon testified at the trial apparently, because

76

1    this is from the Appellate Opinion that he tried to

2    knock the barrel of the gun away and as he did he

3    was shot twice, indicating from that same gun. Yet

4    in some of the Board Reports and Psych Reports it

5    stated there was a struggle between Mr. Dixon and

6    the inmate over the gun as compared to Mr. Dixon

7    just trying to move it away. So I would like to

8    know what is the inmate's account of what happened?

9    Was there some sort of a struggle between he and

10   Mr. Dixon wherein the gun goes off, or is it as

11   reported in the Appellate Opinion that he's

12   pointing it, saying hey sucker, and as he tries to

13   move the gun it goes off.

14        INMATE BAKER: He tried to slap it and it

15   goes off.

16        DEPUTY DISTRICT ATTORNEY DANVILLE: Why was

17   Mr. Baker's finger on the trigger of the gun?

18        INMATE BAKER: Like I said earlier, I wasn't

19   thinking like logically, but I'm saying well where

20   else would it be? I'm saying, but see I wasn't in

21   my right frame of mind. Everything that the

22   District Attorney is saying, it could be true, all

23   of this. If it's in this paper it's true. The

24   thing I'm saying is if I were in my right frame of

25   mind none of this would have happened. But yeah,

26   my finger was on the trigger I felt because that

27   was the logical place for it to be at that time in

1  that state of mind.

2       DEPUTY DISTRICT ATTORNEY DANVILLE:  Why was

3  Val Dixon shot?

4       INMATE BAKER:  Like I said, he slapped at

5  the gun.  It wasn't like I was intentionally trying

6  to hurt Mr. Dixon.  That wasn't my intention.  He

7  slapped at the gun, my finger is on the trigger, it

8  moved and it went off.

9       DEPUTY DISTRICT ATTORNEY DANVILLE:  But the

10  inmate is saying only once.  He is denying that he

11  fired the second shot?

12       INMATE BAKER:  Absolutely.  Absolutely.

13       DEPUTY DISTRICT ATTORNEY DANVILLE:  When did

14  his brother become a Crip member?

15       INMATE BAKER:  I can't tell you that.

16       DEPUTY DISTRICT ATTORNEY DANVILLE:

17  Approximately.  Like within the last two years or

18  three years ago (indiscernible)?

19       INMATE BAKER:  No, it's been like all his

20  life.  For me, and I've been in here almost 25

21  years, so she's asking me to go way back somewhere

22  where I really I don't know.  I wasn't with my

23  brother all the time, so I couldn't tell you when

24  he decided to join a gang.  I can't tell you that.

25       DEPUTY DISTRICT ATTORNEY DANVILLE:  I'm not

26  asking for the specific year, I'm just trying to

27  get a gauge of where during the inmate's life it

1    was he became aware his brother was a Crip member?

2        INMATE BAKER:   That was about when I was 16,

3    15.

4        DEPUTY DISTRICT ATTORNEY DANVILLE:   Because

5    in the December 18, 1998, Psychological Report on

6    page one under the Section Four entitled Family

7    History, it says no other family members have a

8    history of criminal, substance abuse, or

9    psychiatric problems.  So what we heard today about

10   his brother being a Crip member, I'm wondering if

11   he told, and I believe it was Dr. Terrini in '98,

12   yes it was Dr. Terrini.  Did you tell Dr. Terrini

13   back in 1998 when the doctor asked him about his

14   family members that he had a brother who was a Crip

15   and who was incarcerated in the system?

16       INMATE BAKER:   No, I just found out my

17   brother has been incarcerated two weeks ago, so no,

18   I didn't tell him that.  And Dr. Terrini never even

19   asked me that because at that time the doctor was

20   asking me specific questions and I was answering

21   like I'm answering now, specifically.

22       ATTORNEY TARDIFF:   But did he ask you if any

23   other family members were involved in criminal

24   activity?

25       INMATE BAKER:   There you go, that's the

26   question.  As far as I knew, no.  I didn't know.

27       DEPUTY DISTRICT ATTORNEY DANVILLE:   Here it

79

1    is, okay. And now I'm looking at one of the

2    reports for the Cat X, and this one is dated

3    5/19/95 authored by Psychological Social Worker by

4    the name of Dr. Hansen. And in this report on page

5    four she talks about the inmate telling her that he

6    ran away from home when he was 15 years old because

7    of his parents' alcoholism and drug abuse. Earlier

8    in the hearing the inmate's explanation for the

9    prior burglary, which ultimately landed him in CYA

10   because of his escape, he said the reason he did

11   that burglary was because of his dad's drinking

12   problem. But it seems like from this report to Dr.

13   Hansen that his dad had a drinking problem then.

14   So what was different between his dad's drinking

15   problem during the time he ran away --

16        INMATE BAKER:  Well prior to that I'd never

17   seen my dad hit my step mom. And when I left at

18   that time my dad hit my step mom and I didn't like

19   that. I didn't appreciate that. And since I was

20   just a kid there was nothing I could physically do

21   to my father, so that's when that happened.

22        DEPUTY DISTRICT ATTORNEY DANVILLE:  And then

23   in the same report on the same page it says, the

24   paragraph next to the bottom, the inmate was not in

25   the military and stated he had not been married

26   although the C-File indicates that he did marry a

27   girlfriend when he was in county jail on the

80

1   instant offense.  My question to the inmate is why

2   would he tell her that he had not been married when

3   he in fact had been married for six years to this

4   woman?

5       INMATE BAKER:  Well the only explanation I

6   can give you for that is that's a typo because

7   everybody knows in anything they talked to me is

8   I'm married.  I'm proud of my marriage.  I love my

9   wife.  So it's not like I was trying to hide

10  anything.  So that has to be a typo or something,

11  that's all I can put to that.

12      DEPUTY DISTRICT ATTORNEY DANVILLE:  And the

13  woman that he married when he was in county jail,

14  his first wife, is that the woman who aborted the

15  child that led to his depression, that led to the

16  commitment offense?

17      INMATE BAKER:  No, Ma'am, it wasn't.

18      DEPUTY DISTRICT ATTORNEY DANVILLE:  So the

19  woman that he married, how long had he known her?

20      INMATE BAKER:  I'd known her because I'd met

21  her over a few years.  But we didn't really do

22  anything until after I caught the case.  My wife

23  then was Annette McCray.  aborted my

24  baby was April Ratliff.

25      DEPUTY DISTRICT A    And then

26  one thing I wanted to ask him    was talking

27  about God had directed him to be a choir director

81

1    and I'm wondering does he have a church and a choir

2    specifically picked out or is this just in general

3    what he wants to do?

4            INMATE BAKER:  There is a church which is

5    called From the Heart Church Ministries of Southern

6    California.  It's located in Pomona.  And that's

7    pastored by Reverend Joseph J. Owens.  That's one

8    of the pastors that I'm going to speak with.  I

9    don't want to sit here and tell you that I've made

10   a definite commitment to him because the Lord may

11   direct me somewhere else.

12           PRESIDING COMMISSIONER FISHER:  Let me ask

13   you this.  How do you know him?

14           INMATE BAKER:  I've known him through my

15   family.

16           DEPUTY DISTRICT ATTORNEY DANVILLE:  I have

17   no further questions.

18           PRESIDING COMMISSIONER FISHER:  All right.

19   Ms. Tardiff, do you --

20           DEPUTY COMMISSIONER MEJIA:  I have one last

21   question.

22           PRESIDING COMMISSIONER FISHER:  All right,

23   go ahead.

24           DEPUTY COMMISSIONER MEJIA:  You claimed

25   earlier that you take leadership or ownership of

26   the group, you were the oldest.

27           INMATE BAKER:  Absolutely.

82

1    **DEPUTY COMMISSIONER MEJIA:**  Could you

2    explain to me why you weren't aware or very much

3    aware of where the gun came from, the guns came

4    from.

5    **INMATE BAKER:**  I didn't even think to ask,

6    Sir, I really didn't.  It's like I was saying

7    earlier --

8    **DEPUTY COMMISSIONER MEJIA:**  When did you

9    find out that those guns -- The Appellate Report

10   says that the guns were stolen from a hardware

11   store.  When did you become aware of that?

12   **INMATE BAKER:**  Right now at this very moment

13   when she just mentioned that to me.

14   **DEPUTY COMMISSIONER MEJIA:**  So you were

15   under the belief that those rifles were your

16   uncle's?

17   **INMATE BAKER:**  My uncle's house, he was a

18   security guard, he's been just brought up, as long

19   as I've known him he's been working in law

20   enforcement.

21   **DEPUTY COMMISSIONER MEJIA:**  I've got no

22   other questions.

23   **PRESIDING COMMISSIONER FISHER:**  Okay, I just

24   have one follow-up to that one, and it is, well

25   maybe two follow-ups to that one.  The first one is

26   when you guys were out walking or looking for a

27   place to do your hitchhiking from, who was carrying

83

1    the rifles then?

2        INMATE BAKER:  At that time it had to be

3    Steven and Ferris, because I was in the dress and I

4    was up there walking in front with my cousin.

5        PRESIDING COMMISSIONER FISHER:  Okay.  Do

6    you remember before you left, so this is a third

7    question.  Do you remember before you left if

8    anybody said we ought to bring some guns with us?

9        INMATE BAKER:  No.

10        PRESIDING COMMISSIONER FISHER:  Okay, nobody

11   ever said that?  Somebody just went and got the

12   guns and brought them?

13        INMATE BAKER:  Yes, Commissioner.

14        PRESIDING COMMISSIONER FISHER:  And during

15   the trial, did anybody testify during the trial to

16   the fact that the guns were part of a --

17        INMATE BAKER:  Well, they separated us so as

18   far as the juveniles I don't know because we were

19   in different proceedings as far as I know.

20        PRESIDING COMMISSIONER FISHER:  Okay, but

21   you don't remember anybody testifying in your trial

22   about whether they came from the hardware store?

23        INMATE BAKER:  No, I don't recall that.

24        PRESIDING COMMISSIONER FISHER:  Okay, that

25   answered my questions.  Do you have any questions,

26   Ms. Tardiff?

27        ATTORNEY TARDIFF:  So originally this whole

84

1    thing got started because you needed to go

2    hitchhike --

3          **DEPUTY COMMISSIONER MEJIA:**  Okay, we've got

4    to go to another tape.

5          [Thereupon, no further tapes were

6              received for transcription.]

7                    --o0o--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

NOT APPROVED

85

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, PATRICIA RICCI, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 84, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of FRED BAKER, CDC Number C-22918, on SEPTEMBER 24, 2004, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated OCTOBER 15, 2004, at Sacramento County, California.

Patricia Ricci
Transcriber
**CAPITOL ELECTRONIC REPORTING**